Nos. 23-1115, 23-1116, 23-1138, 23-1139

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

Nos.  23-1115
      23-1116
      23-1138
      23-1139          UNITED STATES OF AMERICA,
                       APPELLEE/CROSS-APPELLANT

                              v.

                 DAVID DEQUATTRO; CEDRIC CROMWELL,
                 DEFENDANTS-APPELLANTS/CROSS-APPELLEES

                        _____

            ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
           ENTERED IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS

                        _____

        PRINCIPAL AND RESPONSE BRIEF FOR THE UNITED STATES

                        _____

                       JOSHUA S. LEVY
                       ACTING UNITED STATES ATTORNEY

                       KAREN L. EISENSTADT
                       ASSISTANT U.S. ATTORNEY
                       JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
                       1 COURTHOUSE WAY, SUITE 9200
                       BOSTON, MASSACHUSETTS 02210
                       (617) 748-3412

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................v

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF ISSUES ......................................................................................1

STATEMENT OF THE CASE..................................................................................2

      A.     Statement of Facts ................................................................................2

             1.     Background ...............................................................................2

             2.     Casino Project ..........................................................................3

             3.     RGB Contract............................................................................5

             4.     First Check ($10,000) ..............................................................6

             5.     Second Check ($10,000) ..........................................................9

             6.     Third Check ($10,000)............................................................10

              7.     Fourth Check ($10,000)..........................................................11

              8.     Fifth Check ($10,000)............................................................12

              9.     Bowflex ...................................................................................13

              10.    Sixth Check ($4,000) ..............................................................14

              11.    Hotel Stay................................................................................14

              12.    FBI Investigation....................................................................15

      B.     Procedural Synopsis ...........................................................................16

SUMMARY OF ARGUMENT ...............................................................................18

ARGUMENT ....................................................................................20

I.    THERE WAS SUFFICIENT EVIDENCE OF A QUID PRO QUO ............20

      A.    Procedural History................................................................20

      B.    Standard of Review ..............................................................20

      C.    A Rational Jury Could Find a Quid Pro Quo .....................20

      D.    Defendants' Contrary Arguments Disregard Basic Principles of
            Law and Are Unavailing ......................................................28

II.   THERE WAS SUFFICIENT EVIDENCE THE RGB CONTRACT
      WAS "BUSINESS" OF THE TRIBE ...........................................38

      A.    Procedural History................................................................38

      B.    Standard of Review ..............................................................39

      C.    A Rational Jury Could Find the RGB Contract Was "Business"
            of the Tribe ..........................................................................39

III.  THE DISTRICT COURT DID NOT ERR IN EXCLUDING THE
      CONTESTED WITNESSES, AND ANY ERROR WAS HARMLESS
      IN ANY EVENT ...................................................................46

      A.    Procedural History................................................................46

            1.    Steelman and Tilden ................................................46

            2.    Durocher...................................................................47

      B.    Standard of Review ..............................................................48

      C.    The District Court Did Not Abuse Its Discretion in Excluding
            Steelman and Tilden's Testimony.......................................48

D. The District Court Did Not Abuse Its Discretion in Excluding Durocher's Testimony ............................................................51

E. Any Evidentiary Error Was Harmless................................55

IV. THE DISTRICT COURT DID NOT REVERSIBLY ERR IN INSTRUCTING THE JURY NOT TO RETURN A VERDICT PENDING FINAL INSTRUCTIONS ..........................................56

 A. Procedural History.................................................................56

  1. First Day of Deliberations.........................................57

  2. Second Day of Deliberations ....................................57

  3. Third Day of Deliberations .......................................59

 B. Standard of Review ...............................................................60

 C. DeQuattro Has Not Identified a Prejudicial Error .............60

V. THE DISTRICT COURT DID NOT ERR IN AWARDING RESTITUTION TO THE TRIBE.................................................67

 A. Procedural History.................................................................67

 B. Standard of Review ...............................................................68

 C. The District Court Did Not Abuse Its Discretion in Entering the Restitution Awards .............................................................68

  1. Defendants Committed an "Offense Against Property"...........68

  2. The Tribe Was a "Victim" that Suffered a "Pecuniary Loss" ..........................................................................71

  3. The Tribe's Legal Fees Met the Causation Requirement .........72

  4. Legal Fees Can Be "Other Expenses" ......................73

iii

   5.  The District Court Reasonably Found the Reimbursed Fees "Necessary" ....................................................74

VI. CROSS-APPEAL: THE HOBBS ACT APPLIES TO TRIBAL OFFICIALS ................................................................75

  A. Procedural History................................................75

  B. Standard of Review ..............................................76

  C. The Hobbs Act Applies to Cromwell ....................76

VII. CROSS-APPEAL: TRIBAL OFFICIALS ARE "PUBLIC OFFICIAL[S]" UNDER USSG § 2C1.1 ......................84

  A. Procedural History................................................84

  B. Standard of Review ..............................................85

  C. The District Court Erred in Refusing to Apply the "Public Official" Enhancements ..........................85

CONCLUSION ........................................................................87

CERTIFICATE OF COMPLIANCE ........................................88

CERTIFICATE OF SERVICE ..................................................89

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*City of Columbia v. Omni Outdoor Adver.*,
  499 U.S. 365 (1991) ...................................................................................36

*Close v. State of N.Y.*,
  125 F.3d 31 (2d Cir. 1997) ........................................................................79

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...................................................................................52

*Denezpi v. United States*,
  142 S. Ct. 1838 (2022).................................................................................83

*Dixson v. United States*,
  465 U.S. 482 (1984) ...................................................................................43

*Dunn v. United States*,
  284 U.S. 390 (1932) ...................................................................................29

*EEOC v. Karuk Tribe Housing Auth.*,
  260 F.3d 1071 (9th Cir. 2001) ...................................................................77

*Evans v. United States*,
  504 U.S. 255 (1992) ...................................................................... 22, 34, 83

*Ex Parte Crow Dog*,
  109 U.S. 556 (1883) ...................................................................................81

*In re Coughlin*,
  33 F.4th 600 (1st Cir. 2022), *aff'd sub nom. Lac du Flambeau Band of Lake
  Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689 (2023) ................. 77-78

*In re Grand Jury Proceeding*,
  744 F.3d 211 (1st Cir. 2014) ......................................................................77

*In re: Akebia Therapeutics, Inc.*,
  981 F.3d 32 (1st Cir. 2020) ..................................................................... 72-73

*Keeble v. United States,*
    412 U.S. 205 (1973) ...................................................................81

*Kotteakos v. United States,*
    328 U.S. 750 (1946) ..................................................................51

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
    1143 S. Ct. 1689 (2023) ............................................................77

*Lagos v. United States,*
    138 S. Ct. 194 (2018).......................................................... 73-74

*Lewis v. Clarke,*
    581 U.S. 155 (2017) ............................................................ 78-79

*Littlefield, et al. v. U.S. Dep't of the Interior,*
    No. 16-cv-10184 (D. Mass. July 28, 2016) ...........................13

*Lund v. Henderson,*
    807 F.3d 6 (1st Cir. 2015) ........................................................49

*McCormick v. United States,*
    500 U.S. 257 (1991) ............................................................ 32-33

*McDonnell v. United States,*
    579 U.S. 550 (2016) ................................................32-33, 35-36, 79

*McGirt v. Oklahoma,*
    140 S. Ct. 2452 (2020)........................................................ 80-81

*Michigan v. Bay Mills Indian Cmty.,*
    572 U.S. 782 (2014) ..................................................................77

*Musacchio v. United States,*
    577 U.S. 237 (2016) ........................................................... 32, 45

*Narragansett Indian Tribe v. Rhode Island,*
    449 F.3d 16 (1st Cir. 2006) ......................................................78

*Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Auth.,*
    207 F.3d 21 (1st Cir. 2000) ......................................................42

*Ocasio v. United States*,
578 U.S. 282 (2016) .......................................................76

*Oklahoma v. Castro-Huerta*,
142 S. Ct. 2486 (2022).................................................80

*Pasquantino v. United States*,
544 U.S. 349 (2005) .....................................................82

*Sabri v. United States*,
541 U.S. 600 (2004) .....................................................44

*Salinas v. United States*,
522 U.S. 52 (1997) .......................................................44

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) .......................................................79

*Snyder v. United States*,
No. 23-108 (Dec. 13, 2023)........................................21

*Taylor v. United States*,
579 U.S. 301 (2016) .....................................................79

*United States v. Abdelaziz*,
68 F.4th 1 (1st Cir. 2023) ...................................... 33, 55

*United States v. Acosta-Colón*,
741 F.3d 179 (1st Cir. 2013) .....................................64

*United States v. Adorno*,
950 F. Supp. 2d 426 (E.D.N.Y. 2013)......................71

*United States v. Afriyie*,
27 F.4th 161 (2d Cir. 2022) ................................. 73-74

*United States v. Ahmed*,
51 F.4th 12 (1st Cir. 2022) .........................................86

*United States v. Alfisi*,
308 F.3d 144 (2d Cir. 2002) ................................. 36-37

vii

*United States v. Alicea*,
205 F.3d 480 (1st Cir. 2000) ..............................................................28

*United States v. Allen*,
10 F.3d 405 (7th Cir. 1993) ................................................................34

*United States v. Alphas*,
785 F.3d 775 (1st Cir. 2015) ........................................................ 72, 74

*United States v. Avenatti*,
81 F.4th 171 (2d Cir. 2023) ......................................................... 71-72

*United States v. Barquin*,
799 F.2d 619 (10th Cir. 1986) ..................................................... 80, 82

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988) ..................................................................23

*United States v. Blagojevich*,
794 F.3d 729 (7th Cir. 2015) ........................................................ 22, 33

*United States v. Blue*,
722 F.2d 383 (8th Cir. 1983) ..............................................................82

*United States v. Boots*,
80 F.3d 580 (1st Cir. 1996)*, abrogated on other grounds by*
*Pasquantino v. United States*, 544 U.S. 349 (2005)............................82

*United States v. Buffis*,
867 F.3d 230 (1st Cir. 2017) ..............................................................34

*United States v. Bulger*,
816 F.3d 137 (1st Cir. 2016) ..............................................................66

*United States v. Burke*,
700 F.2d 70 (2d Cir. 1983) ......................................................... 61-62

*United States v. Carrasco*,
79 F.4th 153 (1st Cir. 2023) ................................................... 33, 43, 85

*United States v. Carrero-Hernández*,
643 F.3d 344 (1st Cir. 2011) ..............................................................85

*United States v. Charriez-Rolon*,
    923 F.3d 45 (1st Cir. 2019) ...................................................37

*United States v. Cheal*,
    389 F.3d 35 (1st Cir. 2004) ...................................................68

*United States v. Chen*,
    998 F.3d 1 (1st Cir. 2021) .....................................................60

*United States v. Chin*,
    15 F.4th 536 (1st Cir. 2021) .................................................32

*United States v. Chin*,
    965 F.3d 41 (1st Cir. 2020) ........................................... 70, 72

*United States v. Cianci*,
    378 F.3d 71 (1st Cir. 2004) ................................... 28-30, 44

*United States v. Collins*,
    854 F.3d 1324 (11th Cir. 2017)....................................... 69-71

*United States v. Correia*,
    55 F.4th 12 (1st Cir. 2022) ........................................... 65, 76

*United States v. Corey*,
    77 F. App'x 7 (1st Cir. Oct. 7, 2003) ..................................73

*United States v. Davis*,
    261 F.3d 1 (1st Cir. 2001) .....................................................55

*United States v. de Leon-De La Rosa*,
    17 F.4th 175 (1st Cir. 2021) .................................................29

*United States v. Desimone*,
    119 F.3d 217 (2d Cir. 1997) .................................................63

*United States v. Doran*,
    854 F.3d 1312 (11th Cir. 2017).............................................45

*United States v. Encarnacion*,
    239 F.3d 395 (1st Cir. 2001) .................................................60

*United States v. Facteau,*
   89 F.4th 1 (1st Cir. 2023) ............................................................... 61-62

*United States v. Falcón-Nieves,*
   79 F.4th 116 (1st Cir. 2023) ...................................................................31

*United States v. Farris,*
   624 F.2d 890 (9th Cir. 1980) ..................................................................82

*United States v. Fernandez,*
   722 F.3d 1 (1st Cir. 2013) .............................................................. 21, 43

*United States v. Figueroa-Encarnacion,*
   343 F.3d 23 (1st Cir. 2003) ............................................................ 28, 30

*United States v. Flores-Rivera,*
   787 F.3d 1 (1st Cir. 2015) ......................................................................64

*United States v. García-Morales,*
   382 F.3d 12 (1st Cir. 2004) ....................................................................52

*United States v. George,*
   761 F.3d 42 (1st Cir. 2014) ....................................................................49

*United States v. Gillock,*
   445 U.S. 360 (1980) ...............................................................................79

*United States v. Gonzalez-Arias,*
   946 F.3d 17 (1st Cir. 2019) ....................................................................61

*United States v. Gordon,*
   393 F.3d 1044 (9th Cir. 2004) ................................................................74

*United States v. Gracie,*
   731 F.3d 1 (1st Cir. 2013) ...................................................... 21, 34, 37

*United States v. Graham,*
   484 F.3d 413 (6th Cir. 2007) ..................................................................62

*United States v. Habibi,*
   783 F.3d 1 (1st Cir. 2015) ......................................................................49

x

*United States v. Hagen*,
   60 F.4th 932 (5th Cir. 2023) ................................................................. 70

*United States v. Heslop*,
   694 F. App'x 485 (9th Cir. 2017) ........................................................... 43

*United States v. Hosking*,
   567 F.3d 329 (7th Cir. 2009) ................................................................. 74

*United States v. Jennings*,
   160 F.3d 1006 (4th Cir. 1998) ............................................................... 36

*United States v. Kilmartin*,
   944 F.3d 315 (1st Cir. 2019) ................................................................. 32

*United States v. Kinsella*,
   622 F.3d 75 (1st Cir. 2010) ................................................................... 61

*United States v. Koutsostamatis*,
   956 F.3d 301 (5th Cir. 2020) ................................................................. 74

*United States v. Lachman*,
   521 F.3d 12 (1st Cir. 2008) ................................................................... 52

*United States v. Ladd*,
   885 F.2d 954 (1st Cir. 1989) ................................................................. 62

*United States v. Lane*,
   624 F.2d 1336 (5th Cir. 1980) ............................................................... 63

*United States v. Lemmerer*,
   277 F.3d 579 (1st Cir. 2002) ................................................................. 60

*United States v. Luis*,
   765 F.3d 1061 (9th Cir. 2014) ............................................................... 71

*United States v. Lupton*,
   620 F.3d 790 (7th Cir. 2010) ................................................................. 43

*United States v. Markiewicz*,
   978 F.2d 786 (2d Cir. 1992) ................................................................. 81

*United States v. Mayerdía-Blanco*,
    905 F.3d 26 (1st Cir. 2018) ...............................................................70

*United States v. Mazzei*,
    521 F.2d 639 (3d Cir. 1975) ...............................................................79

*United States v. McClain*,
    934 F.3d 822 (7th Cir. 1991) ..............................................................83

*United States v. McDonough*,
    727 F.3d 143 (1st Cir. 2013) ....................................................... 22, 36

*United States v. McLean*,45
    802 F.3d 1228 (11th Cir. 2015)...................................................... 44-45

Brief for Appellant/Cross-Appellee's Br., *United States v. McLean*,
    802 F.3d 1228 (11th Cir. 2015), Nos. 14-10061-AA, 14-10302-AA,
    2014 WL 1998547 (11th Cir. May 12, 2014).........................................45

*United States v. Mehanna*,
    735 F.3d 32 (1st Cir. 2013) ................................................................52

*United States v. Moffett*,
    53 F.4th 679 (1st Cir. 2022) ...............................................................66

*United States v. Murrillo*,
    443 F. App'x 472 (11th Cir. 2011) .......................................................45

*United States v. Newell*,
    658 F.3d 1 (1st Cir. 2011) ............................................................ 82-83

*United States v. Ng Lap Seng*,
    934 F.3d 110 (2d Cir. 2019) ...............................................................39

*United States v. Olbres*,
    61 F.3d 967 (1st Cir. 1995) ........................................................ 22, 37-38

*United States v. Oldbear*,
    568 F.3d 814 (10th Cir. 2009).............................................................50

*United States v. Pena*,
    24 F.4th 46 (1st Cir. 2022) ....................................................... 33, 55, 64

*United States v. Pena,*
    910 F.3d 591 (1st Cir. 2018) ...............................................................55

*United States v. Pérez-Greaux,*
    83 F.4th 1 (1st Cir. 2023) ...................................................................55

*United States v. Pothier,*
    919 F.3d 143 (1st Cir. 2019) ...............................................................37

*United States v. Powell,*
    469 U.S. 57 (1984) .........................................................................28-30

*United States v. Powers,*
    702 F.3d 1 (1st Cir. 2012) ...................................................................48

*United States v. Razzouk,*
    984 F.3d 181 (2d Cir. 2020) ...............................................................70

*United States v. Ridolfi,*
    768 F.3d 57 (1st Cir. 2014) .................................................................37

*United States v. Ritchie,*
    858 F.3d 201 (4th Cir. 2017) ...............................................................70

*United States v. Rivera-Santiago,*
    107 F.3d 960 (1st Cir. 1997) ...............................................................66

*United States v. Roberson,*
    998 F.3d 1237 (11th Cir. 2021) ...........................................................26

*United States v. Romero,*
    906 F.3d 196 (1st Cir. 2018) ......................................................... 60, 65

*United States v. Royle,*
    86 F.4th 462 (1st Cir. 2023) ................................................................37

*United States v. Ruggiero,*
    928 F.2d 1289 (2d Cir. 1991) .............................................................63

*United States v. Sanchez,*
    389 F.3d 271 (1st Cir. 2004) ...............................................................76

*United States v. Sasso*,
   695 F.3d 25 (1st Cir. 2012) ................................................................ 20, 39

*United States v. Sebaggala*,
   256 F.3d 59 (1st Cir. 2001) ................................................................52

*United States v. Sexton*,
   894 F.3d 787 (6th Cir. 2018) ..............................................................74

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020) .......................................................... 36, 79

*United States v. Simon*,
   12 F.4th 1 (1st Cir. 2021) ..................................................................38

*United States v. Soler-Montalvo*,
   44 F.4th 1 (1st Cir. 2022) ..................................................................38

*United States v. Sotomayor-Vázquez*,
   249 F.3d 1 (1st Cir. 2001) ..................................................................43

*United States v. Spitler*,
   800 F.2d 1267 (4th Cir. 1986) ...........................................................79

*United States v. Taylor*,
   848 F.3d 476 (1st Cir. 2017) .......................................................... 49, 66

*United States v. Tetioukhine*,
   725 F.3d 1 (1st Cir. 2013) ..................................................................51

*United States v. Turner*,
   684 F.3d 244 (1st Cir. 2012) ..............................................................33

*United States v. Urciuoli*,
   613 F.3d 11 (1st Cir. 2010) ................................................................22

*United States v. Valladares-Quintana*,
   187 F.3d 624, 1998 WL 1085780 (1st Cir. 1998) ...............................29

*United States v. White*,
   237 F.3d 170 (2d Cir. 2001) ..............................................................82

*United States v. Whiteagle,*
   759 F.3d 734 (7th Cir. 2014) ...............................................36

*United States v. Willis,*
   844 F.3d 155 (3d Cir. 2016) ................................................43

*United States v. Woodward,*
   149 F.3d 46 (1st Cir. 1998) ....................................22, 24-25, 27

*United States v. Yu Xue,*
   No. 16-cr-22, 2021 WL 2433857 (E.D. Pa. June 15, 2021)................72

*United States v. Zannino,*
   895 F.2d 1 (1st Cir. 1990) ...................................................74

*W. Virginia v. United States,*
   479 U.S. 305 (1987) .........................................................79

*Wilkins v. United States,*
   754 F.3d 24 (1st Cir. 2014) .................................................67

## <u>S<small>TATUTES AND</small> R<small>ULES</small></u>

18 U.S.C. § 371 ..................................................................16

18 U.S.C. § 666................................................................. *passim*

18 U.S.C. § 666(a) ...............................................................75

18 U.S.C. § 666(a)(1)(A)(ii) .....................................................45

18 U.S.C. § 666(a)(1)(B) ........................................... 17, 21, 37, 39

18 U.S.C. § 666(a)(2) .................................................. 17, 21, 39

18 U.S.C. § 1153..................................................................81

18 U.S.C. § 1951.................................................................17

18 U.S.C. § 1951(a) ..............................................................76

18 U.S.C. § 1951(b)(2)...........................................................76

18 U.S.C. § 3231 ................................................................................1

18 U.S.C. § 3663A(a)(1)(A) ..............................................................71

18 U.S.C. § 3663A(c)(1)(A)(ii) .................................................... 67-68

18 U.S.C. § 3742(b) ............................................................................1

26 U.S.C. § 7206(1) ..........................................................................17

28 U.S.C. § 1291 ................................................................................1

Pub. L. No. 99-646, § 59, 100 Stat. 3592 (Nov. 10, 1986)...................80

Fed. R. Crim. P. 31(b)(1) ........................................................... 19, 61

Fed. R. Crim. P. 52(a) ......................................................................66

Fed. R. Evid. 403 ........................................................... 48-49, 51, 55

Fed. R. Evid. 404(b)..........................................................................49

Fed. R. Evid. 702 ...................................................................... 51-52

## SENTENCING GUIDELINES

USSG § 2C1.1...............................................................................2, 19

USSG § 2C1.1(a)(1)...........................................................................85

USSG § 2C1.1(b)(2)...........................................................................84

USSG § 2C1.1(b)(3)...........................................................................85

USSG § 2C1.1 cmt. n.1......................................................................85

## OTHER AUTHORITIES

*Crimes Against Property*, Black's Law Dictionary (11th ed. 2019) .......................69

# STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction because the indictment charged Defendants Cedric Cromwell and David DeQuattro with offenses against the United States. 18 U.S.C. § 3231. Judgment in a Criminal Case entered on January 31, 2023 for each Defendant, and each filed a timely notice of appeal the next day. [D.336, D.338, D.341, D.344].[1] This Court has jurisdiction over Defendants' appeals from their convictions under 28 U.S.C. § 1291.

The government filed a timely notice of cross-appeal on February 6, 2023. [D.364]. This Court has jurisdiction over the government's appeal of the judgment of acquittal for Cromwell's Hobbs Act convictions under 28 U.S.C. § 1291 and over its appeal of Defendants' sentences under 18 U.S.C. § 3742(b).

# STATEMENT OF ISSUES

1.      There was sufficient evidence of a quid pro quo.

2.      There was sufficient evidence the RGB Contract was "business" of the Tribe.

---

[1]      Citations are as follows. "[D._]" is a docket entry; "[C.Br._]" and "[C.Add._]" are Cromwell's opening brief and addendum; "[D.Br._]" and "[D.Add._]" are DeQuattro's opening brief and addendum; and "[JA._]" and "[SA._]" are the Joint Appendix and Joint Sealed Appendix. "[Supp.App._]" is Cromwell's Supplemental Appendix, and "[SSA._]" is the Supplemental Sealed Appendix that the government has tendered concurrently with this brief.

3.     The district court did not err in excluding the contested witnesses, and any error was harmless in any event.

4.     The district court did not reversibly err in instructing the jury not to return a verdict pending final instructions.

5.     The district court did not err in awarding restitution to the Tribe.

6.     Cross-Appeal: The Hobbs Act applies to tribal officials.

7.     Cross-Appeal: Tribal officials are "public official[s]" under USSG § 2C1.1.

## STATEMENT OF THE CASE

### A.     Statement of Facts

#### 1.     Background

The Mashpee Wampanoag ("Tribe") is a federally recognized Indian tribe based in Massachusetts with approximately 2,600 enrolled members. [JA.319-20]. The Tribe's governing body is the Tribal Council ("Council"), which consists of 11 elected members who serve four-year terms, and two appointed members (the Tribal Medicine Man and Tribal Chief). The head of the Council is the Chair; other officers include the Vice-Chair, Secretary, and Treasurer. [JA.320-22, 447, 1421-36]. Defendant Cedric Cromwell, a powerful and influential Tribal leader, was elected Chairman of the Tribe in 2009, 2013, and 2017. [JA.500-01; *see* C.Br.4-6].

In the February 2013 Tribal election, which was one of the "bigger" ones, just over 700 Tribal members voted. [JA.323, 1455-58]. Because of the small size of the electorate and the fact that most members already know each other, campaigning for a Council seat typically costs from a few hundred dollars to a couple thousand dollars for an elaborate campaign, to pay for things like videos, signs, fliers, and T-shirts. [JA.324, 447-48, 481-83, 507].

In 2014, the Tribe received federal grants of approximately $2.9 million. In each year from 2015 through 2019, the Tribe received federal grants in excess of $4 million a year. [JA.931].

### 2. *Casino Project*

For a number of years, the Tribe has been trying to build a $1 billion casino in Taunton, Massachusetts. [JA.283, 451, 713]. The goal of the casino project, which the Tribe calls "Project First Light," is to promote the Tribe's self-sufficiency by providing it with a source of revenue outside of federal funds. [JA.327-28, 474, 481].

In 2012, under Cromwell's leadership, the Tribal Council issued an ordinance establishing the Mashpee Wampanoag Gaming Authority ("Gaming Authority" or "Authority") to handle the Tribe's gaming-related business, including the casino project. [JA.1438-54]. As the Tribe's Chairman, Cromwell automatically became President of the Gaming Authority board under the ordinance. [JA.1445].

Genting International, a Malaysian firm, signed on to finance the casino project and be the casino's initial operator. [JA.284-85, 332]. The Gaming Authority contracted with JCJ Architects ("JCJ") as the architects for the project and D'Amato Associates and Builders ("D'Amato") as the owner's representative. [JA.263-64, 332]. The role of the owner's representative is to advise the Authority on all aspects of the project, such as contractor selection and performance, budgeting, etc. [JA.264, 281-82, 289-90]. JCJ and D'Amato (which Genting had referred to the project) both had significant prior experience with casino projects. [JA.263, 282-84]. The contracts gave the Authority the right to terminate either for cause or without cause, *i.e.*, for convenience. [JA.273, 312-13].

For the April 2, 2014 Gaming Authority board meeting, Cromwell placed on the agenda a vote to terminate JCJ and D'Amato, and the board voted 4-to-1 in favor. [JA.333-35, 374-77, 1464-65]. The minutes of prior board meetings showed no discussion of concerns with D'Amato's work, and the letter to D'Amato stated that it was being terminated for the Authority's "convenience." [JA.295, 336-38, 1522].

Cromwell then successfully pushed the board to hire Steelman Partners to replace JCJ and Robinson Green Beretta Corp. ("RGB") to replace D'Amato. [JA.338-41, 374-77].

### 3.    *RGB Contract*

RGB was a small architecture and design firm based in Providence, Rhode Island co-owned by Defendant David DeQuattro and unindicted co-conspirator Joseph Beretta. [JA.699-702]. Beretta was the president and controller, and DeQuattro was in charge of the architects and business development. [JA.700-01]. They made all major decisions for RGB together. [JA.702].

DeQuattro had met Cromwell in 2011 when RGB won the contract to be the owner's representative for the Tribe's Government Center building. [JA.711-12]. DeQuattro managed that project, which lasted several years. [JA.711-12].

On May 7, 2014, the Gaming Authority and RGB executed a contract for RGB to be the casino project's new owner's representative ("RGB Contract"). [JA.345, 715, 1524-56]. The contract was for an open-ended term (and thus could last until the project was complete) and an open-ended amount, with RGB to invoice the Authority for its time at hourly rates. [JA.716, 1524-56]. As with D'Amato's contract, the contract gave the Authority a right of termination for cause or for convenience. [JA.331, 346, 1524-56]. RGB had almost no prior casino experience, having previously handled only a small renovation of a restaurant in a casino. [JA.713].

The RGB Contract was a major contract for RGB. It generated almost $5 million in revenue from 2014 through 2017, nearly 20% of the firm's total revenue. [JA.717, 835, 1557-59].

### 4.    First Check ($10,000)

Around July 1, 2014, after RGB had sent the Authority its first two monthly invoices (for $75,000 and $125,000), Cromwell asked DeQuattro for a $10,000 check. [JA.780-85, 797, 1557-58]. Cromwell said he did not want RGB's name on the check and that it should not be made out to him but to an LLC. [JA.555-57, 782-83].

DeQuattro told Beretta about Cromwell's request and said Cromwell had described it as a donation to his reelection campaign. [JA.780-85]. Beretta contacted RGB's corporate counsel (his cousin, Richard Beretta) and Sally Dowling, an attorney who worked with Richard, for advice. He emailed Dowling the name "CM International Consulting LLC," which he had obtained from DeQuattro. [JA.779, 785, 1775, 1800].

CM International was a Massachusetts corporation formed and owned by Constantino "Dino" Mitrokostas, Cromwell's close friend who owned a popular restaurant in Mashpee. [JA.523-35, 647]. CM International never did any business or had any employees. [JA.535, 649-50]. Cromwell told Mitrokostas he wanted to route the money through Mitrokostas because he was concerned about the

"appearance" if anyone knew he was receiving money from a company working on the casino project. [JA.556].

Dowling told Beretta that CM International was a dead entity. [JA.786, 905]. Beretta told DeQuattro, and DeQuattro provided the name of another entity, "FMR & Associates, LLC," which Beretta also emailed to Dowling. [JA.786-88, 1776-77]. FMR was another Mitrokostas shell company. [JA.536]. Dowling responded to Beretta, "Joe, this entity is also dead," and told him she did not recommend making the payment. [JA.787-90, 905-06, 913, 1778-79]. Richard also discouraged Beretta from making the payment, questioning whether it was in RGB's best interest. [JA.919-20].

Beretta told DeQuattro FMR was also dead and that the lawyers had recommended against the payment. [JA.789, 791]. Beretta said he would not do it, and if DeQuattro did, he should "make sure it's correct because you don't need a headache and the chairman doesn't need a headache." [JA.791].

On July 8, 2014, Dowling emailed DeQuattro: "Hi, Dave. I did speak to Joe about this. There's nothing in the tribal documents on point. My advice is to make sure the entity that is being paid is a living entity in good standing and that you have investigated the background of the owners and operators of the entity. Call please if you want to discuss." [JA.908].

On July 11, 2014, after hearing from DeQuattro that the companies were dead, Mitrokostas applied to the Commonwealth to reinstate CM International. [JA.533-34, 547-48, 652-54]. The next day, Mitrokostas sent DeQuattro a fax with a cover sheet and signature that said "Constantino Mitrokostas," informing DeQuattro that CM International was now in good standing. [JA.545-46, 1560-67].

DeQuattro told Beretta he would be making the payment to an LLC. [JA.791-92]. Beretta acquiesced, and they agreed RGB would reimburse DeQuattro for the payment through a "bonus." [JA.792-93, 851]. While these events were taking place, Cromwell called DeQuattro several times to ask "where [things] stood." [JA.794].

DeQuattro and Beretta sometimes attended political fundraisers or made campaign contributions to state and local politicians as part of RGB's business development activities. These checks were usually for a few hundred dollars, with DeQuattro contributing a total of $2,375 from 2014 to 2017. [JA.703-07, 969-70, 979, 1622]. Because RGB could not make these contributions directly, DeQuattro or Beretta would make them by personal check, and RGB would reimburse them by grossing up the amounts paid and adding them to DeQuattro and Beretta's year-end bonuses. [JA.704, 708-11, 721-22, 793-94]. Other business development expenses, such as charitable donations, were typically paid directly by RGB. [JA.722].

To reimburse DeQuattro for the anticipated payment to Cromwell, Beretta arranged for RGB to cut DeQuattro a check for $17,087.50 ($25,000 gross) on July 23, 2014. Contrary to his usual practice, Beretta made the bonus larger than was necessary to reimburse DeQuattro for the payment so "it wouldn't look like it was just a 10,000-dollar reimbursement." [JA.708, 792-97, 958, 1413, 1623-26]. DeQuattro deposited the money in his personal savings account, and transferred $10,000 to his personal checking account. [JA.958-59, 1413].

On July 26, 2014, DeQuattro wrote a $10,000 personal check to CM International. [JA.958-59, 1400-05, 1413].

Mitrokostas deposited the check into the CM International account at Cape Cod 5 bank and (at Cromwell's direction) used the funds to buy three treasurer's checks payable to Cromwell ($4,000; $3,000; and $3,000). [JA.554-57, 579-84, 959-60, 1406-13]. Because the face of a treasurer's check does not identify the funding account, it makes the source of the money difficult to trace. [JA.982, 1406-12]. Cromwell deposited the money into his and his wife's joint checking account and used the money for personal expenses. [JA.960, 987, 994-95, 1413].

### 5. *Second Check ($10,000)*

Around September 1, 2014, Cromwell asked DeQuattro for another $10,000, and DeQuattro wrote a second personal check to CM International for $10,000. [JA.784-85, 798, 1400-05, 1414].

9

DeQuattro informed Beretta but they did not discuss why RGB should pay another $10,000. [JA.798, 803-05]. On September 3, 2014, RGB wrote a "bonus" check to DeQuattro for $18,000 ($25,000 gross). [ JA.799, 1414, 1623-26]. Beretta again made the bonus larger than the amount of the payment "because [he] didn't want it just to be for the $10,000." [JA.799].

Mitrokostas deposited DeQuattro's check into CM International's bank account. [JA.584, 784-85, 1414]. At Cromwell's direction, he used the funds to buy two treasurer's checks payable to Cromwell ($5,000 and $5,000). [JA.584-90]. Cromwell put the funds into his joint account with his wife and used the money for personal expenses. [JA.960, 987, 994-95].

### 6. *Third Check ($10,000)*

Around October 31, 2014, Cromwell asked DeQuattro for another $10,000, and DeQuattro wrote a third personal check to CM International for $10,000. [JA. 799-801, 962-63, 1400-05, 1415].

On November 1, 2014, Mitrokostas deposited DeQuattro's check into CM International's bank account. [JA.590, 1415]. Mitrokostas bought a treasurer's check for $8,800 payable to Cromwell and withdrew the balance in cash. [JA.590-92]. Cromwell deposited the treasurer's check into his joint account with his wife and used the money for personal expenses. [JA.960, 987, 994-95].

DeQuattro informed Beretta that "Cedric was asking for another 10,000" but they did not discuss the reason for it. [JA.799-800]. On November 17, 2014, RGB wrote DeQuattro a "bonus" check for $18,000 ($25,000 gross) to reimburse him for the payment, which DeQuattro deposited into his personal savings account. [JA.800, 1415, 1623-26].

### 7. *Fourth Check ($10,000)*

Around January 6, 2015, Cromwell asked DeQuattro for another $10,000, and DeQuattro wrote a fourth personal check to CM International for $10,000. [JA.964-65, 1400-05, 1416].

Mitrokostas deposited the check into CM International's bank account, and at Cromwell's direction, purchased a $10,000 treasurer's check payable to "One Nation Development LLC." [JA.593-94, 964-65, 1406-12, 1416]. One Nation Development was a shell company Cromwell had formed in September 2014. [JA.537-44, 635, 1419-20]. Cromwell deposited the treasurer's check into a checking account he had created for "Cedric Cromwell dba One Nation Development" and used the funds on personal expenses. [JA.964-65, 993-96, 1416].

DeQuattro again told Beretta that "Cedric was asking for another 10,000," but they did not discuss why RGB should pay it. [JA.801, 803-04]. On February 18, 2015, RGB gave DeQuattro a "bonus" check of $15,787.50 ($25,000 gross) to reimburse him for the payment. [JA.801-02, 1416, 1623].

11

### 8.    *Fifth Check ($10,000)*

Around November 12, 2015, just after the federal government formally took the Taunton land in trust for the Tribe (a necessary step for the casino project to move forward), DeQuattro informed Beretta that Cromwell had asked him for another $10,000. [JA.286-87, 501-02, 806]. This time, Cromwell had requested that the check be made out to One Nation Development. [JA.806]. DeQuattro described the request to Beretta as a donation to a tribal charity. [JA.797, 804].

Cromwell emailed DeQuattro documents showing One Nation Development was a Delaware LLC and a letter stating, "Dear Dave, One Development will use the $10,000.00 dollar donation for Political Action Committee food towards food, campaigns and elections. Regards, Cedric Cromwell One Nation Development." [JA.808-18, 1573-80]. Beretta emailed the documents to his attorney cousin Richard for advice. [JA.804-08, 1780-84, 1794-98]. Richard responded, "Really need a letter explaining how funds will be used to advance tribal mission/goals," but RGB did not obtain any such letter. [JA.810-12, 914-15, 1799]. One Nation Development never had any business, employees, or clients, and was never a political action committee, campaign-related entity, or charitable entity. [JA.657, 671-75, 686, 921-22, 953].

On November 13, 2015, DeQuattro wrote a personal check for $10,000 to One Nation Development. [JA.965-66, 1400-05, 1417]. Cromwell cashed it the next

day, depositing $9,500 into the One Nation Development account and taking $500 as a cash withdrawal. [JA.966, 1417]. He spent the One Nation Development money on personal expenses. [JA.993-96].[2]

On November 18, 2015, DeQuattro's weekly direct deposit paycheck from RGB included a one-time addition of $25,000 gross to reimburse him for the payment to Cromwell. [JA.812-13, 1417].

### 9. Bowflex

In early 2016, certain Taunton residents filed a lawsuit against the U.S. Department of Interior challenging the land-in-trust designation described above. After an initial adverse ruling, the casino project slowed down. *See* ECF 88, *Littlefield et al. v. U.S. Dep't of the Interior*, No. 16-cv-10184 (D. Mass. July 28, 2016). RGB was still working and billing, though, and DeQuattro and Beretta were optimistic the ruling would be overturned. [JA.836-38, 1558].

Around August 2, 2016, DeQuattro came into Beretta's office and told him "Cedric was looking for an exercise bike, a Bowflex." [JA.823-24]. Cromwell had a chronic neuromuscular disease. [JA.519, 2118]. Beretta responded, "I'm not buying him a new bike. Let me see what's on Craigslist." [JA.824]. He found a

---

[2] Cromwell says the IRS auditor who examined "Cromwell's joint checking account and One Nation's business checking account" found four checks that appeared to be for campaign or election expenses. [C.Br.14]. The auditor testified to four such checks from Cromwell's joint checking account and none from the One Nation account. [JA.989-96].

used Bowflex Revolution home gym for $1,700, and he and DeQuattro agreed to split the cost. [JA.824-27].

The seller delivered the Bowflex to Cromwell's home in Attleboro on August 5, 2016. [JA.520, 826]. DeQuattro met the seller there and paid cash for the Bowflex, which was set up in Cromwell's basement. [JA.520, 826-27, 1581-82]. DeQuattro reported back to Beretta that Cromwell was unhappy the Bowflex was used. [JA.827].

### 10. Sixth Check ($4,000)

Around December 2016, Cromwell told a friend to ask DeQuattro for another check to be passed through one of Mitrokostas's companies.

On January 12, 2017, DeQuattro wrote a personal check to CM International for $4,000. [JA.966-67, 1400-05, 1418]. Mitrokostas deposited the check into CM International's bank account and withdrew the money in cash. [JA.597-99, 966-67, 1418]. Mitrokostas claimed some of the funds were used for Cromwell's campaign expenses for the February 2017 Tribal election. [JA.597-99].

On January 18, 2017, RGB added $20,000 to DeQuattro's weekly direct deposit paycheck to reimburse him for the payment. [JA.816-818, 1418].

### 11. Hotel Stay

On May 15, 2017, Cromwell texted DeQuattro:

Hello Dave. I hope all is well. My Birthday is coming up this Friday May 19th and I wanted to spend Friday through Monday at a very nice

14

hotel in Boston [] for my Birthday weekend.  Is it possible that you can get me a nice hotel room at the Four Seasons or a suite at the Seaport Hotel?  I am going to have a special guest with me.  Please let me know and Thank You.

[JA.1586].  DeQuattro forwarded the message to Beretta, writing, "Joe u can't think of this stuff……what is next?"  [JA.1586].  Beretta responded, "You got to be kidding."  [JA.820].

On May 18, 2017, RGB paid $1,849.37 for Cromwell to stay at the Seaport Boston Hotel for three nights in an Executive Suite King/Harbor View room. [JA.823, 1587-98].

### 12.    *FBI Investigation*

It eventually became clear the adverse ruling in the Taunton litigation would stand and the casino project would not move forward.  [JA.835-37].  The Authority's last check to RGB was on October 27, 2017.  [JA.836-40].  Cromwell never again asked DeQuattro for a payment.  [JA.841].

On July 8, 2020, federal agents spoke with DeQuattro at RGB's office in Providence.  [JA.934].  They asked him about CM International; he said he did not recognize the name until the agents showed him the First Check.  [JA.941].  The agents asked how DeQuattro had been solicited for the money, and DeQuattro said someone had asked him for "campaign help" for Cromwell at a fundraiser involving approximately 200 people by the water on Cape Cod.  [JA.934-35].  The agents asked whether DeQuattro investigated CM International prior to writing the check,

and DeQuattro said his attorneys had looked into it and told him it was a Delaware company. [JA.936].

The agents asked DeQuattro if he knew Mitrokostas and showed DeQuattro a picture of him. [JA.935]. DeQuattro said he did not know him. [JA.935]. After they used the nickname "Dino," however, DeQuattro acknowledged being familiar with Mitrokostas from tribal events but denied being aware of his connection to CM International. [JA.935-36, 941]. DeQuattro denied knowing of any businesses owned by Cromwell. [JA.935-37, 941]. The agents asked DeQuattro how much he had given to Cromwell in all, and asked whether it was about $40,000. [JA.936, 945]. DeQuattro said that sounded about right but claimed Cromwell never asked for specific amounts. [JA.936, 945-46]. DeQuattro suggested the payments were like the political donations he might make to Rhode Island politicians. [JA.948-49].

Federal agents spoke with Beretta at his house in August 2020, and Beretta claimed RGB's payments to Cromwell were "charitable" donations. Beretta acknowledged at trial this was untrue. [JA.828].

B.   **Procedural Synopsis**

On March 22, 2021, the grand jury returned a superseding indictment charging Cromwell and DeQuattro with:

> Count 1s: conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371 (both Defendants)

16

Count 2s: federal program bribery, in violation of 18 U.S.C. § 666(a)(1)(B), regarding the Fifth Check (Cromwell)

Count 3s: federal program bribery, in violation of 18 U.S.C. § 666(a)(1)(B), regarding the Bowflex, the Sixth Check, and the Hotel Stay (Cromwell)

Count 4s: federal program bribery, in violation of 18 U.S.C. § 666(a)(2), regarding the Fifth Check (DeQuattro)

Count 5s: federal program bribery, in violation of 18 U.S.C. § 666(a)(2), regarding the Bowflex, Sixth Check, and Hotel Stay (DeQuattro)

Count 6s: conspiracy to commit extortion, in violation of 18 U.S.C. § 1951 (Cromwell)

Count 7s: extortion, in violation of 18 U.S.C. § 1951, regarding the Fifth Check (Cromwell)

Count 8s: extortion, in violation of 18 U.S.C. § 1951, regarding the Bowflex (Cromwell)

Count 9s: extortion, in violation of 18 U.S.C. § 1951, regarding the Sixth Check (Cromwell)

Count 10s: extortion, in violation of 18 U.S.C. § 1951, regarding the Hotel Stay (Cromwell).

[JA.1809-12].[3]

Trial began on April 19, 2022. [D.201]. On May 5, 2022, the jury returned

the verdict, convicting Cromwell on Counts 2s, 3s, 6s, 7s, 8s, and 10s; convicting

DeQuattro on Count 5s; and acquitting Defendants on all other counts. For Counts

3s and 5s, the jury found two of the three alleged bribes: the Bowflex and the Hotel

---

[3] Cromwell was also charged with filing false tax returns, in violation of 26 U.S.C. § 7206(1). Those counts were severed, and that trial has been stayed pending the resolution of this appeal. [D.111, D.171].

Stay, but not the Sixth Check. [JA.1809-12]. The court subsequently granted Cromwell a post-verdict judgment of acquittal on his Hobbs Act convictions, ruling that the Hobbs Act does not apply to tribal officials. [D.239]. For their respective bribery convictions, the court sentenced Cromwell to 36 months of imprisonment and DeQuattro to one year of probation. [D.284].

Additional procedural history of particular issues is provided below.

## SUMMARY OF ARGUMENT

The evidence was sufficient for a rational jury to infer a quid pro quo for each count of conviction. The evidence showed Cromwell's power over the RGB Contract; his repeated requests for unusually large, specific payments (which RGB treated as demands rather than requests); a pattern of requests and payments that paralleled the life of the contract; statements indicating the payments were not "gifts"; joint and independent acts of concealment; and false statements to investigators reflecting a consciousness of guilt.

The evidence was also sufficient for a rational jury to find the RGB Contract was the Tribe's "business." Commercial law concepts do not constrain the scope of § 666, and the evidence strongly pointed to the RGB Contract being both the "business" of the Gaming Authority and the "business" of the Tribe.

The district court did not err in excluding the other-payments testimony, as placing that testimony into any useful context would have required a "minitrial" and

risked inviting nullification. The court also did not err in excluding the purported expert witness as he had no experience with Cromwell's Tribe and could offer only an unhelpful abstract opinion disconnected from the facts of the case. There was also no harm.

The court's instruction to the jury not to return a verdict pending the revised, final jury instructions was neither a plain error under Fed. R. Crim P. 31(b)(1) nor an abuse of discretion, but even if it was error, it had no effect on the verdict.

The court did not err in awarding restitution. Defendants' bribery offenses were "offense[s] against property," the Tribe was a "victim" that incurred recompensable losses, and the required causation and necessity standards were met.

Cross-Appeal: The Court should reverse the district court's rulings that (a) the Hobbs Act does not cover tribal officials, and (b) tribal officials are not "public official[s]" under USSG § 2C1.1. Both determinations were based on the flawed reasoning that the Tribe's sovereign immunity was at issue because the government was prosecuting Cromwell for the misuse of his office. The Court accordingly should reverse the judgment of acquittal on Cromwell's Hobbs Act convictions and remand the matter for resentencing.

**ARGUMENT**

## I. THERE WAS SUFFICIENT EVIDENCE OF A QUID PRO QUO

Defendants claim the trial evidence was insufficient to establish a quid pro quo for the payments underlying their bribery convictions.     [C.Br.19-50; D.Br.14-47].  They are wrong.

### A.     Procedural History

Both Defendants moved during trial for a judgment of acquittal on the ground of insufficient evidence of a quid pro quo.  [JA.1056-76].  The district court reserved ruling pending the verdict.  [JA.1143].  On November 15, 2022, after post-verdict filings and argument, the court denied the motions.  [JA.1848-2027, 2058-60].

### B.     Standard of Review

The Court reviews insufficiency claims de novo, "tak[ing] the facts and all reasonable inferences therefrom in the light most favorable to the jury verdict." *United States v. Sasso*, 695 F.3d 25, 27 (1st Cir. 2012).  "The verdict must stand unless the evidence is so exiguous that no rational jury could conclude that the government proved all the essential elements of the offense of conviction beyond a reasonable doubt."  *Id.*

### C.     A Rational Jury Could Find a Quid Pro Quo

The federal program bribery statute prohibits any "agent of an . . . Indian tribal government" from "corruptly solicit[ing] or demand[ing] . . . or accept[ing] . . .

anything of value from any person, intending to be influenced or rewarded in connection with any business . . . involving anything of value of $5,000 of more" of that government. § 666(a)(1)(B). It likewise prohibits "any person" from "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward [the agent] in connection with" such business. *Id.* § (a)(2). The heart of a bribery offense is the "quid pro quo," which is the giving of "something of value"—the quid—in exchange "for influence over some official conduct of the recipient"—the quo. *United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013).[4]

The quids in this case were RGB's payments to Cromwell (for Defendants' bribery convictions, the Fifth Check, Bowflex, and Hotel Stay), and the quo in each instance was Cromwell's protection of the RGB Contract. Defendants do not dispute that RGB made the payments and the contract survived, that the Bowflex and Hotel Stay were for Cromwell's personal use, or that the evidence sufficiently showed Cromwell used the Fifth Check to pay personal expenses. They contend only that the evidence was insufficient to show that protecting the RGB Contract was any

---

[4] The Supreme Court recently granted certiorari on the issue of whether § 666 criminalizes gratuities in addition to quid-pro-quo bribery. *See Snyder v. United States*, No. 23-108 (Dec. 13, 2023). This Court has held that it does not. *See United States v. Fernandez*, 722 F.3d 1, 19, 26-27 (1st Cir. 2013).

purpose of any of the payments, *i.e.*, that the quid was for the quo. They are mistaken.

Because "bribes are seldom accompanied by written contracts, receipts or public declarations of intentions," the government often does not possess direct evidence of a quid pro quo; the quid pro quo must instead be inferred from context and "what the participants say, mean and do." *United States v. McDonough*, 727 F.3d 143, 153 (1st Cir. 2013); *see Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring) (official and bribe-payer "need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods"); *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"). Here, taken "in the light most flattering to the prosecution, together with all reasonable inferences favorable" to the verdict, the evidence established the following constellation of circumstances from which a rational jury could have inferred the quid pro quo for each convicted payment. *United States v. Olbres*, 61 F.3d 967, 970, 974 (1st Cir. 1995) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." (cleaned up)).

Cromwell had power over something RGB cared about greatly: the RGB Contract. *See United States v. Urciuoli*, 613 F.3d 11, 16 (1st Cir. 2010) (official had "considerable power" in area of interest to payer); *see also United States v.*

*Woodward*, 149 F.3d 46, 51, 53, 62 (1st Cir. 1998) (official had "discretion to act or not act in ways that would" benefit payer). The contract provided a large portion of RGB's revenue and had the potential to last for years, but RGB had no guarantee of its continuation, regardless of performance, due to the no-cause termination provision. This clause was not meaningless because Cromwell had used a similar provision to push out RGB's predecessor, D'Amato, which Defendants do not dispute RGB knew. [JA.314, 333-35 ("Q. Who suggested [terminating D'Amato]? A. Cedric."), 372, 393, 1471, 1522 ("Notice is hereby given . . . to D'Amato Builders and Advisors, LLC . . . of the termination of the Agreement for the convenience of [the Authority].")]. Cromwell was also the board member who had "pushed" to bring in RGB, despite its lack of casino experience, which suggested he could always try to "push" it back out. [JA.374, 376 ("It was always pushed to try to have Steelman and RGB come in from Mr. Cromwell.")].

Within this context, Cromwell requested multiple specific things of value from RGB and acted like he was entitled to them (*e.g.*, giving DeQuattro instructions on *how* to get him the cash and calling him for updates when the First Check was delayed). [JA.794, 827]. These facts are indicative of a quid pro quo: though people may solicit gifts or contributions, they generally do not demand them in specific amounts, and $50,000 over 16 months is not a typical token of goodwill. *See United States v. Biaggi*, 853 F.2d 89, 99-100 (2d Cir. 1988) (jury could infer from size of

"gifts" worth "several thousands of dollars each year" that they "were not intended simply as kindness-of-the-heart gifts" and the official "was not requesting [them] without offering something more than his friendship in return").

Also supporting the quid-pro-quo inference was the way Cromwell's requests paralleled the life of the RGB Contract. *Cf. Woodward*, 149 F.3d at 53 (deeming "noteworthy" the "pattern formed by the[] amounts" of the payments over time, which increased when official became chair of relevant committee and ceased when he resigned from office). Even though DeQuattro and Cromwell were "friends" before the contract and RGB had previously worked with the Tribe on the smaller Government Center project, Cromwell began making these requests only after RGB started invoicing on the more valuable casino contract. [JA.841]. While the project was proceeding apace, Cromwell requested $10,000 every few months, with the request for the Fifth Check coming right after the government took the Taunton land in trust. Then, when an adverse court ruling created more uncertainty about the contract's value (though RGB was optimistic the ruling would be overturned [*cf.* D.Br.33]), Cromwell scaled back his requests, leading to the Bowflex, Sixth Check, and Hotel Stay. [D.Br.42]. Only when it became clear the ruling would stand and the contract was no longer valuable did the requests cease entirely.

DeQuattro and Beretta took Cromwell's requests not as friendly suggestions but as demands they were obligated to meet. Though Cromwell offered cover

explanations for the Checks, DeQuattro sometimes did not bother to share them with Beretta, and Beretta did not bother to ask:

> Q. What prompted this payment [from RGB to DeQuattro]?
>
> A. David [DeQuattro] said he made another payment.
>
> Q. To whom?
>
> A. To either the LCC or Cedric. I don't know. He just said he needed another 10,000-dollar payment.
>
> . . .
>
> Q. And in that conversation what, if anything, did he say about Mr. Cromwell?
>
> A. I don't believe anything, except that, you know, Cedric he asked for another $10,000.

[JA.817; *see* JA.803-05]. When RGB's lawyers suggested additional due diligence based on these explanations, DeQuattro and Beretta did not do it. This makes sense because Cromwell's cover explanations likely were not for the purpose of deceiving *RGB*, but instead to create plausible deniability should the payments be discovered. DeQuattro obviously knew the Tribe too well to believe Cromwell needed multiple $10,000 payments for a Tribal election campaign. *See Woodward*, 149 F.3d at 57-58, 70-71 (friendship between briber and bribee could increase likelihood they "understood" each other regarding purpose of payments).

The evidence of DeQuattro and Beretta's thoughts about the payments was particularly strong for the Bowflex and Hotel Stay. Cromwell specifically requested

them, and they were indisputably for his personal use. RGB had already given Cromwell $50,000 in cash by this time, an amount far exceeding RGB's typical business-development payments. [JA.703-06]. Thus, regardless of whether DeQuattro and Beretta knew how Cromwell had spent that money, it would have been perfectly reasonable for them to decline to give him any "gifts." However, despite their clear displeasure, DeQuattro and Beretta promptly complied with Cromwell's demands. [JA.824, 829-32 ("I'm not buying him a new bike"; "What is next?"; "You got to be kidding me")]. Cromwell's complaint that the Bowflex was used further reinforces the conclusion that these were not gifts: adults generally do not complain to gift-givers about the quality of their voluntary gifts.

Cromwell and RGB, both together and independently, took steps to conceal the payments: they agreed to funnel the money through personal checks and shell companies; Cromwell had Mitrokostas withdraw the funds for him in multiple treasurer's checks (mostly structured to be less than $10,000 each); and Beretta had RGB reimburse DeQuattro through "bonuses" and one-time salary increases that did not match the amounts DeQuattro had given Cromwell. *See United States v. Roberson*, 998 F.3d 1237, 1249 (11th Cir. 2021) ("[T]he extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent."). Though they did not try to hide the Bowflex and the Hotel Stay in the same manner [D.Br.33-34], those bribes were not in cash and did not involve banking records or

RGB's books (DeQuattro and Beretta paid for the Bowflex out of pocket, and the Hotel Stay was paid through a corporate credit card and thus could be recorded as part of the credit card bill). Moreover, so long as an observer could not connect them to the Checks, which *were* concealed, they might potentially be explained away as mere "gifts."

Finally, when FBI agents separately confronted DeQuattro and Beretta about the payments to Cromwell, they lied and gave inconsistent cover explanations for the Checks.[5] *See Woodward*, 149 F.3d at 57 ("suggestions of a cover-up" supported inference of illicit intent). Beretta claimed the money was for charity (which he later admitted was false), and DeQuattro claimed it was for "campaign help." [JA.828, 934-35]. DeQuattro also lied in other ways: he claimed that Cromwell never requested specific amounts [*compare* JA.817, *with* JA.936, 945-46]; that he did not recognize "CM International" (until the agents produced the First Check), despite having written $44,000 in personal checks to that entity [*compare* JA.1400-05, *with* JA.941]; that he did not know CM International was connected to Mitrokostas, despite having received a fax from Mitrokostas indicating it was his company [*compare* JA.1560-67, *with* JA.935-36]; and that he did not know of any companies

_____

[5] DeQuattro misleadingly asserts Beretta "testified that he would never have agreed to the contributions had he thought they were in any way related to RGB's contract." [D.Br.6]. Beretta testified that this was what he told the federal agents who interviewed him, but he also testified to not telling truth in that interview. [JA.828, 846].

Cromwell owned, despite having received paperwork from Cromwell that clearly showed One Nation Development was Cromwell's company [*compare* JA.1404, 1573-80, *with* JA.937].

### D. Defendants' Contrary Arguments Disregard Basic Principles of Law and Are Unavailing

Defendants' insufficiency arguments are steeped in misstatements of law that serve only to obscure the straightforward analysis above.

First, DeQuattro argues the Court must ignore any evidence he contends was tied to a count for which he was acquitted. [D.Br.36-47]. The Court cannot do this because it contravenes binding precedent, which requires the Court to consider *all* the trial evidence in reviewing for sufficiency, regardless of any acquitted counts. *See United States v. Powell*, 469 U.S. 57, 67-68 (1984) ("Sufficiency-of-the-evidence review . . . should be independent of the jury's determination that evidence on another count was insufficient."); *United States v. Cianci*, 378 F.3d 71, 93 (1st Cir. 2004) ("Acquittals on certain counts of an indictment play no role in the analysis of whether there is sufficient evidence supporting the surviving counts."); *United States v. Alicea*, 205 F.3d 480, 484 (1st Cir. 2000) ("[A]cquittal on one or more counts does not preclude conviction on other counts based upon the same evidence[.]"). This precedent is so entrenched it has a name: "the *Powell-Dunn* rule." *United States v. Figueroa-Encarnacion*, 343 F.3d 23, 30 & n.4 (1st Cir. 2003)

(affirming conviction for possession of weapon in furtherance of drug trafficking crime where jury acquitted on underlying drug trafficking crime).

The reason for the rule, as the Supreme Court explained in *Dunn v. United States*, 284 U.S. 390, 393 (1932), and reaffirmed in *Powell*, is that—directly contrary to DeQuattro's arguments [D.Br.39-40 & n.16]—even where the jury's guilty verdict on one count is arguably "inconsistent" with its acquittal on another, a court cannot assume the acquittal means the jury was "not convinced of the defendant's guilt" on that count, as it is "equally possible" the acquittal was the result of "mistake, compromise, or lenity." 469 U.S. at 64-65. And, because a court cannot take an acquitted count as meaning the jury disbelieved the evidence relating to that count, *see id.* at 68, there is no basis for discounting that evidence when reviewing the convicted counts for sufficiency. *See United States v. de Leon-De La Rosa*, 17 F.4th 175, 183 (1st Cir. 2021) ("A conviction on one count may be upheld against a sufficiency challenge, even though it is seemingly inconsistent with that jury's verdict of acquittal on another count."); *Cianci*, 378 F.3d at 91-92 (similar); *United States v. Valladares-Quintana*, 187 F.3d 624, 1998 WL 1085780 (1st Cir. 1998) (unpublished) ("When reviewing the sufficiency of the evidence . . . [w]e do not give weight to an acquittal[.]"). This rule neither makes acquittals "mean[ingless]" nor violates any constitutional rights. [D.Br.40-41, 43-44]. It does not matter if the defendant contends "much . . . of the evidence relating solely to the acquitted

conduct would not have been admitted in a separate trial" of the convicted conduct, because that is not an exception to the rule. [D.Br.44]. *See Cianci*, 378 F.3d at 92 ("We have been steadfast with *Powell* and have repeatedly refused to carve out exceptions to the rule.").[6]

Given that the above reasoning controls even where the jury's verdicts on different counts *are* logically inconsistent—*e.g.*, where a defendant is acquitted of the predicate crime but convicted of the compound crime, *Figueroa-Encarnacion*, 343 F.3d at 30—it surely cannot be otherwise where the jury's differentiated verdicts make perfect sense in light of the totality of the evidence, as was the case here. The jury reasonably could have found that although DeQuattro likely knew the First through Fifth Checks were quid pro quos and not campaign donations (especially as the total mounted), some doubt remained, but this doubt did not extend to the Bowflex and Hotel Stay, which were indisputably not campaign donations and the government proved were not just "gifts." Acquitting both Defendants on the Sixth Check makes sense too; although it fell temporally between the Bowflex and the

---

[6] As should be clear from the cited cases, DeQuattro is wrong that the *Powell-Dunn* rule applies to "inconsistent verdict" claims but not to "sufficiency" claims like his. [D.Br.38 n.15]. As *Powell* explains, the latter is just a repackaging of the former. 469 U.S. at 68. The former claim argues the verdicts are inconsistent *because the acquittal proves the jury rejected certain evidence*, and without it, the jury could not have rationally convicted on the convicted count. The latter argues the evidence is insufficient *because the acquittal proves the jury rejected certain evidence*, and without it, no rational jury could have convicted on the convicted count. Neither claim works because the premise is wrong.

Hotel Stay, it was the only Check for which there was evidence of funds spent on campaigning. [D.Br.42]. Finally, because Cromwell was charged with bribery in connection with the First through Fourth Checks only through a conspiracy with DeQuattro, the jury acquitted him on that count (even though *he* must have known those Checks were not campaign donations),[7] but it convicted him of the Fifth Check, which was charged in a substantive count.[8]

Second, Defendants alternatively try to bury the evidence of the earlier Checks on the ground the government did not pursue a "stream of benefits" theory. [C.Br.25-28, 40, 48-50; D.Br.23-24, 39]. That just means the government needed to prove a separate quid pro quo for each payment; it does not render the earlier payments *irrelevant* to that determination, especially where the evidence showed the parties thought about the later payments under the shadow of the earlier ones. [JA.799 ("Dave came in maybe a couple of months later and said that Cedric was asking for another $10,000"), 801, 817, 819-20 ("What is next?"), 869 (Bowflex was "just another request")].

---

[7] Cromwell was also charged in connection with the First through Fourth Checks through an extortion conspiracy with Mitrokostas as his co-conspirator, and the jury convicted him under that theory.

[8] Cromwell is wrong that DeQuattro's acquittal on this Check is "independently exculpatory" as to him. [C.Br.43-44]. This is not only because of the *Powell-Dunn* rule, but also because the government does not need to show the payer had the requisite intent for a bribe to show the recipient did, or vice versa. *See United States v. Falcón-Nieves*, 79 F.4th 116, 130-31 (1st Cir. 2023).

Third, Defendants mistakenly assert that the government needed to prove a "clear and unequivocal" quid pro quo (the standard for a bribe based on a campaign contribution under *McCormick v. United States*, 500 U.S. 257 (1991) [SA.74-75, 112-14; JA.2006-07]) that involved an "official act" as defined in *McDonnell v. United States*, 579 U.S. 550 (2016). [C.Br.22-25, 44-45; D.Br.26-27]. They notably do not claim these standards apply as a *statutory matter*—and have therefore forfeited and waived any such argument, *see United States v. Chin*, 15 F.4th 536, 545 (1st Cir. 2021)—but claim only that they are the "law of the case" on appeal because they were part of the jury instructions. This argument necessarily fails because the Supreme Court abrogated this part of the "law of the case" doctrine in 2016 and held that the statute alone governs sufficiency review, regardless of whether the government acquiesced to "heightened" standards in the jury instructions. *Musacchio v. United States*, 577 U.S. 237, 143-44 (2016).[9]

Defendants likely have not argued that the statute requires the *McCormick* and *McDonnell* standards in this case because it so clearly does not. Taking the evidence in the light most favorable to the verdict, a rational jury readily could have found that none of the convicted payments were campaign donations subject to

---

[9] Although this Court applied the "law of the case" reasoning post-*Musacchio* in *United States v. Kilmartin*, 944 F.3d 315, 328-29 (1st Cir. 2019), this Court obviously could not overrule *Musacchio*. *Kilmartin* thus stands at most for the proposition that the "law of the case" doctrine retains force where the jury charge sets a *lower* burden than the statute, as it did in *Kilmartin*.

*McCormick*; for the Bowflex and the Hotel Stay, in fact, no one even argued that they were. *See United States v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012) ("[o]utside of the campaign contribution context," "implied" quid pro quo is sufficient); *McCormick*, 500 U.S. at 274 (higher standard inapplicable if jury rejects "campaign contribution" interpretation); *Blagojevich*, 794 F.3d at 733 (jury could have found so-called "campaign contribution" was actually "for [defendant's] personal benefit"). *Cf. United States v. Pena*, 24 F.4th 46, 74 (1st Cir. 2022) (sufficient evidence "as to one of two alternative [factual] theories of guilt" is enough to uphold general verdict). And, although this Court has yet to decide the issue, because the text of § 666 does not "contain an 'official act' requirement" but "refers instead to payments intended to influence an agent in connection with 'any business, transaction, or series of transactions' of an organization," *United States v. Abdelaziz*, 68 F.4th 1, 67 n.42 (1st Cir. 2023), it makes no sense to apply the *McDonnell* "official act" standard to § 666. *See United States v. Carrasco*, 79 F.4th 153, 161 (1st Cir. 2023) (declining to decide issue but citing multiple circuits that have so held).

That Defendants have chosen to tether their sufficiency arguments to such demonstrably incorrect standards suggests they recognize how unpersuasive those arguments are when viewed correctly.

Defendants' flagship argument that the government failed to prove any "threat" to the RGB Contract is fallacious and ignores the government's theory of the case.  [C.Br.29-32; D.Br.28-34].  Given what happened to D'Amato, a rational jury could infer that Cromwell's repeated demands for specific payments from RGB conveyed both a promise of protection *and* a threat in the event RGB refused to comply.  *See Gracie*, 731 F.3d at 3 ("When a person with the power to do or not do something demands a payment from the beneficiary of the exercise of that power as a condition for continuing to do so, the payment is [a bribe].").  Contrary to Cromwell's description of this as a novel theory the government "conjure[d]" at trial [C.Br.30-32], it has long been the law that "proof of bribery can[] be proof of extortion (and vice-versa)."  *United States v. Buffis*, 867 F.3d 230, 235 n.5 (1st Cir. 2017); *see Evans*, 504 U.S. at 268 n.18 (rejecting idea that "extortion under color of official right and bribery are mutually exclusive"); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) ("[E]xtortion under color of official right and bribery are really different sides of the same coin.").

Defendants assert any such threat from Cromwell would have been empty because he needed at least two other people to vote with him to take action on the RGB Contract.  [C.Br.38-39; D.Br.31].  But that was clearly a realistic risk given the evidence of Cromwell's influence over the board and the fact that he successfully persuaded *three* board members to vote with him to terminate D'Amato.  [JA.374,

461-71]. Defendants insist RGB's situation was "wholly different" from D'Amato's because (a) D'Amato was "widely perceived" to be more loyal to Genting than to the Authority, and (b) terminating RGB (unlike terminating D'Amato) would have been a "disastrous setback" for the casino project because construction had begun. [C.Br.30-31, 37-38; D.Br.4, 28-30]. That is not what the evidence showed, though, and certainly not when viewed in the light most favorable to the verdict. As noted above, the evidence established that D'Amato was terminated for "convenience" and not for cause, and it also indicated that any perception of D'Amato's disloyalty emanated from Cromwell himself. [JA.281, 294-96, 306, 311, 464, 486-87]. Moreover, to the extent Cromwell believed D'Amato was insufficiently loyal, that just suggests he wanted a vendor more beholden to him (like RGB) in the role. Not one witness testified that terminating RGB would have been a "disastrous" (or even significant) setback to the project; the JCJ and D'Amato witnesses merely agreed that changing the owner's representative can sometimes cause a "delay" and that it is preferable to do it at a "clearcut" time. [JA.276-77, 316-17]. The owner's representative role is advisory, and it took literally one phone call for D'Amato to transfer the project to RGB. [JA.297-98, 338-39].

Cromwell mounts the further attack that protecting the RGB Contract was not a *McDonnell* "official act" because it was "completely passive inaction" that was "consistent with [his] duties and responsibilities." [C.Br.32-33]. This claim is

35

unavailing because (a) as noted above, the government was not required to prove a *McDonnell* "official act," and (b) even if that had been required, the evidence showed an "official act" because the contract's fate was a specific, focused matter that could "by law be brought" before the Gaming Authority board. 579 U.S. at 574. Cromwell's claimed legal distinctions between action and inaction, and between inaction inconsistent with the official's duties and inaction consistent with those duties, find no support in the statute or the case law. *See McDonough*, 727 F.3d at 160 (holding government did not need to prove bribe was paid to make the official "do[] something [he] would not have otherwise done," and quoting Supreme Court's observation in *City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 378 (1991), that "[a] mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid"); *United States v. Silver*, 948 F.3d 538, 549 (2d Cir. 2020) (the official's promise can be to "take or refrain from taking" some action); *United States v. Alfisi*, 308 F.3d 144, 151 (2d Cir. 2002) (payments made to ensure inspector carried out his duties "accurate[ly]" were nonetheless bribes); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (bribery is "an exchange of money (or gifts) for specific official action (or inaction)"). *Cf. United States v. Whiteagle*, 759 F.3d 734, 753 (7th Cir. 2014)

(official promise was to help vendor "win *and maintain* its contract" (emphasis added)).[10]

Contrary to Defendants' arguments, neither the principle against "inference-stacking" nor the "equipoise rule" make this Court the arbiter of competing inferences, and neither changes the analysis. [C.Br.39-41; D.Br.17-21, 31-36]. *See United States v. Ridolfi*, 768 F.3d 57, 61 (1st Cir. 2014) ("Bare citation to this inference-stacking principle as a type of normative call . . . rings hollow."); *Olbres*, 61 F.3d at 974 ("By umpiring the duel between two competing inferences and declaring the winner on the basis of which inference appeared more robust in his eyes, the judge invaded the jury's province."); *see also United States v. Royle*, 86 F.4th 462, 480-81 (1st Cir. 2023) (stating that government need not exclude innocent explanations, and explaining—contrary to DeQuattro's gloss on the case [D.Br.17-21]—that the Court reversed in *United States v. Pothier*, 919 F.3d 143 (1st Cir. 2019), because the government there offered no "evidence to reasonably support

---

[10]    Cromwell also asserts that because continuing the RGB Contract was consistent with his duties, he could not have done it "corruptly." [C.Br.34-35]. Because he did not make this claim below, he must show "clear and gross injustice" to prevail, and his failure to explain how his claim meets that standard is a waiver. *United States v. Charriez-Rolon*, 923 F.3d 45, 52 (1st Cir. 2019). In any event, the argument is misdirected because what must be done "corruptly" under § 666 is the "solicit[ation]," "demand[]," or "accept[ance]" of the payment, not the promised action or inaction by the official. § 666(a)(1)(B); *Alfisi*, 308 F.3d at 150 (disagreeing that "the term 'corruptly' requires evidence of an intent to procure a violation of the public official's duty"), *cited with approval by Gracie*, 731 F.3d at 3.

a finding as to 'which scenario describe[d] what happened'"). Because the Court must "draw[] inferences hospitable to the government's theory of the case *before* judging the strength of any proffered hypothesis of innocence," *Olbres*, 61 F.3d at 975, the equipoise rule "comes into play" only where "[the] evidence . . . permits two equally plausible inferences" *and* there is no "additional circumstantial evidence from which the jury could rationally infer that one was more supportable than the other." *United States v. Soler-Montalvo*, 44 F.4th 1, 11 (1st Cir. 2022). [D.Br.17-21, 31]. That is not the case here because, as explained above, the government offered evidence of numerous surrounding circumstances that "when . . . layered, with inferences taken in the government's favor," *United States v. Simon*, 12 F.4th 1, 32 (1st Cir. 2021), pointed strongly to the quid-pro-quo inference as the correct one.

## II. THERE WAS SUFFICIENT EVIDENCE THE RGB CONTRACT WAS "BUSINESS" OF THE TRIBE

DeQuattro, joined by Cromwell, argues the evidence was also insufficient to show the RGB Contract was "business" of the Tribe. [D.Br.47-57; C.Br.50-51]. The evidence was sufficient here as well.

### A. Procedural History

Defendants moved during trial for a judgment of acquittal on the ground of insufficient evidence that any of the alleged bribes occurred "in connection with any business [or] transaction" of the Tribe. [JA.1072-74, 1801-08]. The district court reserved ruling pending the verdict. [JA.1143]. On November 15, 2022, following

post-verdict submissions and argument, the court denied the motions. [JA.1863-65, 1879, 1902-03, 1915-16, 2059].

## B. <u>Standard of Review</u>

The Court reviews insufficiency claims de novo, "tak[ing] the facts and all reasonable inferences therefrom in the light most favorable to the jury verdict." *Sasso*, 695 F.3d at 27.

## C. <u>A Rational Jury Could Find the RGB Contract Was</u><br>   <u>"Business" of the Tribe</u>

For the federal program bribery statute to apply, the bribee must have been an "agent" of an entity (such as an "Indian tribal government") that received federal "benefits in excess of $10,000" each year during the relevant period, and the bribe must have been made "in connection with any business" of that entity. 18 U.S.C. § 666(a)(1)(B) and (a)(2). *See United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d Cir. 2019) (noting the only "definitional limit[]" on the business or transactions to be influenced" is that they be "of the organization receiving more than $10,000 in federal funding").

The government did not seek to prove that the Gaming Authority as a separate legal entity received the required federal benefits. [D.Br.49]. Instead, the government's theory, as presented in the indictment and at trial, was that the relevant entity for § 666 purposes was the Tribe, which indisputably received more than the required amount of federal benefits and of which Cromwell was plainly an "agent."

39

Thus, the disputed factual question for purposes of triggering § 666 liability, and the issue DeQuattro appeals, is whether the RGB Contract (*i.e.*, the "thing of value of $5,000 of more"), "in connection with" which the bribes were made, constituted any "business" of the Tribe (*i.e.*, the recipient of federal benefits). [D.Br.50].[11]

The evidence was clearly sufficient for a rational jury to so find. Among other things, it showed that the Tribe in 2004 adopted a Constitution that enumerates the Tribal Council's powers, including the powers to "establish procedures and ordinances for the conduct of all tribal government business operations" and "create or provide by ordinance for the creation of organizations . . . for any lawful purpose." [JA.1426-27, 1438]. In 2012, under Cromwell's leadership, the Council invoked those powers to establish by ordinance the Gaming Authority as a "wholly owned" subsidiary of the Tribe to "act as an arm and an instrumentality of the Tribe to promote fundamental governmental policies of the Tribe . . . while providing insulation to the government and members of the Tribe from liabilities and obligations arising from the Gaming Enterprise." [JA.1439].

The Gaming Authority is a limited liability entity with a "legal existence separate and apart from the Tribe," but the Tribe is the Authority's "sole member and owner" in perpetuity, the Authority possesses only those powers devolved to it

---

[11] DeQuattro agreed with the district court that the issue is factual and has not argued otherwise on appeal. [JA.2027; SA.84-87].

from the Council, and should the Council ever dissolve the Authority, its assets revert to the Tribe. [JA.1441, 1449-53]. The ordinance invests the Authority with the Tribe's sovereign immunity but states that any waiver of immunity by the Authority is not a waiver by the Tribe ("provided that the assets of the Authority may be subject to liabilities and claims") and includes stock language to that effect to be included in any Authority contract containing an immunity waiver. [JA.1441-45, 1451]. The Authority operates through a board, the membership of which the Council controls: the Chairman of the Tribe is automatically the President of the board; the Treasurer of the Tribe is automatically the Treasurer; and the Council may appoint up to three additional members to the board, one of whom must be another Council member. [JA.330, 449, 1444-45].

Notwithstanding these facts, DeQuattro claims the RGB Contract could not have been "business" of the Tribe because the Gaming Authority was RGB's contractual counterparty and the contract contained limited-liability language with respect to the Tribe (*i.e.*, the stock language from the ordinance). [D.Br.50-52]. To the extent those facts are not enough, he argues that several others—*e.g.*, that the Authority had a "measure of independence," was given ownership of certain assets, and was not proved to have commingled funds with the Tribe—sealed the issue as a matter of law. [D.Br.53-54]. He is wrong.

The facts DeQuattro cites pertain to commercial liability—*i.e.*, whether the Tribe's assets (separate from its ownership of the Authority) can be reached in a damages claim against the Authority. Even on its face, this is not necessarily the same question as what constitutes the Tribe's "business," and it is certainly not the same question once placed within the context of § 666, which is a criminal statute. As a matter of logic, a parent entity could choose to conduct some piece of "business" through a subsidiary while still considering it the parent's "business"—*i.e.*, something can be both the subsidiary's "business" *and* the parent's "business." The evidence indicates that was what happened here, hence the Authority was created through the Council's power to establish procedures for managing "*tribal government business*," was deemed an "arm" of the Tribe, and received the Tribe's sovereign immunity. [JA.1438 (emphasis added); *see* JA.448 ("The Gaming Authority is the entity that handles strictly the gaming aspect *under the tribe*." (emphasis added)), 474 (agreeing that "the casino project was a major project *for the tribe*" (emphasis added)), 481]. *Cf. Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Auth.*, 207 F.3d 21, 29 (1st Cir. 2000) (tribal housing authority, "as an arm of the Tribe, enjoys the full extent of the Tribe's sovereign immunity").

Moreover, the answer to a commercial-law question cannot be "dispositive" of the scope of a criminal statute unless the statute so indicates, which § 666 does

not. [D.Br.52]. Congress intended § 666 to be "extremely broad in scope," *United States v. Sotomayor-Vázquez*, 249 F.3d 1, 8 (1st Cir. 2001), and this Court has repeatedly refused to "impose limit[ations]" on the statute "beyond those set out in the plain [text]." *Carrasco*, 79 F.4th at 159. That includes limitations borrowed from other areas of law. *See Fernandez*, 722 F.3d at 14 (finding members of the Puerto Rico Senate were "agents" of Puerto Rico government); *United States v. Willis*, 844 F.3d 155, 167 (3d Cir. 2016) (reading *Fernandez* as meaning that "principles of separation of powers" do not limit "§ 666's coverage"); *United States v. Heslop*, 694 F. App'x 485, 487 (9th Cir. 2017) (mem.) (applying § 666 liability by looking past the formal separation between entities to the "clear substance of the facts," which showed "all the tribal entities [we]re interconnected in both theory and practice"). *Cf. Dixson v. United States*, 465 U.S. 482, 494 (1984) ("Federal courts interpreting the federal bribery laws . . . generally avoided formal distinctions, such as the requirement of a direct contractual bond, that would artificially narrow the scope of federal criminal jurisdiction[.]").

It should also include limitations based on the terms of a private contract like the RGB Contract; otherwise, wrongdoers could avoid punishment simply by "contract[ing] around [the] definitions provided in criminal statutes," which cannot be what Congress intended. *United States v. Lupton*, 620 F.3d 790, 800-01 (7th Cir. 2010) (rejecting claim that contract stating that defendant was acting as "an

independent contractor and not as an officer, employee, or agent" of the state was dispositive of whether he was an "agent" of the state government under § 666).

DeQuattro's attempt to portray his arguments as consistent with § 666's purpose is misguided. He argues that none of his conduct "could conceivably have impacted even a single federal dollar" because Genting was funding the casino project.[12] [D.Br.49-50, 53]. The government disagrees that there was any lack of federal interest here, but in any event, the issue is irrelevant. In addition to not requiring any proof of an effect on federal funds, *Salinas v. United States*, 522 U.S. 52, 55-61 (1997), section 666 also does not require the government to prove any "connection between the offense conduct and a case-specific federal interest" whatsoever. *Cianci*, 378 F.3d at 97 (citing *Sabri v. United States*, 541 U.S. 600 (2004)).

The Eleventh Circuit cases DeQuattro cites are unhelpful. [D.Br.54-57]. The court in *United States v. McLean* never considered whether the parent entity's receipt of federal benefits, rather than the subsidiary redevelopment agency's receipt of federal benefits, could trigger § 666 jurisdiction because that issue was not appealed.

---

[12] DeQuattro incorrectly states that Genting also funded the "Gaming Authority as a whole." [D.Br.49-50]. The Authority was effectively funded in-kind by the Tribe: the board members who sat on the Council or were employed by the Tribe were paid in those capacities by the Tribe, thus subsidizing their time working for the Authority; and the Authority board generally met, free of charge, in the Tribe's Government Center building. [JA.450-51, 467, 478-82, 501].

802 F.3d 1228, 1234 (11th Cir. 2015). Rather, the government's appeal assumed the government needed to prove the latter (a position to which it was bound due to the jury charge and the Eleventh Circuit's pre-*Musacchio* "law of the case" doctrine, *United States v Murrillo*, 443 F. App'x 472, 474 (11th Cir. 2011)). *See* Brief for Appellant/Cross-Appellee's Br., *United States v. McLean*, Nos. 14-10061-AA, 14-10302-AA, 2014 WL 1998547 (11th Cir. May 12, 2014) (appealing only on the ground that "a jury reasonably could have concluded [from the facts] that [the subsidiary agency]" received sufficient federal benefits). Because *United States v. Doran* relied on the mistaken belief that *McLean* had already settled the issue, it is under-reasoned. 854 F.3d 1312, 1315 (11th Cir. 2017). *Doran* is also readily distinguishable because: (a) the charge was not bribery but § 666 embezzlement[13] (which asks the narrower, distinct question whether the embezzled property was "owned by, or [] under the care, custody, or control of" the entity that received federal funds, § 666(a)(1)(A)(ii)); and (b) though the non-profit corporation in question was "established by" and "affiliated" with the university, it was neither a subsidiary nor the university's "arm and [] instrumentality" [JA.1439]. *See* 854 F.3d at 1314-15.

---

[13] The language DeQuattro cites from the defunct "DOJ Criminal Resource Manual" likewise concerns the embezzlement portion of § 666 rather than the bribery portion. [D.Br.53].

## III. THE DISTRICT COURT DID NOT ERR IN EXCLUDING THE CONTESTED WITNESSES, AND ANY ERROR WAS HARMLESS IN ANY EVENT

DeQuattro contends the district court erred in excluding the testimony of two proposed lay witnesses and one proposed expert, and Cromwell joins in the latter claim. [D.Br.57-73; C.Br.51-52]. There was no error and no harm.

### A. Procedural History

#### 1. Steelman and Tilden

The government moved in limine to "exclude evidence of any alleged campaign contributions to Cromwell made by anyone other than DeQuattro." [SA.1-5]. Defendants opposed the motion and identified Paul Steelman (the owner of Steelman Partners) and Mark Tilden (a lawyer with a relationship with the Tribe) as proposed witnesses who would testify they gave Cromwell gifts and checks for his alleged "re-election campaign." [SA.6-24]. The district court ruled preliminarily for the government [SA.53], and reaffirmed the ruling at trial, stating:

> [It] creates the potential for a minitrial over Mr. Steelman's activities. And one outcome of that is the potential for the jury directly or indirectly to say how come [the government] did Mr. DeQuattro and they didn't do Mr. Steelman here? . . .
>
> Did Mr. Cromwell engage in bribery with respect to [Tilden] or Mr. Steelman, that's a matter for another case . . . . It is potentially misleading, and it detracts from the core issues in this case.

[JA.1111, 1115; *see* JA.1003-13].

## 2. *Durocher*

Before trial, DeQuattro disclosed an alleged expert who would testify that many tribes are "wary of doing business with non-Indian individuals and companies" due to their history of oppression, and thus "people who care about long-term business success in Indian country understand" they need to develop relationships with tribal officials (such as by giving gifts and "financial support") in hopes of "eventually benefit[ing] through introductions or referrals to other tribal governments and businesses." [JA.104-15]. The government moved to exclude and requested a *Daubert* hearing. [JA.98-103].

The district court held a *Daubert* hearing on November 3, 2021, during which the proposed expert, an attorney named Vernle Skip Durocher, testified as follows. [JA.121-81]. There are 538 federally recognized Native American tribes, and different tribes have different customs. [JA.130-31, 141]. Durocher had experience representing 25-30 tribes as well as "non-tribal businesses trying to do business[] with tribes," but had no experience with the Mashpee Wampanoag or any closely related tribe. [JA.129, 144, 151, 163-65]. Non-tribal vendors may give gifts and contributions not as a quid pro quo but to "build[] up a rapport and a personal relationship with" tribal officials in hopes of obtaining referrals for future business opportunities with other tribes. [JA.147-48]. Durocher's experience involved gifts

of $50 to $300 in value; he had never been asked for a campaign contribution and had no information about their typical size.  [JA.134, 138-45].

The court observed that a quid pro quo could also be a good way to build a relationship with a tribal official and asked Durocher whether the intent he described would "exclude" a quid pro quo.  [JA.156-58].  Durocher said no; he was just "assum[ing] no quid pro quo."  [JA.137-38, 152-58, 162-63].  The court told the parties it expected to exclude Durocher's testimony because his "statements with respect to future opportunities [with other tribes] . . . on the basis of what is available to me right now, [are] not material to this case," and he lacked experience with Cromwell's Tribe.  [JA.165-67].

The court granted the government's motion on December 3, 2021, echoing its earlier reasoning.  [SA.54-55].  When DeQuattro raised the issue mid-trial, the court asked if there was anything "new" to consider.  DeQuattro said there was not, and the court reaffirmed its ruling.  [JA.1107-08].

### B.  <u>Standard of Review</u>

The Court "review[s] a trial court's ruling . . . excluding evidence for abuse of discretion."  *United States v. Powers*, 702 F.3d 1, 10 (1st Cir. 2012).

### C.  <u>The District Court Did Not Abuse Its Discretion in Excluding Steelman and Tilden's Testimony</u>

The Court will "reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect" under Fed. R. Evid. 403 only

"in extraordinarily compelling circumstances." *United States v. Habibi*, 783 F.3d 1, 4 (1st Cir. 2015). This case does not present such circumstances.[14]

The district court accepted that Steelman and Tilden's testimony might theoretically be relevant to Cromwell's alleged "common scheme or plan" to solicit gifts that were not bribes [D.Br.61], but correctly recognized that this depended on whether their payments were (a) not themselves bribes and (b) similar to RGB's—both of which the government contested. [JA.1115]. Admitting the evidence thus would have required a "minitrial" on the circumstances surrounding these other payments, and might also lead the jury to speculate about why the government had charged DeQuattro but not the others. [JA.1111]. Trial courts have "the discretion to exclude relevant evidence for just these sorts of reasons," and the court's ruling here fell well within that discretion. *Lund v. Henderson*, 807 F.3d 6, 11 (1st Cir. 2015) (excluding evidence that would have "turned th[e] trial into a series of mini-trials"); *see United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014) (excluding cooperator's plea colloquy and cooperation agreement as likely to trigger "a mini-trial about a side issue," namely, the cooperator's "innocence of charges not made"); *United States v. Taylor*, 848 F.3d 476, 485 (1st Cir. 2017) (excluding letter

---

[14] As the district court properly excluded the evidence under Fed. R. Evid. 403, the Court need not consider DeQuattro's arguments regarding Fed. R. Evid. 404(b). [D.Br.60-63].

identifying unindicted coconspirator because it "could lead to a mini-trial about a side issue—to wit, why [he] was unindicted").

DeQuattro's attacks on the court's balancing are unpersuasive. The email DeQuattro received about the Las Vegas hotel stay did not make Steelman's testimony probative of DeQuattro's alleged "good faith." [D.Br.60 (citing SA.21)]. As DeQuattro's offer of proof did not indicate Steelman and DeQuattro talked about the hotel stay, the only thing DeQuattro could show he knew about it was what was in the email, which Steelman neither sent nor received. Thus, although the email itself may have been probative of DeQuattro's state of mind, it did nothing to make Steelman's *testimony* about the hotel stay probative on that point.

DeQuattro also argues the jury could have inferred his (or Cromwell's[15]) innocent intent from Steelman and Tilden's asserted belief their own payments were "legitimate" [D.Br.61-62]—but he cites no authority for the questionable proposition that a defendant can establish his intent in a charged transaction through the professed intent of a *different* person in a *different* transaction. *See United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) ("[T]he district court aptly characterized Oldbear's proffer as an attempt to establish an 'everybody-is-doing-it defense.' . . . [O]nly Oldbear's actions and state of mind were material to her guilt.").

---

[15]     For the reason stated in note 8, *supra*, DeQuattro is mistaken that Cromwell's innocent intent would have been "independently exculpatory" as to him. [D.Br.62].

*Cf. Kotteakos v. United States*, 328 U.S. 750, 773-74 (1946) (discussing the related problem of "transference of guilt" between unconnected people and transactions). Even if such proof were permissible, because its probative value would depend on the degree of similarity between the transactions, it just leads back to the minitrial problem the court identified.

Finally, DeQuattro is mistaken that any minitrial could have been limited to just "cautionary instructions and cross-examination." [D.Br.64]. As the government in fairness would have been entitled to a full opportunity to respond, it would have been like adding two (uncharged) defendants to the case.

### D. The District Court Did Not Abuse Its Discretion in Excluding Durocher's Testimony

The district court excluded Durocher's testimony on three independent grounds under Fed. R. Evid. 702 and 403 and did not abuse its discretion in doing so. *See United States v. Tetioukhine*, 725 F.3d 1, 6, (1st Cir. 2013) (expert testimony admissible under Rule 702 remains "subject to Rule 403's balancing test").

First, because Durocher had no experience with the Mashpee Wampanoag, his opinion that Tribal officials would expect gifts and donations from vendors before being willing to refer them to other tribes was based on the assumption that all tribes have this in common—but Durocher did not explain why that assumption was justified given that other practices differed among tribes. [D.Br.68, 70]. The court thus acted well within its discretion in excluding Durocher's opinion on the

basis that, as applied to Cromwell's Tribe, it relied on "stereotyping expertise" rather than the "specialized knowledge" that Rule 702 requires. [JA.160, 167].

Second, though the above flaw alone was disqualifying, the court also appropriately found that Durocher's testimony would not be "helpful to the jury in its deliberations," *United States v. García-Morales*, 382 F.3d 12, 18 (1st Cir. 2004), because it would not materially "assist the jury" in "sort[ing] out [the] contested issues" in the case. *United States v. Mehanna*, 735 F.3d 32, 67 (1st Cir. 2013); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (expert testimony should be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"); *United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001) (Court gives "considerable deference" to such determinations by trial court).

The district court ascertained at the *Daubert* hearing that Durocher's testimony could not be relevant (and thus could not be helpful) as contextual evidence to support the plausibility of DeQuattro's claimed intent because DeQuattro would be offering no evidence that he did, in fact, have the intent Durocher described. *See, e.g.*, *United States v. Lachman*, 521 F.3d 12, 19 (1st Cir. 2008) (affirming denial of new trial motion based on evidence that purportedly supported the "reasonable[ness]" of an exculpatory belief where there was no

evidence defendants "ever held such a contemporaneous belief").[16] This meant the testimony could be relevant only for the abstract proposition that it is *possible* for a vendor to give gifts to a tribal official without a quid pro quo. As the court pointed out, though, this attacked a straw man because the government would not be arguing that it is *impossible*; instead, it would be offering case-specific evidence that a quid pro quo was present here. [JA.157-58]. The court reasonably concluded Durocher's testimony would not materially assist the jury in evaluating that evidence because (a) the hope of "future . . . business opportunities" he described did not exclude a quid pro quo, and (b) he could not offer the jury any insight into what might make a quid pro quo more or less likely, because he was just assuming its absence. [JA.148-49, 159-60, 163-65]. In short, Durocher was not offering an "alternative" to the government's theory so much as just "saying that sometimes it happens and sometimes it doesn't," which no one disputed. [D.Br.66-67; JA.149, 165].

Third, the court also reasonably found the testimony's negligible probative value was far outweighed by the likelihood that it would (a) mislead the jury into thinking there *was* evidence DeQuattro held the intent Durocher described [JA.150, 157 ("a criminal defendant does not have . . . the right . . . to introduce [a] contention

---

[16] DeQuattro could identify no such evidence at the hearing (or at trial) even when asked to do so [JA.149-57, 1107-08], and the only evidence he cites on appeal is off-point because it does not relate to seeking a referral to work *with other tribes*, which was the basis of Durocher's opinion. [D.Br.68 (citing JA.1629-31)].

of his scienter through a cat's paw in the form of a purported expert")]; (b) be used as a vehicle for improper attorney argument [JA.152-56], and (c) confuse the jury into thinking quid pro quo payments are fine so long as the payer hopes for future business opportunities. [JA.156, 161].

DeQuattro's attacks on the court's three bases for exclusion miss their mark. Durocher's lack of experience with Cromwell's Tribe was obviously pertinent even though his testimony concerned referrals to "other tribes" [D.Br.70-71]; even if Durocher could say that "other tribes" would have welcomed Cromwell's referral, the point is meaningless unless he could also say that Cromwell, as a member of the Mashpee Wampanoag, would have expected gifts or money from the vendor before providing such a referral.

DeQuattro is mistaken that the court "insist[ed] that a jury finding of quid-pro-quo bribery would moot Durocher's testimony" or that it excluded the testimony because everyone knows tribes have been oppressed. [D.Br.67-69]. As explained above, the court instead found that Durocher's testimony would not be helpful to the jury in deciding the critical factual dispute in the case, which was whether quid-pro-quo bribery occurred here. On the second issue, the court was merely commenting that one point on which Durocher was qualified to testify (because it *does* apply to every tribe) did not require expert testimony. [JA.166].

Finally, though DeQuattro claims the court did not rely on Rule 403 [D.Br.72], the court's repeated references to the testimony's misleading tendencies show otherwise. *See United States v. Pérez-Greaux*, 83 F.4th 1, 18 (1st Cir. 2023) (inferring district court's Rule 403 balancing from "record as a whole," including court's statements about unfair prejudice).[17]

### E. <u>Any Evidentiary Error Was Harmless</u>

Regardless, there is no reason to think the exclusion of these categories of evidence "substantially sway[ed] the jury." *Abdelaziz*, 68 F.4th at 74.[18]  In context, Steelman and Tillman's payments were not comparable to DeQuattro's. RGB's total payments were much larger (even though Steelman Partners was the larger firm), and the Las Vegas hotel stay (unlike the charged Hotel Stay) was work-related.

---

[17]  Because DeQuattro was the sole proponent of Durocher's testimony below, the government's view is that Cromwell's claim should be limited to plain-error review. [C.Br.51-52].  *But see United States v. Davis*, 261 F.3d 1, 40-41 (1st Cir. 2001) (treating such a claim as preserved).  The claim fails under any standard, though, so the issue is not material.

[18]  The constitutional harmlessness standard is inapt. [D.Br.72-73]. Defendants never argued to the district court that its evidentiary rulings violated the Constitution, so any constitutional claim would be on plain-error review, under which Defendants bear the burden of showing prejudice.  *See Pena*, 24 F.4th at 67 (where issue was argued below on non-constitutional grounds, the Court "review[s] the unpreserved constitutional implications of those rulings for plain error"); *United States v. Pena*, 910 F.3d 591, 601 n.1 (1st Cir. 2018) (similar).  DeQuattro's argument that the alleged errors violated his right to present a complete defense is also without force, because he merely cites a few cases involving dissimilar circumstances.  [D.Br.72 & n.26 (citing cases involving access to evidence, compulsory process, and co-defendant testimony)].

[D.144 Exhibit (referencing "G2E conference," a gaming industry trade show in Las Vegas)].[19]  The exclusion of Durocher's testimony was harmless because it was appropriately probative only of an undisputed abstract proposition.  If Defendants merely wanted to establish whether "gift-giving in the tribal culture is generally understood and accepted" [D.Br.66-67], they could have asked that of the multiple members of Cromwell's Tribe who testified.

## IV.  THE DISTRICT COURT DID NOT REVERSIBLY ERR IN INSTRUCTING THE JURY NOT TO RETURN A VERDICT PENDING FINAL INSTRUCTIONS

DeQuattro, joined by Cromwell, claims the district court erred in instructing the jury on the second day of deliberations not to return a verdict pending the court's final, revised instructions.  [D.Br.74-78; C.Br.52].  The court did not err in making the choice DeQuattro challenges, but even if it did, there was no harm.

### A.    Procedural History

At the May 2, 2022 charge conference, the district court informed counsel that it planned to charge the jury orally after closing arguments and then would "refine" the charge into written instructions that it would give the jury the next day along with a transcript of the oral instructions.  No party objected to this plan.  [SA.96-97].

---

[19]    The Las Vegas hotel stay also would have been a strange thing for DeQuattro to rely on in making his later payments because the email showed Steelman assumed that payment from DeQuattro himself.  [SA.22 (transferred reservation previously "Under (Mr. Dave DeQuattro American Express 2027 security code 4275)"].

### 1. First Day of Deliberations

After closing arguments on May 3, the court charged the jury orally. [JA.1226-79]. The court told the jury it would be receiving a transcript of the oral instructions and written instructions after the court had considered counsel's "suggestions." [JA.1222-23, 1279]. The jury retired around 3:00 p.m. to begin deliberations. [D.232].

The court then invited the parties to make objections to the oral charge, stating that it would address any meritorious objections by "refin[ing]" the language in the written instructions. Cromwell and DeQuattro each offered several objections to the substance of the charge. [JA.1280-90]. The jury asked to leave for the day and was released around 4:15 p.m. [D.232; JA.1293].

### 2. Second Day of Deliberations

The next morning, on May 4, 2022, the court told counsel it was still working through the objections, so the written instructions were not yet ready. The court proposed telling the jury that "because there have been objections . . . , that they cannot complete their deliberations until they have []the written materials . . . [because] [t]he written materials are my response" to the objections. [JA.1300].

DeQuattro's counsel said, "I think that if the Court was intending to give them additional oral instructions based on the objections, th[en] I would understand the

caution to them to not finalize their deliberations," but it did not make sense if the written instructions were going to be the same as the oral ones. [JA.1301]. The court said they would not be the same because it planned to address Defendants' objections in the written instructions, hence it did not want the jury to return a verdict before receiving them. [JA.1301].

Cromwell's counsel noted his "exception." [JA.1304]. DeQuattro's counsel said he "object[ed] to requiring [the jury] to defer any form of deliberation until receiving the written instructions," though he was fine with the court telling the jury more instructions were forthcoming. [JA.1304]. The court clarified that it would not be precluding the jury from deliberating pending the final instructions but would just tell the jury not to "return [a] verdict" yet. [JA.1304]. The court then brought in the jury and instructed as follows:

> I received various requests or suggestions of modifications that I might make in the jury instructions here. . . What I am going to be doing is sharing with counsel the version that I'm prepared to submit to you. . . It may take a little time for us to discuss it . . . .
>
> Now in the interim, I'm of the view that you can continue deliberating even without those documents . . . . But I must tell you that you may not return a verdict until you have the written instructions that I'm going to provide you, and I'll have a few more oral instructions as well to be delivered at the same time. . . . And so until you have the additional instructions in writing that I'm going to give you and some oral instructions, I'm instructing you not to return a verdict in this case.

[JA.1305-07]. The jury retired to continue deliberating around 9:20 a.m. [JA.1307-09].

While the court and counsel were discussing the draft written instructions, DeQuattro's counsel said, "I would respectfully, again . . . ask that Your Honor consider instructing the jury that they are free to deliberate, and if their deliberations include a vote, they're free to vote, however, the instructions that will further refine the instructions orally given yesterday will be provided to them[.]" [JA.1357]. The court said, "everything that I've done is consistent with what you ask, except for returning a verdict." [JA.1358]. Counsel asked the court again to note DeQuattro's objection. [JA.1358].

At 2:30 p.m., the jury sent a note stating: "We feel that we are at a stopping point for the day until we receive the written instructions. We would like to reconvene when we have the instructions and information." [JA.1365-66]. DeQuattro's counsel said, "[R]espectfully, we renew the objection. We think they should have been allowed to reach a verdict before[.]" [JA.1366]. The court acknowledged the statement and discharged the jury for the day without objection. [JA.1366-69].

### 3. *Third Day of Deliberations*

When the jury arrived on the morning of May 5, 2022, the court provided it with the final, written instructions and a transcript of the oral charge. [JA.1383]. The court said the written instructions covered the more "technical" issues but "all of the instructions are important," and it pointed specifically to the "reasonable

doubt" instruction at "pages 50 through 53 of the transcript." [JA.1384-85]. The court told the jury it was now free to return a verdict. [JA.1385]. The jury retired around 9:25 a.m. and returned the verdict around 2:15 p.m. [JA.1387-88; D.234].

**B.**     **Standard of Review**

The Court reviews "de novo the district court's construction of the Federal Rules of Criminal Procedure." *United States v. Encarnacion*, 239 F.3d 395, 397 (1st Cir. 2001). Trial-management choices are reviewed for abuse of discretion. *See United States v. Lemmerer*, 277 F.3d 579, 591-92 (1st Cir. 2002) (noting the Court "normally will not reverse unless the judge's choice among the various avenues available was patently unreasonable"). Unpreserved arguments are reviewed for plain error, which requires the defendant to "show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it." *United States v. Romero*, 906 F.3d 196, 205 (1st Cir. 2018) (cleaned up).

**C.**     **DeQuattro Has Not Identified a Prejudicial Error**

DeQuattro's claim focuses on one specific choice by the court. He does not claim error based on any changes from the oral to the written instructions. He also does not complain that the court permitted the jury to deliberate before it received the court's final instructions. He cannot assert such a claim because he insisted the jury be allowed to do so, thus making any error on that head an "invited" one. [JA.1304, 1357-58]. *See United States v. Chen*, 998 F.3d 1, 6 (1st Cir. 2021) (invited

errors are waived).  His claim is rather that the court should have *gone farther*—that is, it should have also permitted the jury to *return a verdict* before receiving the final instructions.  [JA.1348].  He asserts the court's refusal to do so—as embodied in the court's instruction to the jury on the morning of the second day of deliberations not to return a verdict yet (the "challenged instruction")—violated Fed. R. Crim. P. 31(b)(1) and was "an abuse of discretion."  [D.Br.74].

DeQuattro did not preserve a Rule 31(b)(1) claim because he never referenced the rule in his objections or even suggest his objection was grounded on a specific rule or right.[20]  *See United States v. Facteau*, 89 F.4th 1, 27 (1st Cir. 2023) ("[A] party is not at liberty to articulate specific arguments for the first time on appeal simply because the general issue was before the district court[.]" (cleaned up)).  The claim is therefore subject only to plain-error review, and as DeQuattro has not explained how his claim meets that standard, waived.  *See United States v. Gonzalez-Arias*, 946 F.3d 17, 31 (1st Cir. 2019) (failure to address four plain-error prongs waives the argument).  Even if the issue were not waived, Rule 31(b)(1) is a red herring.  The rule concerns partial verdicts; it means "the district judge [must] accept a partial verdict" if the jury specifically so requests and must "refrain from instructing the jury that they may not return a partial verdict."  *United States v.*

---

[20]  His belated citation to Rule 31(b) when requesting bail pending appeal did not preserve anything.  *See United States v. Kinsella*, 622 F.3d 75, 83 (1st Cir. 2010) (raising issue in new-trial motion does not preserve it for appeal).

*Burke*, 700 F.2d 70, 80 (2d Cir. 1983) (interpreting materially identical version of rule). DeQuattro cites no case that reads the phrase "at any time" in the rule as meaning a judge may never prohibit the jury from returning a verdict of any type. [D.Br.74-75]. Nor would such an interpretation make sense: if such a principle existed, why would it be buried in a rule about partial verdicts, and why would it apply only to multi-defendant trials? *See Facteau*, 89 F.4th at 27 (an error cannot be plain unless "indisputable in light of controlling law" (cleaned up)).

DeQuattro's "abuse of discretion" claim fares no better. Defendants objected to the oral charge and persuaded the court the charge required revision. Taking as a given that (as DeQuattro requested) the jury was permitted to deliberate pending those revisions, the court's challenged instruction merely prevented the jury from returning a verdict based on what the court (and Defendants) believed were *incomplete or incorrect jury instructions*. [JA.1300, 1367; SA.77-78]. A trial court has the discretion to reject such a verdict, and to argue that it must do otherwise, as DeQuattro does, seems to run directly contrary to the court's duty of ensuring a "fair verdict . . . by a jury that is fully informed." [JA.1367]. *See United States v. Ladd*, 885 F.2d 954, 960 (1st Cir. 1989) (court "refused to accept the verdict" due to concern about "defendant's last objection" and instead "reinstructed the jury, ore sponte [regarding] specific intent"); *United States v. Graham*, 484 F.3d 413, 420-21 (6th Cir. 2007) ("[I]t is sometimes necessary and proper for the trial court to re-

charge a jury to correct possible misunderstandings. . . . [T]he mere fact that the jury had sent a note stating that it had concluded its deliberations did not relieve the trial court of [that] authority[.]"); *United States v. Desimone*, 119 F.3d 217, 226 (2d Cir. 1997) (judge chose "not [to] accept the verdict" pending "supplemental charge" correcting problem in the original charge); *United States v. Lane*, 624 F.2d 1336, 1338 (5th Cir. 1980) (similar). *Cf. United States v. Ruggiero*, 928 F.2d 1289, 1302 (2d Cir. 1991) (refusing to accept verdict that jury returned just ten minutes after it was instructed to start deliberations afresh).

DeQuattro argues that even if the court's prohibition on returning a verdict was permissible *ab initio*, it became impermissible when it lasted "such a substantial period of time"—but he misstates that period as a "day and a half." [D.Br.74-75]. In fact, the prohibition was in effect for a little over five hours: from 9:20 a.m. to 2:30 p.m. on the second day of deliberations.[21] There are a few problems with DeQuattro's time argument. For one thing, he never alerted the district court to a *time* issue (as he could have done when he renewed his objection as the court was discharging the jury on the second day [JA.1366-67]), so he forfeited it. For another, DeQuattro offers no case or doctrinal underpinning to explain how long a court may

---

[21] Notwithstanding DeQuattro's suggestion to the contrary, the jury was free to return a verdict at all other times; indeed, the court explicitly told the jury on the first day of deliberations, "[Y]ou can make your determination whenever you choose to make your determination." [JA.1275. *Cf.* D.Br.74 n.28].

or may not prohibit the jury from returning a verdict based on incomplete or incorrect instructions. None of his arguments help to show either how the court erred or how he could have possibly been prejudiced.

His argument about the "fractional" nature of the written instructions is logically flawed because it conflates two unrelated issues. [D.Br.75-78]. The court's decision to provide the jury with fractional rather than complete written instructions on the third day of deliberations (or to provide written instructions at all) was not *caused* by its decision to give the challenged instruction, and the challenged instruction and the five hours it lasted did not "delay" when the jury received the written instructions. [D.Br.75]. The court could not have given the jury the written instructions (whether fractional or not) on the second day of deliberations because they were not done yet. A defendant cannot show the court's decision on one day was an abuse of discretion by arguing that *on the next day*, the court made an *independent* decision to do something else.

DeQuattro does not assert a standalone fractional instruction claim, likely because he did not preserve one,[22] and he could not show plain error anyhow. *See*

<hr>

[22] DeQuattro never objected to the fractional nature of the written instructions and did not join any such objection by Cromwell. *See Pena*, 24 F.4th at 67 n.17 (codefendant's objection does not preserve claim for defendant); *United States v. Flores-Rivera*, 787 F.3d 1, 27 n.20 (1st Cir. 2015) (claim unpreserved where defendant failed to join codefendant's objection); *United States v. Acosta-Colón*, 741 F.3d 179, 189 (1st Cir. 2013) (similar). Cromwell did not preserve a fractional instruction claim either. His initial objection could have preserved at most the

*Romero*, 906 F.3d at 205. Other than the time between the oral and written instructions, the district court handled the issue here like it did in *United States v. Correia,* 55 F.4th 12, 42 (1st Cir. 2022), where the Court found no abuse of discretion. [JA.1387-88]. There is also no reason to think DeQuattro's substantial rights were affected.

DeQuattro's argument that the challenged instruction "had the inevitable effect of diminishing the jurors' recollection of the parties' arguments" does not make sense. [D.Br.75]. As the court explained (and DeQuattro does not dispute, *see infra* note 23), the jury was free to deliberate as it saw fit on the second day but just could not formally return a verdict; *ergo*, the jury was free to consider the parties' arguments whenever it wanted to.

DeQuattro's argument that the challenged instruction amounted to "judicial pressure in the exercise of [the jury's] functions" and "improperly invaded the prerogative of the jury to deliberate however it chooses" is insufficiently developed. [D.Br.75]. He fails to explain how that can be so where (unlike the cases he cites) the court did not comment on the evidence, put a thumb on the scale for either side,

---

narrow issue he raised, which was the court's refusal to include a written "reasonable doubt" instruction. [JA.1363-65]. However, Cromwell forfeited even that objection when (despite the court's invitation to "make th[e] objection after [the jury is] sent out") he did not renew it after the court instructed the jury, presumably because the court drew the jury's attention to the pages in the written transcript of the oral charge about "reasonable doubt." *See Correia*, 55 F.4th at 42 n.7.

or tell the jury *how* to deliberate.[23] *Cf., e.g.*, *United States v. Moffett*, 53 F.4th 679, 684-86 (1st Cir. 2022) (noting court's "substantial discretion both in administering trials in criminal cases and in managing jury deliberations," but finding the court "invaded the jury's power . . . by over-emphasizing certain of the government's evidence").

In any case, even if the court's party-neutral, non-substantive instruction was error, there is no need for a new trial because it had no effect on the verdict. *See Taylor*, 848 F.3d at 484 (an error is harmless under Fed. R. Crim. P. 52(a) if it is "highly probable [it] did not contribute to the verdict" (cleaned up)).[24] For DeQuattro to have been harmed, one must believe the jury wanted to acquit him of

---

[23] As DeQuattro agreed with the court telling the jury additional instructions were forthcoming, any effect from the jury's knowledge of *that* fact cannot be attributed to the challenged instruction. [JA.1304]. And, though DeQuattro at one point suggested to the district court that the jury might misunderstand the challenged instruction to mean it could not take a vote, the court disagreed, and DeQuattro has not pursued that argument on appeal. [JA.1357-58].

[24] The harmless-beyond-a-reasonable-doubt standard does not apply. It is unclear if DeQuattro is trying to prove "constitutional error," *United States v. Rivera-Santiago*, 107 F.3d 960, 966-67 (1st Cir. 1997), or if he is just saying the court's action vaguely "implicate[d]" a constitutional right (which might be said of nearly every action in a criminal trial). [D.Br.78]. Regardless, any constitutional claim would be reviewed at best for plain error because DeQuattro made no such claim below. *See supra* note 18. To the extent DeQuattro is trying to assert a constitutional claim, though, his argument is so confusingly constructed the Court should deem it waived. *See United States v. Bulger*, 816 F.3d 137, 148-49 (1st Cir. 2016) ("[W]e consider waived arguments confusingly constructed and lacking in coherence. And constitutional claims like the ones [defendant] lobs are just the type of complicated issues that call for some in depth treatment." (cleaned up)).

the Bowflex and the Hotel Stay (plus everything else) *but only* during the five-hour period it could not return a verdict and not at any other time (when it obviously could have but did not do so).   That is not only highly improbable, but wholly implausible.[25]   Indeed, the record strongly indicates the jury was not ready to return a verdict at all during the challenged five-hour period, as its 2:30 p.m. note on that day said the jury was only then at the point of wanting to start going through the instructions, and the jury needed almost five more hours the next day to reach a verdict.

## V. THE DISTRICT COURT DID NOT ERR IN AWARDING RESTITUTION TO THE TRIBE

Defendants challenge the district court's restitution orders on shared and distinct grounds.  [C.Br.54-60; D.Br.78-85].  Their arguments are unpersuasive.

### A. Procedural History

After the verdict, the government requested restitution for the Tribe under the Mandatory Victim Restitution Act ("MVRA") for the legal fees it had incurred due

---

[25]   The potential loss of nullification is, of course, not a cognizable form of prejudice, but there is no logical reason the jury would have wanted to nullify *only* during the challenged five-hour period either. *See Wilkins v. United States*, 754 F.3d 24, 30 (1st Cir. 2014) ("[T]here is no principled way in which we can rely on a petitioner's hope of jury nullification to find prejudice.").

to the federal investigation and prosecution of the convicted conduct.  Defendants opposed restitution.[26]  [JA.2188-2213, 2225-58; SA.199-310].

At a hearing on January 18, 2023, the district court overruled all Defendants' objections save one.  [JA.2259-2300].  The court agreed with DeQuattro that the Tribe's legal fees before the government's investigation focused on RGB (*i.e.*, before the second government subpoena) should be Cromwell's sole responsibility.  [JA.2288].  The court ordered Cromwell to pay restitution of $209,678.54, with DeQuattro jointly and severally liable for $140,707.79.  [C.Add.6; D.Add.5].

## B.    Standard of Review

The Court reviews restitution awards for abuse of discretion and any subsidiary findings for clear error.  *See United States v. Cheal*, 389 F.3d 35, 48 (1st Cir. 2004).  Legal conclusions are reviewed de novo.  *See id.*

## C.    The District Court Did Not Abuse Its Discretion in Entering the Restitution Awards

### 1.    Defendants Committed an "Offense Against Property"

The MVRA applies to any Title 18 "offense against property." § 3663A(c)(1)(A)(ii).    Defendants claim that, per the Eleventh Circuit's

---

[26]  The government also requested restitution for legal fees incurred by a Council member whom the Tribe indemnified.  The court denied that request and it is not at issue in this appeal.

68

interpretation of that term in *United States v. Collins*, 854 F.3d 1324 (11th Cir. 2017), they did not commit any "offense against property." [C.Br.54-56; D.Br.79-80].

*Collins* supports the opposite conclusion. *Collins* held that—based on the statute's text and structure, and taking into account the term's roots in the common-law distinction between "crimes against [the] person" and those "against property"—an "offense against property" in the MVRA is a crime "in which the defendant intends to damage another's property" or "seeks to derive an unlawful benefit from another's property or otherwise deprive a person or his property, therefore acting 'in opposition to' or 'contrary to' the classic property rights of ownership and possession." *Id.* at 1331-32.[27]

Defendants' bribery offenses met this standard. Even assuming that some bribery offenses do not because not all bribery "implicate[s] someone else's property," *id*. at 1335, Defendants' offenses plainly implicated "someone else's property" because the RGB Contract with its attendant right to payment (which Defendants do not dispute was the Tribe's "property") was the "object" of the bribes. *Id.* at 1331.[28] Defendants nevertheless argue the government did not establish an

_____

[27] Black's Law Dictionary similarly defines the term "crimes against property" as "[a] category of criminal offenses in which the perpetrator seeks to derive an unlawful benefit from—or do damage to—another's property without the use or threat of force." *Crimes Against Property*, Black's Law Dictionary (11th ed. 2019).

[28] Defendants have not argued that a contractual right to payment cannot support an "offense against property" unless the victim overpaid on the contract, so

"offense against property" because (a) § 666's elements and the jury charge did not require the government to show, and the government did not show, Cromwell was influenced by the bribes [D.Br.79-80], and (b) maintaining the RGB Contract was "consistent with [Cromwell's] duties and responsibilities" [C.Br.55-56], so there was no proof the Tribe's property was affected or damaged.

As an initial matter, multiple circuits have held the "offense against property" determination is conduct-based rather than categorical, and this Court should do the same. *See United States v. Hagen*, 60 F.4th 932, 953 (5th Cir. 2023); *United States v. Razzouk*, 984 F.3d 181, 187-89 (2d Cir. 2020); *United States v. Ritchie*, 858 F.3d 201, 208-10 (4th Cir. 2017); *Collins*, 854 F.3d at 1333-35 (citing cases). *Cf. United States v. Chin*, 965 F.3d 41, 59 (1st Cir. 2020) (stating in another context that the "restitution analysis focuses on the causal relationship between the *conduct* and the loss, not between the nature of the statutory offense and the loss" (cleaned up)). Section 666's elements and the jury charge are thus beside the point.

In terms of Defendants' conduct, because the purpose of the bribes was to influence Cromwell in connection with the Tribe's property, Defendants necessarily sought "to derive an unlawful benefit" from that property "contrary to . . . the classic property rights of ownership and possession," which is what *Collins* requires. *See*

---

that question is not before the Court. *See United States v. Mayerdía-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018) ("[A]rguments not raised by a party in its opening brief are waived.").

854 F.3d at 1331-32 (rejecting view that "offense against property" means causing "damage to or loss or destruction of property"); *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014) ("'[A]gainst property' means infringing on a victim's property interest.").

*United States v. Adorno*, 950 F. Supp. 2d 426 (E.D.N.Y. 2013), is inapt. [D.Br.79-80]. The only "property" allegedly at issue there was the bribed employee's salary, so the court reasoned it needed to find "honest services fraud," which required proof the employee's conduct was "influenced." *Id.* at 428-30. By contrast, Cromwell's salary was not the property at issue here.[29]

### 2. The Tribe Was a "Victim" that Suffered a "Pecuniary Loss"

Despite Cromwell's arguments to the contrary, the Tribe was a "victim" under the MVRA. [C.Br.57-58]. Cromwell's actions caused the Tribe reputational harm and corrupted its relationship with a key vendor, Defendants' conduct infringed the Tribe's property interests, and the Tribe suffered a tangible loss in the form of the legal expenses for which it sought reimbursement. Cromwell asserts that a victim's reimbursable "expenses" cannot also be its "pecuniary loss" under the statute, but the sole case he cites is unpersuasive. [C.Br.60]. *See United States v. Avenatti*, 81

---

[29]  If the Court were to find no "offense against property," the appropriate remedy would be to vacate and remand for the district court to determine if discretionary restitution is appropriate. *See* § 3663(a)(1)(A) (allowing discretionary restitution for Title 18 offenses other than those subject to mandatory restitution).

F.4th 171, 209-10 (2d Cir. 2023) (explaining that *United States v. Yu Xue,* No. 16-cr-22, 2021 WL 2433857 (E.D. Pa. June 15, 2021), does not make sense because, although the statutory terms are distinct, nothing indicates that one excludes the other).

### 3. *The Tribe's Legal Fees Met the Causation Requirement*

Defendants' argument that the government failed to show a "direct" pecuniary loss because the Tribe's legal fees were an "indirect" loss misreads the statute. [C.Br.59; D.Br.80-81].[30] The MVRA's "direct and proximate" causation requirement means "a court may only order restitution for losses [with] an adequate causal link to the defendant's criminal conduct," *United States v. Alphas*, 785 F.3d 775, 786 (1st Cir. 2015), *i.e.*, losses that "would not have been incurred" but for the offense, were "reasonably foreseeable," and are "not too attenuated in fact or time from the crime." *In re: Akebia Therapeutics, Inc.*, 981 F.3d 32, 38 (1st Cir. 2020). It does not mean the victim's losses cannot involve any intervening fact. *Cf. Chin*, 965 F.3d at 60 (stating that patients may have been "victims" of compounding pharmacy's tainted drugs even though "the clinics and the hospitals" purchased the drugs, and remanding for district court to "engage[] in a proximate cause analysis of whether the harm that would flow to the patients [through the clinics and hospitals]

---

[30] Cromwell did not preserve this argument, so for him, the argument is on plain error. [D.316]. However, the claim fails under any standard.

. . . was foreseeable"); *Akebia*, 981 F.3d at 38 n.4 ("no one dispute[d]" corporation

was "victim" of employee's insider trading crime where corporation incurred legal

fees for government investigation).

DeQuattro also argues the award against him is void because the court "made

[no] attempt" to determine which of the Tribe's fees were the but-for result of the

Bowflex and Hotel Stay rather than his acquitted conduct.  [D.Br.81-82].  The court

did make such a determination: it found that, due to the nature of the investigation,

all legal fees the Tribe incurred after that investigation focused on RGB were tied to

both the acquitted counts *and* DeQuattro's count of conviction.  [JA.2286-88].  As

this was a fact-based finding, clear-error review applies, but even as a legal or mixed

determination, there was no error.  The Tribe's expenses could not be segregated by

bribe because all the alleged bribes were bound up together as the but-for cause of

the government's investigation.

### 4.     *Legal Fees Can Be "Other Expenses"*

DeQuattro argues a victim's legal fees are categorically not reimbursable

"other expenses."  [D.Br.82-84].  Every circuit to consider this question—including

this Court in an unpublished decision—has correctly concluded that there is "no

statutory basis," in the text or otherwise, for such a "per se rule."  *United States v.*

*Corey*, 77 F. App'x 7, 11 (1st Cir. Oct. 7, 2003); *see United States v. Afriyie*, 27

F.4th 161, 166 (2d Cir. 2022) (explaining why *Lagos* does not affect this

conclusion); *United States v. Sexton*, 894 F.3d 787, 801 (6th Cir. 2018); *United States v. Hosking*, 567 F.3d 329, 332 (7th Cir. 2009), abrogated on other grounds by *Lagos v. United States*, 138 S. Ct. 194 (2018); *United States v. Gordon*, 393 F.3d 1044, 1057 (9th Cir. 2004), abrogated on other grounds by *Lagos*, 138 S. Ct. 194. The one case on which DeQuattro relies, *United States v. Koutsostamatis*, did not involve legal fees and relied on an unpersuasive application of ejusdem generis. 956 F.3d 301, 311 n.4 (5th Cir. 2020); *see Afriyie*, 27 F.4th at 167 (rejecting *Koutsostamatis*).

### 5.     *The District Court Reasonably Found the Reimbursed Fees "Necessary"*

Finally, DeQuattro claims the Court must at least vacate and remand because the court awarded reimbursement for expenses that were "clearly not 'necessary.'" [D.Br.84-85]. This claim should be deemed waived as DeQuattro has neither explained how the court clearly erred in finding otherwise nor identified a full list of the expenses he contests. [JA.2281-91]. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Even if not waived, the Court should affirm because the court's necessity findings were reasonable. *See Alphas*, 785 F.3d at 787 (court need only make "a reasonable determination of appropriate restitution" and should "resolv[e] uncertainties with a view toward achieving fairness to the victim").

74

# VI.  CROSS-APPEAL: THE HOBBS ACT APPLIES TO TRIBAL OFFICIALS

The district court granted Cromwell a judgment of acquittal on his Hobbs Act convictions (Counts 6s-8s and 10s) on the logic that Hobbs Act extortion under color of official right does not apply to tribal officials.  This was error, and the Court should reverse.

## A.    <u>Procedural History</u>

Cromwell moved for a judgment of acquittal on his Hobbs Act charges during trial on the theory that Hobbs Act extortion under color of official right does not apply to tribal officials.  [D.220, D.228; JA.1076-77].  The district court reserved ruling pending the verdict.

On November 15, 2022, after post-verdict briefing and discussions [JA.1870-80, 1953-54, 1968-69, 2014-24; Supp.App.1-18], the court granted the judgment of acquittal on Cromwell's Hobbs Act convictions, stating:

> [M]y own view is that the Supreme Court and the First Circuit have been moving in the direction of saying, Look, if you want to take away the immunity of a tribe or its leaders, Congress is going to do that with specificity.    That in fact is what they did with respect to 666(a). . . . [T]he Tenth Circuit [] said, you know, if you want 666 to apply to Indian tribes, you've got to say so directly, and they granted acquittal.  Within several months, Congress amended again to make it direct that [] Indian tribes and their officials were included[.]
> . . .
> [B]ut we also have here an extortion claim, extortion under color of official right.  That does not specify tribes or tribal leaders as officials.  And my view is that I have to grant acquittal with respect to that.  That is a statute that just doesn't apply, unless we are to just run roughshod

over the particular attributes of sovereignty that Indian tribes have. . . . . [T]hat's the [In re] *Coughlin* case that the First Circuit dealt with earlier this year. It's the subject of a petition for certiorari now. . . .

[T]here is filed as an amicus curiae a brief by the group of people who have styled themselves as professors of federal Indian law. . . . The language that [they] offer at the end of the brief is, "Tribal sovereign immunity persists unless a native nation clearly waives it, or Congress unequivocally says otherwise[.]"

[JA.2036-39; D.289]. Though the court expressed a willingness to reconsider and accepted more briefing, it stood by its ruling. [JA.2157-60, 2180-87, 2268-68].

## B. **Standard of Review**

The Court reviews issues of statutory interpretation de novo. *See United States v. Sanchez*, 389 F.3d 271, 272 (1st Cir. 2004).

## C. **The Hobbs Act Applies to Cromwell**

The Hobbs Act punishes "[w]hoever in any way or degree obstructs, delays, or affects commerce . . . by . . . extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). "Extortion" means "the obtaining of property from another, with his consent" through various wrongful means, including "under color of official right." § 1951(b)(2); *see Correia*, 55 F.4th at 29 (extortion under color of official right occurs when "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts" (quoting *Ocasio v. United States*, 578 U.S. 282, 285 (2016))). In ruling that this language does not apply to tribal officials, the district court repeatedly referenced the concept

of "tribal sovereign immunity." Sovereign immunity refers to the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). Tribes possess sovereign immunity from suit, and Congress cannot abrogate that immunity without a "clear" statement. *See In re Coughlin*, 33 F.4th 600, 604-05 (1st Cir. 2022), *aff'd sub nom. Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689 (2023). The court erred in requiring a "clear" statement to that effect in the Hobbs Act, though, because the Tribe's sovereign immunity was not implicated in this case for at least two, independent reasons.

First, the party that prosecuted the offense was the United States, and tribes do not possess sovereign immunity as against the federal government. As the Court stated in *In re Grand Jury Proceeding*, 744 F.3d 211 (1st Cir. 2014), "the United States [i]s a superior sovereign from whose suits the tribes enjoy no sovereign immunity." *Id.* at 219-20. Contrary to the district court's reasoning, this principle is distinct from Congress's power to abrogate tribal immunity through legislation. [SA.81, 104-06]. Tribes specifically lack immunity from suit by the *federal executive* "even where Congress has not specifically abrogated the tribes' immunity." 744 F.3d at 219; *see EEOC v. Karuk Tribe Housing Auth.*, 260 F.3d 1071, 1075 (9th Cir. 2001) (while "Indian tribes do, as a general rule, enjoy

sovereign immunity from private lawsuits," they "do not . . . enjoy sovereign immunity from suits brought by the federal government").

Second, the Tribe's immunity belongs to the Tribe, not to individual tribal members or employees. Accordingly, where a suit seeks to impose "individual or personal liability" such that the Tribe is not the "real party in interest"—like this case—the Tribe's immunity is "simply not in play," regardless of whether the person was "acting within the scope of his employment" with the Tribe. *Lewis v. Clarke*, 581 U.S. 155, 162 (2017). Moreover, in the context of state criminal enforcement, this Court has said that, even assuming "tribal sovereign immunity may [in some cases] extend to tribal *officers*," it can do so "only when such officers [we]re acting within the *legitimate scope* of their official capacity," which Cromwell plainly was not doing in extorting bribes from RGB. *See Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 30 (1st Cir. 2006) (emphasis added). In other words, even if the Tribe possessed immunity from suit by the federal executive (which it does not), the government's prosecution of Cromwell did not touch on that immunity, so there was no reason to look for a clear statement about tribal officials in the Hobbs Act.[31]

---

[31] *In re Coughlin*, which the district court referenced in its analysis, is not on point for the same two reasons: unlike this case, the party bringing suit in *Coughlin* was not the federal government but a private debtor, and the suit there was against the tribe rather than individual tribal members. *In re Coughlin*, 33 F.4th at 603.

The flaw in the district court's sovereign-immunity reasoning becomes even more obvious when one considers the analogous situation of state officials. States have sovereign immunity, and a clear-statement rule applies to Congress's abrogation of that immunity, *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996), but (like tribes) states "have no sovereign immunity as against the Federal Government," *W. Virginia v. United States*, 479 U.S. 305, 311 (1987), and any immunity belongs to the sovereign and not to individual officers, *see Lewis*, 581 U.S. at 161-62. And state officials have been prosecuted under the Hobbs Act for years without, to the government's knowledge, any complaint about the lack of a clear statement in the statute that they are covered. *See, e.g., McDonnell*, 579 U.S. 550 (state governor); *United States v. Gillock*, 445 U.S. 360 (1980) (state legislator); *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) (state assembly member); *United States v. Mazzei*, 521 F.2d 639, 643-46 (3d Cir. 1975) (en banc) (state senator); *United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986) (state highway administrator).[32] The reason no one has made this argument is that, for the reasons

---

[32] The district court's sovereign-immunity logic not only would have made these prosecutions improper due to the lack of a clear statement, it also suggests Congress could not fix the situation even *with* a clear statement. The Hobbs Act was enacted pursuant to Congress's Commerce Clause authority, *see Taylor v. United States*, 579 U.S. 301, 306 (2016), and Congress lacks the power to abrogate state sovereign immunity under the Commerce Clause. *See Close v. State of N.Y.*, 125 F.3d 31, 38 (2d Cir. 1997).

stated above, the immunity of the sovereign the official served is not germane in a Hobbs Act prosecution of the official.

The Tenth Circuit's analysis of § 666 in *United States v. Barquin*, 799 F.2d 619 (10th Cir. 1986), which the district court cited, is plainly inapt. *Barquin* held that a prior version of § 666 did not cover tribal officials because (a) Congress chose to enumerate in the statute the officials to whom it applied, and (b) that list did not include tribal officials. 799 F.2d at 621-22 (referencing § 666's "narrowly drawn definitions" of covered officials). A few months after *Barquin*, Congress amended § 666 to list agents of an "Indian tribal government" as covered officials. *See* Pub. L. 99-646, § 59, 100 Stat. 3592 (Nov. 10, 1986). *Barquin* was not based on tribal immunity or any clear-statement rule; it was based on ordinary principles of statutory interpretation. *See id.* at 620. Those same principles tell us that because the Hobbs Act (unlike § 666) does not list the specific officials it covers but instead covers anyone who violates its terms, its failure to specifically mention tribal officials does not exempt them.

The district court briefly mentioned *Oklahoma v. Castro-Huerta* and *McGirt v. Oklahoma,* but those cases do not support the court's reasoning either. [SA.79-81, 104-06]. They both concerned state rather than federal prosecutions and were focused on the issue of jurisdiction to prosecute rather than tribal immunity from suit. *See Castro-Huerta*, 142 S. Ct. 2486 (2022) (state had concurrent jurisdiction

to prosecute non-tribal member for crime committed against tribal member on tribal land); *McGirt*, 140 S. Ct. 2452 (2020) (holding that certain land in Oklahoma was "Indian Country" under the Major Crimes Act, 18 U.S.C. § 1153, which provides that certain offenses committed by tribal members "within the Indian country" are within the federal government's exclusive jurisdiction). Though *McGirt* mentioned the need for a "'clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands," 140 S. Ct. at 2477 (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)), that was a reference to crimes committed by an Indian against another Indian on Indian land, a situation not present here.[33] *See Crow Dog*, 109 U.S. 556 (holding that federal court lacked jurisdiction to try Indian for the murder of another Indian committed in Indian country); *Keeble v. United States*, 412 U.S. 205, 209 (1973) (Major Crimes Act was enacted in response to *Crow Dog*). *Cf. United States v. Markiewicz*, 978 F.2d 786, 799 (2d Cir. 1992) (discussing "Indian-against-Indian crimes on Indian territory").

The district court offered no explanation for requiring a clear statement in the Hobbs Act other than its incorrect sovereign-immunity reasoning, and the

---

[33]     The victim of Cromwell's extortion was RGB. RGB, DeQuattro, and Beretta are not Tribal members. Cromwell used the assistance of another non-member, Mitrokostas, in carrying out the extortion. And, though some portions of the offenses may have occurred on Tribal land, a significant portion did not: Cromwell's home (the address he used for One Nation Development and where he received the Bowflex), CM International's address, the Boston Seaport Hotel, and RGB's offices are not on Tribal land.

government is aware of no reason such a rule should apply. Instead, as the government argued below, the appropriate standard for interpreting the Hobbs Act is the one this Court articulated in *United States v. Boots*: specifically, federal criminal statutes that "are not specific to Native Americans, but rather are of general applicability" should apply equally to tribal members *unless* such application "would interfere with any Native American right protected by statute or treaty, or right integral to self-government." 80 F.3d 580, 593 (1st Cir. 1996) (applying honest services wire fraud to tribal members), *abrogated on other grounds by Pasquantino v. United States*, 544 U.S. 349 (2005); *see United States v. Newell*, 658 F.3d 1, 11-12 (1st Cir. 2011) (applying *Boots* to § 666 conviction).[34]

The Hobbs Act applies to Cromwell's conduct because such application does not interfere with any protected Tribal rights or right integral to self-government under *Boots*. The Tribe perceived no such interference and supported the

---

[34] At least four other circuits have recognized this rule. *See Barquin*, 799 F.2d at 621 ("[T]ribal members are subject to general federal criminal statutes unless a particular Indian right or policy is infringed by enforcement of the law[.]"); *United States v. White*, 237 F.3d 170, 172 (2d Cir. 2001) ("With certain exceptions . . . federal laws of general applicability are presumed to apply to American Indians, regardless of whether they reside on or off a reservation."); *United States v. Blue*, 722 F.2d 383, 385 (8th Cir. 1983) (stating that "if a particular Indian right or policy is infringed by a general federal criminal law, that law will be held not to apply to Indians on reservations unless specifically so provided" but otherwise, the "general rule" is that "Congressional enactments, in terms applying to all persons, includes Indians"); *United States v. Farris*, 624 F.2d 890, 893-94 (9th Cir. 1980) ("[F]ederal laws generally applicable throughout the United States apply with equal force to Indians on reservations.").

prosecution.  [D.283-D.284; JA.2103-06].  It is plainly not integral to self-government for a Tribe's leaders to be immune from federal prosecution generally. *See Newell*, 658 F.3d at 11-12 (affirming § 666 conviction of tribal governor and stating that "despite rather mysterious invocations of tribal self-governance, [defendant] has not managed to explain how holding him, *qua* governor of a Tribe that received millions of dollars a year in federal financial assistance, criminally responsible for extensive misuse of federal funds would interfere with a 'right integral to self-government'").  The case did not impugn any Tribal law or policy. The government was not prosecuting Cromwell for carrying out his official duties; in fact, his actions violated the Hobbs Act precisely because extorting RGB was *not* consistent with his official duties.  *See Evans*, 504 U.S. at 268 (official must be "not entitled" to the payments under the governmental system he serves); *United States v. McClain*, 934 F.3d 822, 830 & n.11 (7th Cir. 1991) ("under color of" indicates the extortionate payment must be one to which there was, in fact, no "official right"). Finally, the case did not interfere with the Tribe's power to sanction Cromwell based on its own laws and traditions.  *Cf. Denezpi v. United States*, 142 S. Ct. 1838 (2022) (double jeopardy does not bar federal prosecution following tribal-law prosecution of same conduct).

In sum, the district court erred in finding that Hobbs Act extortion under color of official right does not apply to tribal officials, and the Court should reverse the

judgment of acquittal. As the court's error improperly lowered Cromwell's guidelines offense level, the Court should also remand for resentencing.[35]

## VII. CROSS-APPEAL: TRIBAL OFFICIALS ARE "PUBLIC OFFICIAL[S]" UNDER USSG § 2C1.1

The district court rejected two sentencing enhancements tied to Cromwell's status as a "public official" on the same incorrect clear-statement reasoning it applied to the Hobbs Act. The Court should reverse.

### A. Procedural History

Probation calculated Cromwell's offense level as 26, including a two-level enhancement for Cromwell being a "public official" at the time of the offense and a four-level enhancement because the offense involved an "elected public official," for a Guidelines sentencing range ("GSR") of 63-78 months. [SSA.14-15, 32]. Probation calculated DeQuattro's offense level as 18, including a four-level enhancement for an offense involving an "elected public official," for a GSR of 27-33 months. [SA.131, 143].

At sentencing, the district court rejected the two "public official" enhancements as inapplicable to tribal officials. [JA.2066, 2076]. This ruling

---

[35] The district court reasoned that because the only count of conviction covering the First through Fourth Checks was the Hobbs Act conspiracy count, the judgment of acquittal on that count required lowering the "value of the payment" under USSG § 2C1.1(b)(2) by $40,000, which resulted in a two-level rather than six-level loss enhancement. [JA.2077-82].

lowered Cromwell's offense level by six levels, which when added to the loss of four levels due to the judgment of acquittal on Cromwell's Hobbs Act conspiracy conviction, *see supra* note 35, resulted in a new GSR of 21-27 months. The ruling lowered DeQuattro's offense level by four levels, which resulted in a new GSR of 15-21 months. [JA.2074-75, 2083, 2089]. As noted above, the court sentenced Cromwell to 36 months in prison and DeQuattro to one year of probation.

## B.  Standard of Review

The Court "review[s] a district court's interpretation of the legal meaning and scope of a sentencing guideline de novo." *United States v. Carrero-Hernández*, 643 F.3d 344, 349 (1st Cir. 2011) (cleaned up).

## C.  The District Court Erred in Refusing to Apply the "Public Official" Enhancements

The bribery and extortion offense guideline provides for a two-level base offense level increase "if the defendant was a public official," USSG § 2C1.1(a)(1), and a four-level enhancement "[i]f the offense involved an elected public official." § 2C1.1(b)(3). As Cromwell was an elected tribal official at the time of Defendants' offenses, these enhancements should have applied. The commentary to the guideline confirms this, as it states that the term "'public official' shall be construed broadly" to include any person who "act[ed] under color of law or official right." § 2C1.1 cmt. n.1; *see Carrasco*, 79 F.4th at 168.

The district court nevertheless concluded that the term "public official" does not encompass tribal officials because the guideline does not contain a clear statement about tribal officials. [JA.2066]. This was error because, as explained above, no clear-statement rule applies. *See supra* Section VI(C). Moreover, this ruling did not even make sense on the court's own sovereign-immunity logic. Once any immunity was overcome to allow the suit—as the court found it was for Defendants' § 666 charges—there is no reason it should have had any effect on Defendants' advisory guidelines sentencing ranges. That would be like saying that even where immunity does not preclude a lawsuit, it should provide a discount on damages, which is not how immunity works.

The court misinterpreted the guideline, and the error was not harmless. *Cf. United States v. Ahmed*, 51 F.4th 12, 22 (1st Cir. 2022) (indicating that a guidelines calculation error is harmless where the "sentencing court makes clear that it would have entered the same sentence regardless of the Guidelines"). The case should therefore be remanded for resentencing on this basis, as well.

## **CONCLUSION**

The government accordingly requests that the Court affirm Defendants' § 666 convictions, reverse the judgment of acquittal on Cromwell's Hobbs Act convictions, and vacate Defendants' sentences and remand for resentencing.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    <u>/s/ *Karen L. Eisenstadt*</u>
Karen L. Eisenstadt
Assistant U.S. Attorney

**CERTIFICATE OF COMPLIANCE WITH**
**Rule 32(a)**

**Certificate of Compliance with Type-Volume Limit,**
**Typeface Requirements, and Type-Style Requirements**

1.   This brief complies with this Court's Order of January 16, 2024 allowing the government to file a principal/response brief of no more than 21,000 words, because this brief contains 20,839 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.

 /s/ *Karen L. Eisenstadt*
Karen L. Eisenstadt
Assistant U.S. Attorney

Dated:  January 16, 2024

## CERTIFICATE OF SERVICE

I, Karen L. Eisenstadt, Assistant U.S. Attorney, hereby certify that on January 16, 2024, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

Michael Pabian, Esq.
Michael Pabian Law Office
20 Park Plaza, Suite 1000
Boston, MA 02116

Robert Hennessy
Schnipper Hennessy, PC
25 Bank Row, Suite 2S
Greenfield, MA 01301


 /s/ *Karen L. Eisenstadt*
Karen L. Eisenstadt
Assistant U.S. Attorney

Nos. 23-1115, 23-1116, 23-1138, 23-1138

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————————

Nos. 23-1115
23-1116
23-1138
23-1139          UNITED STATES OF AMERICA,
APPELLEE/CROSS-APPELLANT

v.

DAVID DEQUATTRO; CEDRIC CROMWELL,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

————————————————

## Addendum Table of Contents[1]

1.  Excerpts from transcript of November 15, 2022 Sentencing Hearing
Pages 1-12 ...........................................................................G.Add.01
Pages 33-38 .........................................................................G.Add.13

2.  Government's Notice of Appeal [D.364] ........................................G.Add.19

---

[1] The government has not included the Judgments for defendants David DeQuattro and Cedric Cromwell in this addendum as those documents were included in the addenda to the defendants' opening briefs.

```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS



                              )
UNITED STATES OF AMERICA,      )
                              )          Criminal Action
          Plaintiff,           )          No. 20-10271-DPW
                              )
v.                             )
                              )
CEDRIC CROMWELL and            )
DAVID DEQUATTRO,               )
                              )
          Defendants.          )
                              )



              BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                   UNITED STATES DISTRICT JUDGE


                           SENTENCING

                       November 15, 2022




             John J. Moakley United States Courthouse
                        Courtroom No. 1
                       One Courthouse Way
                   Boston, Massachusetts  02210
```

```
                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 3200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

**G.Add.1**

```
 1    APPEARANCES:
      Counsel on behalf of United States:
 2    Christine J. Wichers
      Jared C. Dolan
 3    United States Attorney's Office MA
      1 Courthouse Way
 4    Suite 9200
      Boston, MA 02210
 5    617-748-3278
      Christine.wichers@usdoj.gov
 6    Jared.dolan@usdoj.gov

 7    Counsel on behalf of Defendant Cedric Cromwell:
      Timothy R. Flaherty
 8    699 Boylston Street, 12th Flr.
      Boston, MA 02116
 9    617-227-1800
      Timothyrflaherty@gmail.com
10
      Counsel on behalf of Defendant David DeQuattro:
11    Martin G. Weinberg
      Maksim Nemtsev
12    Martin G. Weinberg, PC
      20 Park Plaza
13    Suite 1000
      Boston, MA 02116
14    617-227-3700
      Owlmgw@att.net
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3    before the Honorable Douglas P. Woodlock, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

 7    November 15, 2022.)

 8    (Case called to order.)

 9              THE COURT:  Well, there are a couple of housekeeping

10    matters I want to take up first.  I have Mr. DeQuattro's

11    assented-to motion to seal the filings regarding his motion for

12    judgment of acquittal.  I assume there's no objection to that

13    from anyone.  It's been outstanding for a while.  So I'm going

14    to allow it.  The only thing that I think that's going to

15    remain under seal are the certain bank records that touch on

16    matters that were not introduced in the trial.

17              Second, I have some uncertainty about what's going on

18    with the victim witness statements.  I look at the procedural

19    order that was entered here.  It requires that the government

20    provide the Probation Office with written statements setting

21    forth the names of victims and their contact information and so

22    on as of May 12.  I don't believe that was done or there was

23    any notification.  The Presentence Report at paragraph 63 says,

24    "There are no identifiable victims."  And then all of a sudden,

25    a series of documents were produced through the U.S. Attorney's
```

The times "10:57" appear beside lines 10 and 20.

1     Office that purport to be victim witness statements.

2          So was the government unaware of these victims at the

3     time that it was obligated to provide the information to the

4     Probation Office?

5          MS. WICHERS:  No, Your Honor.  The issue is that, I

6     think the lack of clarity of the term "victim" in the relevant

7     statutes.  We had --

8          THE COURT:  I'm not even getting to that.  You had

9     notice that there were people who purported to be victims and

10:59 10  you didn't notify the Probation Office?

11         MS. WICHERS:  No, we did not, we did not have notice

12    that there were individuals of the tribe who --

13         THE COURT:  What about the tribe itself or someone who

14    purports to be speaking for the tribe itself?

15         MS. WICHERS:  We did not give them a -- we did not

16    give them the deadline, but we also did not --

17         THE COURT:  It was not their deadline.  It's yours.

18    You were supposed to notify Probation so Probation can prepare

19    in response to that because Probation actually does look at

10:59 20  these, as do I.  And so you were aware that there was someone

21    purporting to speak on behalf of the tribe who said they were

22    victims here as of May 12 and it wasn't disclosed to Probation,

23    right?

24         MS. WICHERS:  Almost right.  We were not aware that

25    someone was prepared to speak on behalf of the tribe.

1  Otherwise, your statement is correct.

2         THE COURT:  Well, the tribe purported to be --

3         MS. WICHERS:  Yes.

4         THE COURT:  And was the tribe speaking apart from some

5  other human being?  I mean, the tribe made you aware.  How did

6  they make you aware?  Who spoke for the tribe to make you

7  aware?

8         MS. WICHERS:  We learned of that last week when we met

9  with the tribe.

11:00 10       THE COURT:  But you said that you knew as of May 12

11  that the tribe was purported to be a victim, right?

12         MS. WICHERS:  Correct.

13         THE COURT:  How did you know that?

14         MS. WICHERS:  From the facts of the case.

15         THE COURT:  Pardon me?

16         MS. WICHERS:  From the fact of the case.

17         THE COURT:  So you thought that they were a victim?

18         MS. WICHERS:  Yes.

19         THE COURT:  And why didn't you disclose that to the

11:00 20  Probation Office?  I'm asking a fairly specific question.  I

21  don't understand the answer to it.

22         MS. WICHERS:  I guess one would call it oversight.

23         THE COURT:  Okay.  So the oversight resulted in a

24  filing that was made relatively recently here through the U.S.

25  Attorney's Office raising some significant issues, apparently

the government recognizes it's a significant issue whether or

not the tribe can be viewed as a victim --

MS. WICHERS:  Yes.

THE COURT:  -- under these circumstances.  It would be

nice to know that ahead of time so that we don't have a hearing

in which we have to take this matter up belatedly.  But then we

have other things that are filed, a series of things that were

filed by persons who request that their letter be submitted

under seal, but they're addressed to me, sent along through the

11:01  U.S. Attorney's Office.

There is actually two, one in which was transmitted to

Ms. Victoria as of yesterday at 3:25 p.m. that says, the

individual has asked that the letter be submitted under seal to

Judge Woodlock and not be made public.  The short of it is I

don't receive those kinds of letters.  If somebody wants to be

heard on the question of sentencing, and this person apparently

does want to be heard on the question of sentencing, it has to

be known to both sides.  Otherwise I simply strike it.  I can't

imagine why it would be thought otherwise.  Then --

11:02  MS. WICHERS:  We --

THE COURT:  If I may.  Then shortly thereafter, as of

3:59, another letter comes in with a communication to

Ms. Victoria.  This one, too, just received.

Now, I guess I'm supposed to interpolate that that

means that this person also wishes to have this under seal, not

1    to be disclosed.  Is that right?

2         MS. WICHERS:  Yes, Your Honor.

3         THE COURT:  Okay.  Well, so long as these people don't

4    want to have their observations pressing me to take particular

5    action with respect to the sentence available for the defendant

6    to review and others to review to evaluate their bona fides for

7    it, I'm going to strike both of those letters here.

8         Now, I have one letter that doesn't seem to fall in

9    that category.  It was submitted apparently to the U.S.

11:04 10   Attorney's Office from Mr. Kelly, and that was done at 6:14

11   yesterday -- well, actually 6:14 this morning and then

12   communicated at 7:43 through the U.S. Attorney's Office.

13   Little hard to absorb things like that.  Mr. Kelly I know has

14   represented the tribe, or I gather he's represented the tribe

15   in various matters here.  But I assume that the defendants have

16   seen this letter.  Have you, Mr. Flaherty?

17        MR. FLAHERTY:  I'm aware of it, Judge.  I haven't

18   absorbed it either.

19        THE COURT:  Okay.  But this is a letter from Gayle

11:05 20   Andrews, in parens, Peters, who is a member of the tribe.

21        MR. FLAHERTY:  Thank you, yes.

22        THE COURT:  Okay.  So I want to be sure that we can

23   move ahead with matters with these delayed submissions.  Do the

24   defendants have any objection to moving ahead at this point?

25        MR. WEINBERG:  Not from the defendant DeQuattro, Your

1   Honor.

2           THE COURT:  Mr. Flaherty?

3           MR. FLAHERTY:  No, sir, no objection.

4           THE COURT:  All right.  So then let's turn to a

5   separate question that was raised in connection with the

6   motions for judgment of acquittal, which I've been thinking

7   about quite a bit.  The issue really has to do with the

8   integrity of the tribe and its immunities and the immunities

9   that extend to those who are their leaders.  Put it that way.

11:06 10         The issue is not precisely developed as yet in the

11  larger sense, but my own view is that the Supreme Court and the

12  First Circuit have been moving in the direction of saying,

13  Look, if you want to take away the immunity of a tribe or its

14  leaders, Congress is going to do that with specificity.  That

15  in fact is what they did with respect to 666(a).  The statute

16  was amended in I think 1984 or so.  And almost immediately the

17  Tenth Circuit, dealing with a case then under appeal said, you

18  know, if you want 666 to apply to Indian tribes, you've got to

19  say so directly, and they the granted acquittal.  Within

11:07 20  several months, Congress amended again to make it direct that

21  Indian tribes were included, Indian tribes and their officials

22  were included.

23         Now, what do I draw from that?  Well, first that it's

24  very important, having in mind the integrity of tribal

25  governments and their relationships that they have as

sovereigns, to observe the parameters.  It is the case that no

one would suggest that section 201, which is the traditional

bribery statute, applies to tribes.  In fact, it's so unclear

whether it applies at all to state and local officials,

although the government from time to time in the past anyway

has tried to pursue it on those grounds.

What happened is 666 was amended to make it clear, but

we also have here an extortion claim, extortion under color of

official right.  That does not specify tribes or tribal leaders

as officials.  And my view is I have to grant acquittal with

respect to that.  That is a statute that just doesn't apply,

unless we are to just run roughshod over the particular

attributes of sovereignty that Indian tribes have.

Now, the issue is percolating along in the Supreme

Court.  It's percolating as a result of at least one case

coming from the First Circuit.  It's been identified by

Mr. Flaherty and Mr. Weinberg in their pleadings, and that's

the *Chippewa v. Coughlin* case that the First Circuit dealt with

earlier this year.  It's the subject of a petition for

certiorari now.  The petition and the opposition have been

filed.  The time for a reply hasn't run and the court hasn't

set it for a conference yet, or at least they hadn't as of this

morning because I looked at it this morning.  Nevertheless,

there is filed as an amicus curae a brief by the group of

people who have styled themselves as professors of federal

1 Indian law in support of the petitioners who were essentially

2 saying, you know, you can't do this unless you've called out

3 with specificity the application to the tribes. Interestingly

4 enough, the counsel in the case and among the federal Indian

5 law professors, Matthew Fletcher, who was a tribal member as I

6 understand it, was the reporter of this document.

7 It's through the statement of the law, the law of

8 American Indians. It was issued in this form on September 26

9 of this year, although it was adopted I believe by the ALI

11:11 10 subject to revision back in 2019. It's not directly on point,

11 but it I think gives pretty clear indication that this is an

12 area in which everybody has to tread carefully, lest

13 enthusiasms to pursue things that people might find

14 objectionable and certain people don't undermine the authority

15 of the relevant tribal sovereign.

16 The language that the tribal or the Indian law

17 practitioners offer at the end of the brief is, "Tribal

18 sovereign immunity persists unless a native nation clearly

19 waives it or Congress unequivocally says otherwise. Congress

11:13 20 did not do so when it enacted the bankruptcy code," which was

21 the original issue, "and it has not done so since. Native

22 nations may therefore raise sovereign immunity as a defense to

23 claims for damages under the code."

24 All of that I read to mean that the use of the Hobbs

25 Act in this area -- and I actually solicited from the

1    government materials regarding it.  I never received that.

2    Perhaps that was an oversight.

3         There seems to be a quizzical look, so let me be more

4    specific.  I asked for this when I said, "Had this ever been

5    done before?"  And I was told that it had been.  It had been

6    done in Oklahoma.  I said, "Where are the materials," and I was

7    told that they were not available.  I asked to have them

8    searched for and didn't hear anything since.  I'm not aware of

9    any reported decisions with respect to the Hobbs Act applying

11:14 10    to Indian tribes.  Are you, Ms. Wichers?

11         MS. WICHERS:  No, Your Honor.

12         THE COURT:  Okay.  So it comes back to this, that I'm

13    going to grant the motion for judgment of acquittal with

14    respect to the Hobbs Act, which applies only to Mr. Cromwell.

15         Now, having said that, I solicited Ms. Victoria to

16    look at the guidelines in this area, and I believe that she's

17    provided the outcome of her exploration to counsel.  It doesn't

18    make a difference under the guidelines, at least the way in

19    which Ms. Victoria speaks of it, and of course this is

11:15 20    consistent with the idea of overcharging that this area has

21    generated.  But the government is entitled to charge any

22    applicable statute and apparently they believe no potential

23    applicable statute to apply.  So I've looked at it and decided

24    that it must be disregarded here.  That is part of the

25    materials that the tribe itself included, or at least the

1  current leadership of the tribe itself included in its argument

2  here.

3        One of the things that's critical in getting this

4  early rather than late is to be able to sort through what's

5  going on because there are arguments that are made in

6  Mr. Weeden's letter on behalf of the tribe that one might think

7  were evidentiary in nature.  That is the assumption or

8  argument, whether supported or not in the evidence is another

9  matter that we'll get to, but the assumption that the Gaming

11:16 10  Commission and the tribe are both within the ambit of 666(a).

11  Properly, timely provided with the information, presumably

12  counsel would be able to argue against it.  I've tried to sort

13  through this as best I can to be sure that I'm not influenced

14  by that any more than I'm influenced by somebody who sends a

15  letter and says they don't want anybody else to know about it;

16  it's just for me.

17        So I guess that's where we are.  The first order of

18  business, as far as I'm concerned, is to deal with the

19  outstanding motion for acquittal here, which is now focused as

11:17 20  a result of the action I've taken with respect to the Hobbs Act

21  on 666(a).  And I don't know if the defendants have anything

22  more that you want to say in anticipation of going through that

23  and then moving on to the calculation of the sentence, assuming

24  that it's going to be calculated as well.

25        MR. WEINBERG:  If I could just have five minutes to

**G.Add.12**

1    So we're now faced with the issue of what do we do in

2  light of the insights that Ms. Victoria has brought to bear in

3  this case.  I'm not sure, first Mr. Flaherty and then

4  Mr. Weinberg, if there are any remaining guidelines challenges

5  to be made here.  I looked carefully at the Presentence Report,

6  and this has been narrowed down to what I think is capable of

7  being advanced, but perhaps I've missed something.  So are you

8  going to go first, Mr. Weinberg?

9    MR. WEINBERG:  I think there's at least probably two

11:52 10  common challenges.  One being to Ms. Victoria's finding or view

11  that the four-level enhancement for an elected public official

12  should be added to the base guideline, which elevates the

13  guideline from 14 to 18.

14    THE COURT:  But why isn't that a fair way of referring

15  to a sovereign's position?  I've said, you know, he was the

16  voice of the sovereign here.  Isn't it demeaning to Indian

17  tribal sovereignty to say he's a second-class official?

18    MR. WEINBERG:  I would contend to Your Honor that,

19  just as in the statutory analysis for 1951, the Sentencing

11:53 20  Commission and implicitly Congress has every ability to write

21  the text to include a tribal sovereign for an enhanced

22  sentence, and there was nothing in the face of these guidelines

23  that expand them to include the leader of a Commonwealth, the

24  leader of a territory, political leaders that are not elected

25  but they omit and do not mention anything to do --

**G.Add.13**

1     THE COURT:  Does it cover state and local officials?

2     MR. WEINBERG:  It does cover state and local

3  officials.

4     THE COURT:  So it's only as to representatives of the

5  tribal sovereignty.  That's the argument that you're making.

6     MR. WEINBERG:  They're omitted where the Sentencing

7  Commission in its text included so many others.  But then they

8  have a list of factors that you go through.  Is it within 201?

9  No.  Are they state or local elected officials?  No.  Are they

11:54 10  -- you know, the emphasis is on public and every one of these

11  guideline criteria, Mr. Cromwell, whatever his leadership of a

12  2600-member tribe is, it's not a public tribe.

13     THE COURT:  But you're making this Manichean

14  distinction between public and Indian sovereign, and I would

15  suggest that Indian sovereign means a special kind of public.

16     Now, is this language infelicitous?  Yes, it is.  The

17  guidelines at every turn make clear how difficult it is to

18  capture things on the run.  And of course we only now are

19  getting a commission that's capable of even doing anything with

11:55 20  the guidelines.  We've been dealing not with the dysfunctional

21  Sentencing Commission, a nonfunctional Sentencing Commission.

22  But reading this language from a broader perspective, I wonder

23  whether that makes sense.

24     MR. WEINBERG:  The Commission did try to address the

25  scope of -- in that, I think section E, and he talked about, is

**G.Add.14**

this somebody who is acting under color of law or official
right, just like as to language of the Hobbs Act official
right.  Is he different than, you know, somebody who is elected
by the public in terms of an open-ended public?  And that's
what all of the other criteria mentioned, except one where they
exclusively talk about someone who is a political leader almost
anticipating the Supreme Court's case in *Percoco* or however I
pronounce that.

THE COURT:  I note, as you just have, that *Percoco* is
going to be argued at the end of this month.  The briefing was
only completed yesterday.

MR. WEINBERG:  Lastly, Judge, if we remember what the
act is that Mr. Cromwell is being punished for and that it
risks an elevation of Mr. DeQuattro's sentence, it's
Mr. Cromwell's conduct as the chairman of the Gaming Authority,
not the chairman of the tribe.  He wasn't elected to the Gaming
Authority.  He was appointed because he was the head of the
tribe.  He was one of five members.  It was a business
transaction.  It didn't deal with legislation.  It didn't
deal --

THE COURT:  But that's not a requirement, that it deal
with legislation.

MR. WEINBERG:  No.  The requirement is that it be an
elected public official whose conduct as an elected public
official is at the heart of 666.  He was a member of a Gaming

```
 1    Authority that --

 2           THE COURT:  You mean you have to be elected at each of

 3    the levels separately?

 4           MR. WEINBERG:  If there's the separation, as there

 5    is --

 6           THE COURT:  And if I say there isn't?

 7           MR. WEINBERG:  The Gaming Authority insulated the

 8    tribe from any liability for any decision made by Mr. Cromwell,

 9    any decision about federal program funds.  So in this case --

11:57 10       THE COURT:  I'm not sure I understand what you mean by

11    that, insulated the tribe?

12           MR. WEINBERG:  Well, from Mr. DeQuattro's perspective,

13    he's dealing with Mr. Cromwell not as the head of the tribe as

14    he did when they built the government center but as the head of

15    the Gaming Authority.  They signed the contract that said that

16    no liability by the Gaming Authority to RGB can obligate the

17    tribe.  You can't sue the tribe.

18           THE COURT:  But you could sue the Gaming Authority.

19           MR. WEINBERG:  You could sue the Gaming Authority.

11:58 20       THE COURT:  So the Gaming Authority is simply a

21    subordinate entity of the tribe?

22           MR. WEINBERG:  But he wasn't elected to the Gaming

23    Authority, Judge.

24           THE COURT:  I think I understand that argument.

25           Anything else, Mr. Flaherty?
```

1        MR. FLAHERTY:  Just, not to repeat and reiterate

2    Mr. Weinberg's arguments, but I think the catch-all clause,

3    subsection paragraph E of 2C1.1 does not include tribal

4    officials, Judge.  And I know that you said are we then to say

5    that tribal sovereign officials are second-class citizens.  No,

6    not at all, or second-class officials.  But they're not public

7    officials.  Tribal government affairs, the Mashpee Wampanoag

8    tribe is no more public than the Edgartown Yacht Club, Your

9    Honor.

11:59 10        THE COURT:  The government hasn't yet gone after the

11   Edgartown Yacht Club for breach of fiduciary duty or some

12   property crime, wire fraud.  That's not the issue.  The issue

13   is whether or not we're dealing with a sovereign who can be

14   swept up in this particular guideline.

15        MR. FLAHERTY:  But to reiterate my arguments in Rule

16   29 and my memorandums afterwards post-conviction, public means

17   just what it means, Judge.  And the elections were limited to

18   the 2,600-member Mashpee Wampanoag Tribe.  I couldn't

19   participate.  You couldn't participate.  Any other person who

11:59 20  is not an enrolled member of the tribe couldn't participate.

21   That membership is guided by ancestral lineage, bloodlines, and

22   the tribe by its very existence, by its definition, is not

23   public.

24        Article I Section 8 recognizes independence of tribes.

25   And that's going back to 1787.  And I know it's been abrogated

in many respects over the years, but here the sentencing

guidelines are silent.  1951 is silent.  And for those reasons,

Judge, the court has I know thought very long and hard about

it, I would suggest that that particular enhancement on

sentencing not be applied in this case or any tribal case

specifically because the language is not included therein

describing tribal officials as elected public, public

officials.

THE COURT:  Well, I'm not going to allow the

enhancement, and the reason I'm not going to is basically the

same way in which I dealt with 666(a) here.  If an entity, a

government entity like the Sentencing Commission wants to do

it, they know how to do it.  The language is clear in this area

that it requires them to apply.  They haven't drawn the tribe

into this directly.  They've given a generality, a generality

generated I think by where they were at the time that they

entered that guideline.  Maybe they'll tidy it up.  They've got

a lot of work to do.  This will become part of their work if

that's what they want to do.  But until they do, it seems to me

that this is not a guideline that I'm going to honor for these

purposes.  So I exclude that.

Now I ask a separate question with respect to this.

It's a larger question that's raised by these kinds of

guidelines, and I don't know whether the parties -- well, the

parties will be heard on it.  I don't know whether they've

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 20-10271-DPW** |
| | ) | |
| **(1) CEDRIC CROMWELL and** | ) | |
| **(2) DAVID DEQUATTRO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the United States of America (the prosecution in the above-captioned case) hereby appeals to the United States Court of Appeals for the First Circuit from the district court's (Woodlock, J.) oral ruling made during defendants' November 15, 2022 sentencing hearing [*see* D.289], granting defendant Cedric Cromwell's *Motion for Judgment of Acquittal* [D. 242], as to Counts 6, 7, 8 and 10 (the Hobbs Act counts of conviction), from the sentences imposed by the district court on defendants Cedric Cromwell and David Dequattro on November 15, 2022 [*see* D.289], which sentences the district court restated on January 18, 2023 [*see* D.335], and from the resulting *Judgments in a Criminal Case* (judgments for both defendants entered on the docket on January 31, 2023), [D.336, 338].

Defendants David Dequattro and Cedric Cromwell filed notices of appeal from their judgments and sentences on February 1, 2023 [D.341, D.344], and those appeals have been docketed as Appeal Nos. 23-1115 and 23-1116, respectively.

**G.Add.19**

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    /s/ *Christine Wichers*
CHRISTINE WICHERS
JARED C. DOLAN
Assistant U.S. Attorneys

Certificate of Service

I hereby certify that on February 6, 2023, this Notice of Appeal filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Christine Wichers*
CHRISTINE WICHERS
Assistant U.S. Attorney

2

**G.Add.20**