Nos. 23-1116 & 23-1138

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,
*Appellee/Cross-Appellant,*

v.

CEDRIC CROMWELL,
*Defendant - Appellant/Cross - Appellee.*

———————————————

*On Appeal From A Judgment Of The United States District Court
For The District Of Massachusetts*

———————————————

## PETITION FOR REHEARING AND
## SUGGESTION FOR REHEARING *EN BANC*

———————————————

ROBERT F. HENNESSY
FIRST CIRCUIT NO. 1158975
BBO NO. 675977

SCHNIPPER HENNESSY, PC
25 BANK ROW, SUITE 2S
GREENFIELD, MA 01301
413) 325-8541, (413) 325-8692-fax
*rhennessy@schnipperhennessy.com*

October 11, 2024

## PETITION FOR REHEARING AND
## SUGGESTION FOR REHEARING *EN BANC*

Now comes Cross-Appellee, Cedric Cromwell, by and through counsel, and petitions for Rehearing *En Banc* and for Panel Rehearing, pursuant to the provisions of Rules 35(b)(1) and 40(a)(2) of the Federal Rules of Appellate Procedure, of so much the panel opinion in the above referenced cases as reverses the District Court's grant of Cromwell's motion for judgment of acquittal on his Hobbs Act convictions.

## RULE 35(b)(1) STATEMENT

This Court should grant rehearing en banc in order to ensure adherence to the heightened *quid pro quo* standard prescribed in *McCormick v. United States*, 500 U.S. 257 (1991), which this Court has held is applicable where, as here, the "thing of value" alleged to have been corruptly exchanged "is treated as" or "takes the form of" a campaign contribution. *United States v. D'Amico*, 496 F.3d 95, 101 (1st Cir. 2007). The panel's written opinion, which acknowledges that donations received by Cromwell were solicited "as campaign contributions" [Opinion at 45], nevertheless fails even to cite let alone apply *McCormick* or ensure fidelity to its prophylactic holding.

The panel decision thus conflicts with *McCormick* and also with decisions of this and other United States Courts of Appeals reaffirming *McCormick*'s heightened standards as applicable in all Hobbes Act prosecutions predicated on putative campaign contributions. *See e.g. United States v. Turner*, 684 F.3d 244, 253 (2012) (quoting *McCormick*, 500 U.S. at 273); ("public official's acceptance of payments that *are treated as* campaign contributions is a violation of the Hobbs Act 'only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act.'"); *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) (Sotomayor, J.) ("proof of an express promise is necessary when the payments are made *in the form of* campaign contributions.") (emphasis added); *United States v. Salahuddin*, 765 F.3d 329, 343 n. 9 (3d Cir. 2014) ("explicit *quid pro quo* is required for extortion based upon campaign contributions"). Reconsideration by the full court is necessary to secure uniformity of the court's decisions and adherence to the Supreme Court's holdings.

## RULE 40(a)(2) STATEMENT

The panel's written opinion also overlooks or misapprehends important points of law and fact pertinent to the proper analysis of the

sufficiency of the government's evidence to prove, beyond a reasonable doubt, the existence of separate a *quid pro quo* with respect to each of the transactions underlying the each of the reinstated counts (Counts 6, 7, 8, and, 10). These include the standard by which the sufficiency of the government's evidence on the *quid pro quo* element needed to be assessed and the significance of the government's express disavowal on a "stream of benefits" theory to that sufficiency analysis.

## ARGUMENT

**The Panel Opinion Overlooked or Misapprehended the Standard by which the Sufficiency of the Government's Evidence on the Quid Pro Quo Element Needed to be Assessed. The Result is a Panel Decision Thus Conflicts With McCormick And Also With Decisions of this and Other United States Courts of Appeals Reaffirming McCormick's Heightened Standards as Applicable in all Hobbes Act Prosecutions Predicated on Putative Campaign Contributions**

In *McCormick v. United States*, the Supreme Court acknowledged that – given the system of private political campaign financing that has existed in the United States since the nation's inception – political candidates and incumbents alike cannot realistically avoid soliciting campaign funds from the precisely those whose interests they may later advance through the support of specific legislation or other official acts. 500 U.S. 257, 272-73 (1991). As a result, *McCormick* held that Hobbes Act extortion based on

solicitation of campaign contributions requires a *quid pro quo* in the form of an "explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273.

In its brief to this Court, the government argued, for the first time, that that this Court's sufficiency review need not—indeed, may not— consider whether the its evidence at trial sufficed to prove beyond a reasonable "a 'clear and unequivocal' *quid pro quo* (the standard for a bribe based on a campaign contribution under *McCormick v. United States*, 500 U.S. 257 (1991)." It claimed that the District Court's *McCormick*-derived "'clear and unequivocal' *quid pro quo*" instructions—instructions which the government not only repeatedly endorsed but also explicitly requested below—may not serve as the standard by which to measure the sufficiency of the evidence appeal because, the government asserted, it erroneously elevated its burden of proof beyond that required by statute. [Gov't. Br. at 32-33]. Further (and again for the first time on appeal) the government argued that the District Court's "'clear and unequivocal' *quid pro quo*" instruction must be dispensed with on appeal because "[t]aking the evidence in the light most favorable to the verdict, a rational jury readily

could have found that none of the convicted payments were campaign donations subject to *McCormick*." [Gov't. Br. at 32-33].

Cromwell countered in his Reply Brief that neither *McCormick* nor standards derived therefrom "adds" any extra "element" to charged offenses, but instead simply establishes substantive guidelines for determining whether the government has carried its burden of establishing the element of an actionable *quid pro quo*, which this Court has made clear (and the government does not contest) remains essential to "official right" extortion under 18 U.S.C. § 1951. *Accord United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("adjectives do not add a new element to these criminal statutes but signal that the statutory requirement must be met"). *Compare Musacchio v. United States*, 577 U.S. 237 (2016) (addressing different situation of how to conduct sufficiency analysis when "a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element"). Therefore, Cromwell argued, the District Court's "'clear and unequivocal' *quid pro quo*" standard constituted the standard against which the sufficiency of the government's evidence must be assessed. *See United States v. Kilmartin,* 944 F.3d 315, 328-29 (1st Cir. 2019); *United States v. D'Amico*, 496 F.3d 95, 102 (1st. Cir. 2007) (vacated on other grounds in

*D'Amico v. United States*, 552 U.S. 1173 (2008)). Cromwell argued that the government's arguments to the contrary, raised for the first time on appeal, were waived. [Cromwell Reply Brief at 25]. Cromwell further cited the lack of controlling authority limiting *McCormick*'s prophylactic principles to circumstances in which the *bona fides* of a purported campaign contribution are not disputed by the government. Were this the standard, Cromwell noted, it would be difficult to see how even the payments made to McCormick himself, which were made in cash and went unrecorded as contributions by both donor and recipient, *McCormick*, 500 U.S. at 260, could have been "subject to *McCormick*."

Inexplicably, the panel's sufficiency analysis elides completely these foundational questions concerning the standards against which the government's evidence needed to be measured on appeal. It makes no reference and provides no analysis of the live issue of the applicability of the District Court's *McCormick*-derived "'clear and unequivocal' *quid pro quo*" instructions either under *McCormick* or under the law of the case doctrine. It simply ignores them. Moreover, despite acknowledging that donations received by Cromwell and charged as Hobbs and violations were, at a minimum, solicited "as campaign contributions" [Opinion at 45],

the panel opinion fails even to cite *McCormick* let alone pay any mind to ensuring fidelity to its prophylactic holding.

At most, the panel opinion intimates some level of tacit agreement with (albeit no substantive analysis of) the government's argument that the *McCormick*–derived "'clear and unequivocal' *quid pro quo*" standard expressly agreed to government below is nevertheless inapplicable on appeal because "a rational jury readily could have found that none of the convicted payments were campaign donations subject to *McCormick*." See Opinion at 45-46 (observing that "the fact that Cromwell used most of the checks for personal expenses rather than for reasons that he gave DeQuattro could lead a reasonable juror to find that Cromwell's explanations were pretextual" and that "the small size of the Tribe" among other factors made it "unlikely that Cromwell needed multiple $10,000 payments for a tribal election campaign"). The problem with such a *sub silentio* endorsement, however, is that it is irreconcilable with this Court's prior rejection of nearly identical government arguments—that unobjected-to *McCormick*-based instructions are rendered inapplicable simply because a jury "could have" inferred that a charged payment was not a campaign contribution—in circumstances strikingly similar to those presented here.

In *United States v. D'Amico*, 496 F.3d 95, 102 (1st. Cir. 2007) (*vacated on other grounds in D'Amico v. United States*, 552 U.S. 1173 (2008), this Court explained:

> The government contends that the *quid pro quo* requirement does not apply in this case because there *was evidence from which a jury could conclude* that [the payor's] payment to D'Amico was not a campaign contribution. But, *whatever inference the evidence may have permitted*, the district court instructed the jury that to find D'Amico guilty, it had to conclude that "the payment was made in return for an agreement or a promise by [D'Amico] to perform some official act . . . . The quid pro quo is a promise to use the office for the benefit of the payor." This instruction, unobjected to by the government, is the law of the case and supplies the standard by which we measure the sufficiency of the evidence.

*Id.* at 102.

Here, "whatever inference the evidence may have permitted" concerning the *bona fides* of the payments charged as Hobbes Act extortion as campaign contributions[1], the jury was instructed repeatedly and without

---

[1] In this regard, the evidence at trial establishing that the donations were understood by the parties to be contributions went far beyond the language used in Cromwell's requests. The record demonstrates that, even as charged in indictment, the payments solicited by Cromwell were understood to be at least "in the form" of "donations to his reelection campaign and/or charitable contributions to One Nation Development" App.48,73. At trial, the government's star immunized witness, Beretta, testified repeatedly to his understanding of Cromwell's requests as "contribution[s] to his re-election campaign" and that he and DeQuattro considered the fulfillment of those requests to be "a political contribution."

objection that in order to convict, an agreement between Cromwell and Dequattro to exchange payments for official action by Cromwell "must be established *clearly and unequivocally* beyond a reasonable doubt . . . ." App:1815. (emphasis added). "This instruction, unobjected to by the government, is the law of the case and supplies the standard by which [the Court was required to] measure the sufficiency of the evidence." *Id.* In declining to do, the panel "overlooked or misapprehended" a point of law crucial to the fair and accurate determination of Cromwell's sufficiency claims.  It likewise conflicts with a decision of the United States Supreme Court or of the court to which the petition is addressed (with citation to the conflicting case or cases) and consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions

---

App. 780,783,792,798,843-844. Evidence was presented that DeQuattro, when interviewed FBI, stated that the purpose of his donations was "Campaign help fundraising" and that he would donate again if asked, App.94813, and that Cromwell, in relation to the 2015 payment charged in Counts Two and Seven of the Indictment, communicated in writing that the donation would be used "for Political Action Committee towards food, campaigns and elections" App:1577, a fact also specifically referenced in the indictments. At the same time the circumstantial case that the payments were clearly *not* considered campaign contribution by the parties on account of the way that they were subsequently used is weakened by the fact, stipulated to at trial, that tribal leaders like Cromwell are not subject to federal or state laws governing the solicitation, acceptance, recording or disbursement of campaign contributions. App. 1141-1142.

**The Panel Opinion Overlooked Or Misapprehended The Significance Of The Government's Express Disavowal On A "Stream Of Benefits" Theory On The Sufficiency Analysis.**

At trial, the government expressly disavowed any reliance on a "stream of benefits" theory of *quid pro quo*, App:1028-29, 1079-80, choosing to proceeded exclusively on a theory that *each* of things of value solicited and received by Cromwell was a separate *quid pro quo* transaction given by mutual agreement in exchange for a discrete promise to "protect" RGB's casino contract from termination. App.229,1079-1080. The consequence of that strategic decision, as the government acknowledged in its opening brief, was that "the government needed to prove a separate *quid pro quo* for each payment[.]" [Gov't Br. at 31]. The existence or non-existence of a separately charged and separately prosecuted *quid pro quo* agreement is a matter that must be determined individually, in light of the specific circumstances present *at the time* that each allegedly corrupt payment was solicited or received. *See, e.g., McDonnell v. United States*, 579 U.S. 550, 572-73 (2016)(jury must "determine whether the public official agreed to perform an 'official act' *at the time of the alleged quid pro quo*" (emphasis added)); *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022)("[T]he official must make a decision or take action, or promise to do so, on the

particular matter *at the time* he receives payment or other things of value."
(emphasis added));*United States v. Silver*, 948 F.3d 538, 558 (2d Cir.
2020)("[A] particular question or matter must be identified *at the time* the
official makes a promise or accepts a payment." (emphasis added)). *Accord*
Government Brief at p. 31 (acknowledging that choice not pursue a "stream
of benefits" theory "means the government needed to prove a separate
quid pro quo for each payment."). Concomitantly, analysis of the
sufficiency of the evidence offered in support of separately charged and
separately prosecuted *quid pro quo* agreements must also be individualized,
and must focus specifically on matters as they stood at the time that each
allegedly corrupt payment was solicited or received. This, the panel
opinion fails to do.

Instead of analyzing with particularity the evidence as it existed at
the time of or in relation to any of the transactions separately charged, the
panel opinion improperly engages in an omnibus analysis in which it relies
generally on circumstances present with respect to individual transactions
while simultaneously ignoring the *absence* of such circumstances with
respect to others.

For example, the panel's analysis seizes on evidence that in relation

to *one* requested contribution, the first, Cromwell "g[ave] DeQuattro instructions on how to get him the cash and calling him for updates when one of the checks was delayed" as supportive of the proposition that Cromwell he "intended DeQuattro to understand that he was being asked to enter a quid-pro-quo arrangement" while failing to acknowledge the *absence* of similar evidence in relation to any other donation separately charged. Similarly the panel points to evidence of alleged concealment as "powerful evidence of ... corrupt intent" [Opinion at 46 (citation omitted)], while simultaneously failing to acknowledge that *none* of the transactions underlying *any* substantive Hobbs Act extortion counts at issue (Counts Seven, Eight, and Ten) were concealed in any way Cromwell—that the donation charged substantively in Count Seven was made by check payable directly to One Nation Development, an entity formed by Cromwell in his own name, App:1420, that the BowFlex charged in Count Eight was delivered directly to Cromwell's home where DeQuattro, in yet another indication of friendship, personally helped Cromwell set up the machine, or that the hotel stay charged in Ten was booked in Cromwell's name, which appeared on the hotel records. App:1587-1591.

Further evidence of an improper conflation can be found throughout

the panel's opinion, including its observations that the clearly aggregated amount of "$50,000 over sixteen months is not *a* typical token of goodwill," and that Cromwell's complaint to DeQuattro that the Bowflex was used rather than new further *reinforces the conclusion that the checks and other things of value given* were not -- as Cromwell contends -- gifts since, as the government notes, "adults generally do not complain to gift-givers about the quality of their voluntary gifts." [Opinion at p. 45 (emphasis added)]. These observations lays bare the panel's failure to assess individually and with particularity the evidence as it existed at the time of or in relation to of separately charged transactions.

The result of this flawed analysis is to deny Cromwell a meaningful review of the sufficiency of the evidence with respect to each of the charges against him.

## CONCLUSION

For all of the reasons asserted herein, the court should grant this petition for a rehearing or rehearing en banc.

October 11, 2024                    Respectfully submitted,

APPELLANT CEDRIC CROMWELL

By /s/ Robert F. Hennessy
ROBERT F. HENNESSY

FIRST CIRCUIT NO. 1158975
BBO NO. 675977
SCHNIPPER HENNESSY, PC
25 BANK ROW, SUITE 2S
GREENFIELD, MA 01301
(413) 325-8541
FAX: (413) 325-8692
*rhennessy@schnipperhennessy.com*

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

*Certificate of Compliance with Type-Volume Limit,*
*Typeface Requirements, and Type Style Requirements*

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **2,750** words (according to Microsoft Word's word count feature), excluding the parts of the brief exempted by Fed. R. App. P. Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type style requirements of Feb. R. App. P. Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, using Microsoft Word in size 14 font, Book Antiqua type style.

/s/ Robert Hennessy
Robert Hennessy
*Attorney for Defendant-Appellant*

October 11, 2024

## CERTIFICATE OF E-FILING AND SERVICE

I certify that on October 11, 2024, the foregoing document was electronically filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system, thus effectuating service on all parties to this appeal.

/s/ Robert Hennessy
Robert Hennessy
*Attorney for Defendant-Appellant*

October 11, 2024

Nos. 23-1116 & 23-1138

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

---

UNITED STATES OF AMERICA,
*Appellee/Cross-Appellant*,

v.

CEDRIC CROMWELL,
*Defendants - Appellant/Cross - Appellee*
_____

*On Appeal From The United States District Court
For The District Of Massachusetts*

_____

## ADDENDUM
_____

1.    PANEL OPINION ................................................................. ADD. 1

# United States Court of Appeals
## For the First Circuit

───────────────

Nos. 23-1115
     23-1116
     23-1138
     23-1139

UNITED STATES OF AMERICA,

Appellee, Cross-Appellant,

v.

DAVID DEQUATTRO; CEDRIC CROMWELL,

Defendants-Appellants, Cross-Appellees.

───────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

───────────────

Before

Barron, Chief Judge,
Kayatta and Gelpí, Circuit Judges.

───────────────

    Martin G. Weinberg, with whom Kimberly Homan and Michael Pabian were on brief, for appellant, cross-appellee David DeQuattro.
    Robert F. Hennessy, with whom Schnipper Hennessy, PC was on brief, for appellant, cross-appellee Cedric Cromwell.
    Karen L. Eisenstadt, Assistant U.S. Attorney, with whom Joshua S. Levy, Acting U.S. Attorney, was on brief, for appellee, cross-appellant.

───────────────

September 27, 2024

───────────────

BARRON, **Chief Judge**.  In 2020, a federal grand jury indicted David DeQuattro, an architect with Robinson Green Beretta Corp. ("RGB"), and Cedric Cromwell, Chairman of the Mashpee Wampanoag Tribal Council ("Council") and President of the Mashpee Wampanoag Gaming Authority ("Gaming Authority").  They were charged with various federal offenses based on Cromwell allegedly soliciting, and DeQuattro allegedly giving in return, checks and other things of value to protect a contract between RGB and the Gaming Authority to build a casino on Mashpee Wampanoag Tribe-owned land.

Following a jury trial in the United States District Court for the District of Massachusetts, DeQuattro was convicted of one count of federal-program bribery, in violation of 18 U.S.C. § 666(a)(2), while Cromwell was convicted of two counts of federal program bribery, in violation of 18 U.S.C. § 666(a)(1)(B).  The jurors also found Cromwell guilty of three counts of Hobbs Act extortion and one count of conspiracy to commit Hobbs Act extortion.  The District Court entered a judgment of acquittal on those Hobbs Act-related counts because it determined that the Hobbs Act did not clearly abrogate tribal immunity.

In these consolidated appeals, DeQuattro and Cromwell challenge their § 666 convictions, and the government challenges the judgment of acquittal.  We reverse both the § 666 convictions and the judgment of acquittal.

- 2 -

**I.**

**A.**

18 U.S.C. § 666 provides:

> (a) Whoever, <u>if the circumstance described in</u>
> <u>subsection (b) of this section exists</u>--
>> (1) being an agent of an organization, or of
>> a State, local, or Indian tribal government,
>> or any agency thereof-- . . .
>>> (B) corruptly solicits or demands for the
>>> benefit of any person, or accepts or agrees to
>>> accept, anything of value from any person,
>>> intending to be influenced or rewarded in
>>> connection with any business, transaction, or
>>> series of transactions of such organization,
>>> government, or agency involving any thing of
>>> value of $5,000 or more; or
>> (2) corruptly gives, offers, or agrees to give
>> anything of value to any person, with intent
>> to influence or reward an agent of an
>> organization or of a State, local or Indian
>> tribal government, or any agency thereof, in
>> connection with any business, transaction, or
>> series of transactions of such organization,
>> government, or agency involving anything of
>> value of $5,000 or more;
> shall be fined under this title, imprisoned
> not more than 10 years, or both (emphasis
> added).

Subsection (b) sets forth the jurisdictional element of

§ 666 by establishing the link that must be shown between the

corrupt conduct described in subsection (a) and federal-program

financial assistance.  Subsection (b) provides: "The circumstance

referred to in subsection (a) of this section is that the

organization, government, or agency receives, in any one year

period, benefits in excess of $10,000 under a Federal program

involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." Id.

> The Hobbs Act provides:
>
> > Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2).

**B.**

The superseding indictment charged DeQuattro and Cromwell in Count One with conspiracy to violate § 666(a) in violation of 18 U.S.C. § 371. The indictment also charged DeQuattro in Counts Four and Five with violating § 666(a)(2), and Cromwell in Counts Two and Three with violating § 666(a)(1)(b). The § 666 counts pertained to Cromwell allegedly either soliciting or accepting from DeQuattro various "things of value" -- including payment for overnight lodging in a Boston hotel, gym equipment for his residence, and checks totaling tens of thousands of

- 4 -

dollars -- in return for Cromwell protecting the contract between RGB and the Gaming Authority from being terminated.

The superseding indictment also charged Cromwell, based on his role in the same alleged scheme to protect the RGB contract, with Hobbs Act-related offenses.  Specifically, the superseding indictment charged him with four counts of Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Counts Seven, Eight, Nine, and Ten), and one count of conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951 (Count Six).[1]

The jury acquitted DeQuattro and Cromwell of Count One's § 666-based conspiracy charges.  The jury also acquitted DeQuattro of the substantive § 666 charges in Count Four, all but a portion of the substantive § 666 charges in Count Five, and Cromwell of the Hobbs Act charges in Count Nine.  The jury found DeQuattro guilty of one portion of the substantive § 666 charges in Count Five, and Cromwell guilty of the substantive § 666 charges in Counts Two and Three, one count of conspiracy to commit Hobbs Act extortion (Count Six), and three counts of Hobbs Act extortion (Counts Seven, Eight, and Ten).

Following the verdict, DeQuattro and Cromwell each moved for judgment of acquittal under Federal Rule of Criminal Procedure

---

[1] The superseding indictment also charged Cromwell with filing false tax returns in violation of 26 U.S.C. § 7206(1).  Those counts were severed and a trial on them has been stayed pending the resolution of this appeal.

29(a), after having earlier moved for judgment of acquittal at both the close of all the evidence and the close of the government's case. DeQuattro and Cromwell based their respective Rule 29 motions concerning the § 666 counts in part on the ground that the evidence did not suffice to show the intent to engage in a corrupt quid-pro-quo exchange about the RGB contract. DeQuattro and Cromwell also based their motions as to these charges on the ground that the evidence did not suffice to satisfy § 666's jurisdictional element. They did so by arguing that the RGB contract was "business" only of the Gaming Authority and that, unlike the Tribe, the Gaming Authority had not received the requisite federal benefits described in subsection (b). Finally, Cromwell argued in his motion for a judgment of acquittal as to the Hobbs Act-related charges that (1) "the evidence failed to establish that [he] was a <u>public</u> official"; and (2) there was "insufficient evidence of a corrupt quid pro quo."

At a consolidated hearing that concerned both the Rule 29 motions and sentencing, the District Court denied DeQuattro's motion for judgment of acquittal in full but granted Cromwell's motion in part. More specifically, the District Court denied Cromwell's motion with respect to his § 666 convictions but granted it on tribal immunity grounds as to the Hobbs Act convictions. The District Court then sentenced DeQuattro to a one-year probationary term with home confinement for his single § 666

conviction and Cromwell to 36 months' imprisonment for his multiple convictions under § 666.  The District Court also ordered DeQuattro and Cromwell to pay restitution in the amount of $140,707.79 and $209,678.54, respectively.  Their appeals, and the government's cross-appeal, followed and were then consolidated.

## II.

DeQuattro and Cromwell base their challenge to their § 666 convictions on the same two, distinct insufficiency-of-the-evidence grounds that they advanced below. We focus here solely on the ground that they contend concerns § 666's jurisdictional element, as we conclude, based on this ground alone, that their § 666 convictions must be reversed. United States v. Green, 797 F.2d 855, 856 n.1 (10th Cir. 1986).

## A.

In ruling that the evidence sufficed to satisfy the jurisdictional element, the District Court reasoned as follows: "Congress intended [§ 666] to extend to affiliates of the tribes themselves, and [the Gaming Authority] was clearly that kind of affiliate."  Moreover, the District Court determined, the record sufficed to show that the Tribe had received the kind of federal-program assistance that subsection (b) describes.

The District Court did not explain what made the Gaming Authority "that kind of affiliate," however.  Nor did the District Court explain why the Gaming Authority being such an "affiliate"

sufficed to show that the allegedly corrupt conduct charged in the § 666 counts occurred "in connection with" the "business" of the Tribe rather than only the Gaming Authority. As a result, the District Court did not explain what exactly in the record sufficed to show that only the Tribe -- and not the Gaming Authority itself -- had to have received the financial assistance that subsection (b) describes for the jurisdictional element to be satisfied.

Because this sufficiency challenge is preserved, our review is de novo. See United States v. Millán-Machuca, 991 F.3d 7, 17 (1st Cir. 2021). In undertaking that review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Before diving into the merits of the challenge, we pause to clarify one point. DeQuattro and Cromwell frame the challenge as if it concerns § 666's jurisdictional element. We do not see why it does.

Wholly independent of the jurisdictional element set forth in subsection (b) of § 666, subsection (a)(1) and subsection (a)(2) of the measure set forth numerous substantive elements. One such element is that the "agent" of an entity that § 666

- 8 -

covers -- whether an "Indian tribal government" or an "agency" of such a government -- be engaged in the prohibited bribery "in connection with any business . . . <u>of</u> <u>such</u> organization, government, or agency." 18 U.S.C. § 666(a)(1) (emphasis added).

This substantive element ensures that the bribery is tied to the entity that receives the federal-program assistance, while the jurisdictional element merely ensures that the entity that is tied to the corrupt conduct has received that assistance. Thus, the jurisdictional element comes into play only if that substantive element is satisfied.

Against this backdrop, it is significant that DeQuattro and Cromwell are contending, without dispute by the government, that the sole "agent" of a covered entity involved in the alleged bribery was Cromwell acting as Chairman of the Tribal Council in his role as "agent" of <u>the Tribe</u> (an "Indian tribal government") and not as President of the Gaming Authority in his role as "agent" of the Gaming Authority (a mere "agency" of that "government").[2] It is significant, too, that DeQuattro and Cromwell are then further contending, again without dispute by the government, that

_____

[2] Counts Two and Three of the superseding indictment charged Cromwell with "being an agent of an Indian tribal government, or any agency thereof, <u>namely, the Mashpee Wampanoag Tribe</u>, corruptly solicit[ing] . . . ." Similarly, Counts Four and Five charged Dequattro with corruptly giving, offering and agreeing to give "anything of value to any person, with intent to influence and reward an agent of an Indian tribal government, or any agency thereof, <u>namely, the Mashpee Wampanoag Tribe</u>" (emphasis added).

the only "business" that occurred "in connection with" the alleged corrupt conduct involving Cromwell as the Tribe's "agent" was the RGB contract.[3]  The result is that DeQuattro and Cromwell are necessarily contending that the evidence does not suffice to show that the allegedly corrupt conduct occurred "in connection with" the "business" of the entity of which the person involved in that conduct is an agent.  DeQuattro and Cromwell's challenge therefore necessarily targets this "business"-related substantive element described above rather than the jurisdictional element itself.

This feature of the challenge, we hasten to emphasize, does not do anything to undermine it.  The challenge still plainly has merit, just as DeQuattro and Cromwell contend it does, if the evidence does not suffice to show that the RGB contract was "business" of the Tribe.  In that event, as we have explained, the evidence then would fail to satisfy a necessary element of the offense, even though that element is substantive rather than jurisdictional.

---

[3] Consistent with the government's position on appeal that the "business" that the alleged corrupt conduct occurred "in connection with" was solely the RGB contract, the jury was instructed that the jurors had to find the contract "constituted business of the Mashpee Wampanoag Tribe" to find the defendants guilty of the charged § 666 offenses. See United States v. Burhoe, 871 F.3d 1, 21 n.17 (1st Cir. 2017) (holding that an "alternative legal theory" that the government waived by not objecting to a jury instruction that foreclosed it was "not available to the government" as a ground for defending the verdict from a sufficiency challenge on appeal).

Although the government also appears to treat the
challenge as if it concerns the jurisdictional element, it
recognizes that, in substance, the challenge turns on whether the
evidence suffices to show that the RGB contract is "business" of
the Tribe.  Indeed, the government makes no argument that the
convictions can stand if the evidence does not so suffice.  We
therefore proceed to assess whether the evidence suffices to show
that the RGB contract is "business" of the Tribe, first by laying
out DeQuattro and Cromwell's case that the evidence does not do
so, then by reviewing the evidence that the government identifies
in arguing that the evidence does, and, finally, by explaining why
we agree with DeQuattro and Cromwell rather than the government.

**B.**

DeQuattro and Cromwell emphasize that the RGB contract
provides no basis in and of itself for finding that the contract
was "business" of the Tribe.  They point out, as the record makes
evident, that the contract was between RGB and the Gaming
Authority, not RGB and the Tribe itself.  They further contend
that nothing in the record indicates that, even though the Tribe
was not a party to the RGB contract, the relationship between the
two entities makes the contract the Tribe's "business."

DeQuattro and Cromwell point out that the record makes
clear that the Gaming Authority is a "legally separate" entity
from the Tribe.  They also point out that, under § 666, the Gaming

Authority is (unlike the Tribe itself, which is an "Indian tribal government") an "agency" of that government. As such, it is a separately enumerated and defined category of entity under § 666. 18 U.S.C. § 666(a)(1), (d)(2).

DeQuattro and Cromwell do not focus solely, however, on the formal distinction between the two entities and thus on the fact that the Gaming Authority, as an incorporated entity, has both a separate legal personality and an independent statutory status from the Tribe. They also point to the fact that the record establishes that a third-party entity -- and so not the Tribe -- provided all the funding for the Gaming Authority save for, at most, an unspecified amount of in-kind support that the Tribe provided to the Gaming Authority.[4] Additionally, they emphasize that the Tribe created the Gaming Authority to ensure that the Tribe would not be liable for the Gaming Authority's gambling-related activities. They note, too, that the record establishes that the RGB contract itself was structured to ensure

---

[4] In opposing DeQuattro's and Cromwell's motions for judgment of acquittal, the government did submit bank records showing a single transfer of funds from the Tribe to the Gaming Authority. However, the government did not seek at any time to admit these records into evidence, nor does the government rely on this evidence on appeal. Indeed, the government in its briefs to us only seeks to dispute DeQuattro's and Cromwell's description of the Gaming Authority as being funded entirely by a third-party entity by pointing to some evidence in the record of in-kind funding by the Tribe.

that it would not give rise to any such liability on the part of the Tribe.

For these reasons, DeQuattro and Cromwell contend that the record does not suffice to show that any of the Tribe's funds -- and thus any of the Tribe's federal-program funds -- would be put at risk by the Gaming Authority's RGB contract.  They thus contend that it would conflict with the congressional purpose to "protect the integrity of the vast sums of money distributed through Federal programs from . . . undue influence by bribery," Sabri v. United States, 541 U.S. 600, 606 (2004) (quoting S. Rep. No. 98-225, at 370 (1983)), to conclude that the evidence suffices to show that the RGB contract is the Tribe's "business."  Such a conclusion, DeQuattro and Cromwell contend, would mean that the allegedly corrupt conduct would violate § 666 even though "the entity that alone had a business transaction that could have been impacted by an illegal bribe" -- the Gaming Authority -- "received no federal program benefit," and the "entity that alone received federal benefits" -- the Tribe -- "had no business transaction with [DeQuattro or Cromwell] at all that related to the alleged payment of a thing of value to Cromwell."

DeQuattro and Cromwell do not rely, however, only on what they call the "legal independence" of the Gaming Authority in advancing this sufficiency challenge.  They also argue that the challenge draws support from the other ways in which the record

establishes that the Gaming Authority operated independently from the Tribe.

Here, DeQuattro and Cromwell direct our attention to the evidence that establishes that the Gaming Authority "exercised a number of independent powers and a strong measure of independence with respect to its financial affairs, including ownership of 'all Gaming Enterprise Assets other than any interest in real property,' as well as the 'full power of acquisition, disposition or encumbrance' of such assets." They then also direct our attention to the evidence that establishes that (1) the Gaming Authority "had the explicit power 'to hire, fire, discipline or appoint employees, contractors, consultants, attorneys and accountants or other agents of the Authority, prescribe their duties and compensation, and indemnify the same,'" and (2) the ordinance creating the Gaming Authority granted it "'the <u>exclusive power</u> to do <u>any and all things</u> necessary or desirable in connection with the development, design, financing, construction, equipping, leasing, operation, management . . . , maintenance, and promotion of the Gaming Facilities and the operation or conduct of the Gaming Enterprise'" (emphasis in original).

Finally, DeQuattro and Cromwell contend that their position draws support from two Eleventh Circuit rulings, <u>United States</u> v. <u>McLean</u>, 802 F.3d 1228 (11th Cir. 2015) and <u>United States</u> v. <u>Doran</u>, 854 F.3d 1312 (11th Cir. 2017). In finding the evidence

insufficient to satisfy the jurisdictional element of § 666 in each of those cases, the defendants here argue, the Eleventh Circuit treated an entity that had not itself received the requisite federal-program assistance as being independent of the entity that created it, even though the subordinate entity in each instance had even more ties to its creator than the Gaming Authority has to the Tribe.

### C.

In responding to this sufficiency challenge, the government acknowledges that the Tribe was not a party to the RGB contract. The government nonetheless contends that the record suffices to show that the Gaming Authority and the Tribe were intertwined to an extent that permits a rational juror to find beyond a reasonable doubt that the contract between RGB and the Gaming Authority "constituted any 'business' of the Tribe."

The government relies in part on the evidence in the record that shows that "the Tribe in 2004 adopted a constitution that enumerates the Tribal Council's powers, including the powers to 'establish procedures and ordinances for the conduct of all tribal government business operations' and 'create or provide by ordinance for the creation of organizations . . . for any lawful purpose'" (alteration in original). The government also relies on the evidence in the record that shows that "[i]n 2012, under Cromwell's leadership, the Council invoked those powers to

establish by ordinance the Gaming Authority as a 'wholly owned' subsidiary of the Tribe to 'act as an arm and an instrumentality of the Tribe.'"

The government further asserts that the evidence suffices to show that the "Tribe is the Authority's 'sole member and owner' in perpetuity, the Authority possesses only those powers devolved to it from the Council, and should the Council ever dissolve the Authority, its assets revert to the Tribe." The government goes on to highlight two additional features of the record: (1) the tribal ordinance that creates the Gaming Authority "invests the Authority with the Tribe's sovereign immunity but states that any waiver of immunity by the Authority is not a waiver by the Tribe"; and (2) under that ordinance the "Authority operates through a board, the membership of which the Council controls: the Chairman of the Tribe is automatically the President of the board; the Treasurer of the Tribe is automatically the Treasurer;" and "the Council may appoint up to three additional members to the board, one of whom must be another Council member."

These aspects of the record do suffice to show that the two entities share significant ties. We are not persuaded, though, that the ties suffice to show that the RGB contract is "business" of the Tribe rather than only of the Gaming Authority itself.

**1.**

Notably, the government is not arguing that the RGB contract is the Tribe's "business" just because the Gaming Authority, as a tribal "agency" for purposes of § 666, is a creature of the Tribe, in the sense that the Tribe created it and can terminate it.  The government's choice not to advance such an argument is understandable.

Section 666 defines an "agency" as "a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and <u>a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program</u>."  18 U.S.C. § 666(d)(2) (emphasis added).  The text of § 666 thus makes plain that an "Indian tribal government" and an "agency thereof" are distinct entities -- notwithstanding that the former in some respects controls the latter -- for purposes of assessing whether the required amount of federal-program funding had been received by the entity whose "business" "involv[ed]" the relevant "thing of value."  <u>Id.</u> § 666(a)(1), (a)(1)(B), (a)(2); <u>see</u> <u>Bailey</u> v. <u>United States</u>, 516 U.S. 137, 146 (1995) ("We assume that Congress used [different] terms because it intended each term to have a particular, nonsuperfluous meaning."); <u>see also</u> <u>Hernández-Miranda</u> v. <u>Empresas</u>

Díaz Massó, Inc., 651 F.3d 167, 170 (1st Cir. 2011) ("Questions of statutory interpretation are questions of law."); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847-48 (D.C. Cir. 2000) (noting, in the context of the Foreign Sovereign Immunities Act of 1976, that a government instrumentality "is presumed to have legal status separate from that of the sovereign" that created it and therefore, absent certain exceptions, the sovereign is "not amenable to suit based upon the acts of such an instrumentality").  As a result, the text of § 666 makes clear that we cannot simply assume that the two entities are one and the same, such that the "business" of one is necessarily the "business" of the other.

That said, the government is right that, "[a]s a matter of logic, a parent entity could choose to conduct some piece of 'business' through a subsidiary while still considering it the parent's 'business' -- i.e., something can be both the subsidiary's 'business' and the parent's 'business'" (emphasis in original). For example, both entities may be signatories to a single contract with a third party.  There also are circumstances in the corporate context in which the conduct -- or, if you will, the "business" -- of one corporate entity may be attributed to another. See, e.g., Liberty Mut. Ins. Co. v. Enjay Chem. Co., 316 A.2d 219, 222-23 (Del. Super. Ct. 1974) (principal-agent); Wallace ex rel.

Cencom Cable Income Partners II, Inc. v. Wood, 752 A.2d 1175, 1184
(Del. Ch. 1999) (alter ego).

        As we noted above, however, the government does not
suggest -- nor could it -- that the Tribe was a party to the RGB
contract.  In addition, the government asks us not to look to
commercial-law concepts to decide whether the RGB contract is
"business" of the Tribe under § 666.  Nor does the government
suggest that the RGB contract would in any way make the Tribe
liable for any of the Gaming Authority's contract-related
activities.  Thus, although there are legal tests for attributing
a subsidiary's commercial conduct to its corporate parent for
purposes of assigning liability, the government does not suggest
that the application of any of those tests is relevant here.  Cf.
Transamerica Leasing, Inc., 200 F.3d at 847-48 (noting that the
presumption of corporate separateness under the Foreign Sovereign
Immunities Act of 1976 can be overcome "where a corporate entity
is so extensively controlled by its owner that a relationship of
principal and agent is created" or "where recognition of the
instrumentality as an entity apart from the state 'would work fraud
or injustice'" (quoting First Nat'l City Bank v. Banco Para El
Comercio Exterior de Cuba, 462 U.S. 611, 629 (1983))).[5]

---

        [5] We note that although in the context of the Foreign Sovereign
Immunities Act of 1976 a government instrumentality that has a
separate legal status from that of the sovereign that created it

What, then, is the basis for the government's position that, due to the ties between the Gaming Authority and the Tribe described above, a rational juror could find beyond a reasonable doubt on this record that the RGB contract is the Tribe's "business"? According to the government, the case is, at least in part, that the evidence suffices to show that the Gaming Authority is an "arm" of the Tribe, in the sense that the term "arm" is used to describe an agency or instrumentality of a sovereign entitled to claim the sovereign's immunity from suit. And, indeed, the government invokes one of our "arm of the Tribe" cases as support for the contention: <u>Ninigret Dev. Corp.</u> v. <u>Narragansett Indian Wetuomuck Hous. Auth.</u>, 207 F.3d 21 (1st Cir. 2000). As we will next explain, however, we are not persuaded, because we do not see how the mere fact that the Gaming Authority qualifies as an "arm"

---

is treated as the sovereign "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," <u>Transamerica Leasing</u>, 200 F.3d at 848 (quoting <u>Banco</u>, 462 U.S. at 629), the text of § 666 specifically defines a "government agency" as an entity "established, and <u>subject to control</u>, by a government or governments for the execution of a governmental or intergovernmental program," <u>id.</u> § 666(d)(2) (emphasis added). So, there is a question regarding whether the analysis used in the context of the Foreign Sovereign Immunities Act of 1976 for evaluating how separate sovereigns are from their agencies and instrumentalities is applicable here.

of the Tribe could make its contract with RGB the Tribe's "business" for purposes of § 666.

**2.**

For starters, we see no reason in principle why a test that is designed to determine when an agency or instrumentality of a Tribe may claim that sovereign's immunity from suit would be a good test for determining when a contract is sufficiently tied to an entity that received federal-program funds to make the bribery a federal crime under § 666. Certainly nothing in the text of § 666 indicates that the ability of such an entity to claim its sovereign's immunity from suit bears on whether the bribery was "in connection with" the "business" of only that entity and not of the sovereign itself. Moreover, the components of the "arm" test -- insofar as they are even clear in the context of a tribe -- do not easily map on to the concerns that animate the requirement in § 666 that the allegedly corrupt conduct must have occurred "in connection with" the "business" of the same entity whose "agent" was involved in that conduct. Rather, they would appear to concern -- at least in key respects -- matters that relate only to the reasons for conferring the immunity from suit itself.

Ninigret itself does nothing to suggest otherwise. In holding that a tribal housing authority was an "arm of the Tribe," Ninigret simply cited to two Eighth Circuit cases that had held

the same based on the fact that the subordinate entities in those cases had been created by tribal ordinance and as such were "tribal agenc[ies]."  207 F.3d at 29 (first citing Dillon v. Yankton Sioux Tribe Hous. Auth., 144 F.3d 581, 583-84 (8th Cir. 1998); and then citing Weeks Constr., Inc. v. Oglala Sioux Hous. Auth., 797 F.2d 668, 670-71 (8th Cir. 1986)).  But, of course, no argument is being made here -- for good reason, as we have explained -- that the contracts of all agencies are "business" of the government that created them just because the agencies were created by those governments.

It is possible that the government here means to be invoking the "arm of the Tribe" test more generally.  There is authority (though not within our circuit) that has assessed whether an entity is an "arm of the Tribe" -- and so entitled to the Tribe's immunity from suit -- with reference to a more developed set of considerations than merely whether it was created by Tribal ordinance.  See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1185 n.9, 1187-88 (10th Cir. 2010). Those considerations largely overlap with our two-step "arm" test for determining a state agency's or instrumentality's entitlement to claim a state's sovereign immunity, which we have explicated in some detail.  Compare Breakthrough, 629 F.3d at 1187-88, with Grajales v. P.R. Ports Auth., 831 F.3d 11, 17-18 (1st Cir. 2016). But, even if we were to use those factors as our guide here, we

still do not see how the fact that the Gaming Authority might qualify as an "arm" of the Tribe would suffice to show that the Gaming Authority's RGB contract is "business" of the Tribe.

Consider the first step of our multi-step "arm of the state" test. Under it, the agency or instrumentality qualifies as an "arm" of the state if the state "clearly structured the entity to share its sovereignty." Grajales, 831 F.3d at 18 (quoting Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 68 (1st Cir. 2003)). To make the assessment, courts then look to a "broad range of structural indicators," including "how state law characterizes the entity, the nature of the functions performed by the entity, the entity's overall fiscal relationship to the [state] . . . , and how much control the state exercises over the operations of the entity." Id. at 17-18.

But, insofar as an entity is deemed to be an "arm" based only on certain of these factors (such as whether the state has characterized the entity as an "arm" or the degree of control that the state exercises over the entity), we do not see why the entity's status as an "arm" would suffice to show that a contract that entity had entered is the state's "business" under § 666. The characterization and control factors would seem to provide a basis for concluding that any typical state agency would be an "arm" of its state. Yet, as we have explained, the government

- 23 -

does not endorse -- and, in fact, at oral argument
disclaimed -- the notion that any contract that a state agency
enters is "business" of the state for purposes of § 666.

Thus, we do not see why it matters in determining whether
the RGB contract is "business" of the Tribe that the record here
shows that the Tribe's ordinance establishing the Gaming Authority
"invests the Authority with the Tribe's sovereign immunity" and
refers to the Gaming Authority as a "'wholly owned' subsidiary of
the Tribe to 'act as an arm and an instrumentality of the Tribe.'"
A typical state agency itself enjoys a state's immunity, may easily
be described as a "wholly owned subsidiary" of its state, and is
an "arm" of the state.  So, we do not see how any of those factors
distinguish the Gaming Authority from such an agency.

True, the record shows that the Tribe's constitution
empowers the Tribal Council to "'create or provide by ordinance
for the creation of organizations . . . for any lawful purpose'"
(alteration in original).  But, because a contract entered by a
lawfully created state agency does not for that reason alone
qualify as "business" of the state, that general grant of authority
similarly provides no support for deeming the RGB contract that
the Gaming Authority -- rather than the Tribe -- entered the
"business" of the Tribe.

The government does point out, as noted above, that the
record shows that the Tribe's constitution gave the Tribal Council

the authority to "establish procedures and ordinances for the conduct of all tribal government business operations." But it is not evident that the Gaming Authority was created pursuant to that grant of power rather than the grant of power to "'create or provide by ordinance for the creation of organizations . . . for any lawful purpose'" (alteration in original). And, in any event, the Tribe's labeling of the Gaming Authority's operations as "tribal government business operations" cannot be dispositive of whether the contract is "business" of the Tribe under § 666 if, as the government itself rightly contends, what matters under § 666 is substance rather than form. Cf. Dixson v. United States, 465 U.S. 482, 494 (1984) ("Federal courts interpreting the federal bribery laws . . . generally avoided formal distinctions, such as the requirement of a direct contractual bond, that would artificially narrow the scope of federal criminal jurisdiction.").

Finally, the fact that the "[Gaming] Authority operates through a board, the membership of which the [Tribal] Council controls" does not lead to the inference that the RGB contract was "business" of the Tribe. That degree of control no doubt bears on whether the Gaming Authority is an "arm" of the Tribe for immunity purposes. Such control cannot be of similar import for present purposes precisely because states typically control who leads state agencies, however. For good reason, as we have noted, the

government disavows the view that any contract by a state agency is "business" of the state.

Of course, under the first step of the "arm" test, factors may matter other than how the sovereign characterizes the agency or instrumentality or how much control the sovereign exercises over it. As noted above, another factor is the agency or instrumentality's "overall fiscal relationship" to the sovereign. Grajales, 831 F.3d at 18.

The government does argue that the Gaming Authority and the Tribe are financially related to the extent that "should the Council ever dissolve the Authority, its assets revert to the Tribe." But, again, the government fails to explain why this fact has any bearing on whether the RGB contract is "business" of the Tribe, at least when a state similarly presumably recoups the "assets" of all its agencies upon their dissolution.

What is more, other factors under the first step of the "arm" test seem to cut against finding the Gaming Authority to be an "arm" of the Tribe. The test's first step also takes account of the entity's "proprietary" function, "separate[] incorporat[ion]," and "power to . . . enter contracts in its own name and right." Fresenius, 322 F.3d at 62 n.6. But an agency or instrumentality of a state that is proprietary, separately incorporated, and can enter contracts on its own is less rather than more likely to qualify as an "arm." And the record shows

here that the Gaming Authority was created by the Tribal Council to have a proprietary function, to be separately incorporated, and to have the power to enter its own contracts.

There is, we recognize, also a second step of the "arm" test. It may be met if there is a "risk that the damages" owed by the agency or instrumentality of a sovereign in a suit against it "will be paid from the [sovereign's] treasury." Id. at 68.

The government makes no argument, however, that the Gaming Authority would qualify as an "arm" of the Tribe via this step. Nor is it evident (in light of the Gaming Authority's fiscal structure and the terms of the RGB contract) that the RGB contract could give rise to a liability that the Tribe would owe. So, here, too, the invocation of the "arm" test fails to show that the evidence suffices to permit a rational juror to find beyond a reasonable doubt that -- even though the Tribe is not a party to the RGB contract and is not at risk of being liable from it -- the RGB contract is "business" of the Tribe.[6]

---

[6] We do note that our analysis, which has focused on our multi-step "arm of the state" test, has not addressed some factors other courts have found to be relevant in an "arm of the Tribe" analysis -- such as the "preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians." Breakthrough, 629 F.3d at 1188 (quoting Dixon v. Picopa Constr. Co., 772 P.2d 1104, 1111 (Ariz. 1989)). But we do not see (nor does the government explain) why such considerations, which stem from "the policies underlying tribal sovereign immunity," id. at 1187, would have any bearing on whether "business" of the Gaming Authority is also "business" of the Tribe under § 666.

**3.**

The "arm" test aside, the government does also argue
that the evidence suffices to show the RGB contract is the Tribe's
"business" because we should look to substance over form in
construing § 666.   But, beyond the invocation of the "arm" test,
the government does not explain why consideration of the substance
of the RGB contract and the Gaming Authority's relationship to the
Tribe permits a finding that the contract is the Tribe's rather
than only the Gaming Authority's "business."

The evidence in the record shows, for example, that the
Gaming Authority receives almost all its funding from a third-
party entity and not the Tribe.   In addition, as far as the record
shows, the Gaming Authority entered the RGB contract pursuant to
the "exclusive" powers that it had been given by the Tribe, rather
than at the direction of the Tribe.

Consistent with its contention that substance rather
than form matters, the government does argue -- although it is a
little difficult to discern the contours of that argument -- that
§ 666's scope should not "include limitations based on the terms
of a private contract like the RGB contract."   Relatedly, the
government states that "otherwise, wrongdoers could avoid
punishment simply by contracting around the definitions provided
in criminal statutes" (cleaned up). As support for the contention,
the government cites United States v. Lupton, 620 F.3d 790, 800-

01 (7th Cir. 2010), which held that the contract that stated that
the defendant there was acting as "an independent contractor and
not as an officer, employee, or agent of the state" was not
dispositive of whether he was an "agent" of the state government
under § 666.

       We are not deferring, however, to the RGB contract's
formal characterization of the relationship between the Tribe, the
Gaming Authority, and the construction work contemplated by the
RGB contract.  Rather, in determining that the record does not
suffice to allow the jury to find, beyond a reasonable doubt, that
the RGB contract was the "business" of the Tribe, we are doing
exactly as the government suggests: looking to the substance of
the RGB contract.

       That look reveals that, on this record, there is no
plausible basis for concluding that the Tribe would be liable for
the Gaming Authority's activities in relation to the contract or
that the Gaming Authority received any funds from the Tribe.  After
all, the record at most shows that the Gaming Authority receives
some unspecified in-kind support from the Tribe.  That makes it
hard to see how -- in substance -- the RGB contract implicates any
of the Tribe's funds.  And, that being so, it is hard to see how,
in substance, the RGB contract is "business" of the Tribe itself.

       To be sure, the government does argue that the fact that,
as the defendants assert, the alleged bribery here could not

"conceivably have impacted even a single federal dollar" is irrelevant. The government rightly points out that § 666 does not require the government to prove any "connection between the offense conduct and a case-specific federal interest." United States v. Cianci, 378 F.3d 71, 97 (1st Cir. 2004). But, as we have explained, § 666 does require proof that the allegedly corrupt soliciting of a thing of value by an "agent" of an entity that § 666 covers -- or corrupt giving of a thing of value to such an agent -- must have occurred "in connection with" the "business" of that same entity. And, as we have also explained, § 666 imposes this requirement to ensure that, via subsection (b)'s federal-program assistance requirement, there is a link between the bribery that § 666 prohibits and that federal assistance. Indeed, although the U.S. Department of Justice's Criminal Resource Manual is not binding on us, the defendants note that it states that the intent of Congress in enacting the measure was to require "that the agent must have illegally obtained cash or property from the [organization, government, or] agency that received the necessary Federal assistance." U.S. Dep't of Just., Crim. Res. Manual § 1001 (emphasis added).

Thus, it is concerning that the only "business" of a covered entity that the government identifies here "in connection with" the alleged bribery is the RGB contract. That agreement was struck by an entity that itself received no federal benefits or

even any funding from the Tribe (save for in-kind financial support).  It is also an agreement for which the sole entity that did receive such assistance bears no liability.  The consequence is that the things of value allegedly corruptly solicited by or given to Cromwell in his role as an "agent" of the Tribe -- whether the checks, the overnight lodging, or the gym equipment -- do not appear to have come in any sense (even indirectly) from the Tribe rather than the Gaming Authority itself.  Yet, the government is not contending that Cromwell was acting in his role as the "agent" of the Gaming Authority in engaging in the corrupt conduct with the "business" at issue.  Rather, it is contending that he was acting in his role as the "agent" of the Tribe.

**4.**

Insofar as the government means to suggest that there is analogous precedent that supports its position in this case, we also are not persuaded.  For example, the government invokes an unpublished Ninth Circuit opinion -- <u>United States</u> v. <u>Heslop</u>, 694 F. App'x 485, 487 (9th Cir. 2017).  That case held the jurisdictional element of § 666 satisfied in the case of the defendant, David Heslop, despite Heslop's argument that the stipulated facts did not show that "the business, transactions, or

series of transactions at issue were those of the Indian tribal government." Id. (cleaned up).

The Ninth Circuit did reject Heslop's argument by looking to the "clear substance of the facts" and noting that the "Tribe consists of roughly a dozen members, and all the tribal entities are interconnected in both theory and practice." Id. However, the defendant there "pled guilty to stipulated facts that refer either to the Tribe alone, or to both the Tribe and its corporate entities together." Id. (emphasis added). Because there were no guilty pleas involved here, there is no equivalent evidentiary record like the "stipulated facts," id., deemed dispositive in that case.

We note, too, that our analysis accords with the Eleventh Circuit's in Doran, even though that case did not involve a conviction for federal program bribery under § 666(a)(2) and instead concerned a conviction for embezzlement under § 666(a)(1). See 854 F.3d at 1313. The defendant there was convicted of embezzling from an "organization" that had received the requisite amount of federal program funds in the relevant period -- namely, Florida State University ("FSU"). Id. The defendant argued that he was entitled to a judgment of acquittal because the evidence sufficed to show at most that the funds had been embezzled from the FSU Student Investment Fund ("SIF"), which was a nonprofit corporation that FSU had established for charitable and

educational purposes and had itself "received no federal benefits." Id. at 1314.

The Eleventh Circuit agreed with Doran. Id. at 1315-16. Relying on McLean, the court determined that the relevant "organization" for purposes of the jurisdictional provision, § 666(b), was the SIF and not FSU itself. That was so, Doran ruled, because the SIF "was the organization that was the subject of the embezzlement" and because "[t]he Government [was] mistaken in focusing on FSU as the victimized organization and in conflating FSU and the SIF." Id. at 1315. The Eleventh Circuit then went on to explain that "[d]espite the affiliation of FSU and the SIF, there [was] simply no evidence in the record that FSU and the SIF are alter egos so as to allow the Court to pierce the SIF's corporate veil and to treat FSU and the SIF as one and the same." Id.

In so ruling, Doran noted that the SIF had characteristics that suggested it was not wholly independent from FSU. For example, the SIF's Board of Directors included the Chair of the FSU Board of Trustees, the FSU President, and other FSU faculty members. But Doran stressed that the SIF's funds "came from private donors and not from FSU," the SIF "funneled no money to FSU, and FSU funneled no money to it," and the government there conceded the point that "the SIF was not the recipient of any federal funds." Id. at 1314. Given these facts, Doran explained,

the "Government ha[d] not demonstrated any federal interest" in Doran's alleged wrongdoing.  Id. at 1316.

The government does argue that Doran's reliance on the Eleventh Circuit's earlier decision in McLean undermines Doran as persuasive authority here.  The government contends that, in fact, McLean "never considered whether the parent entity's receipt of federal benefits, rather than the subsidiary . . . agency's receipt of federal benefits, could trigger § 666 jurisdiction because that issue was not appealed."

But Doran held that absent "evidence in the record that FSU and the SIF are alter egos so as to allow the Court to pierce the SIF's corporate veil and to treat FSU and the SIF as one and the same," SIF should be treated as distinct from FSU -- the entity that created it -- for purposes of § 666.  Id. at 1315.  We reach a similar conclusion in rejecting the government's arguments that the evidence of the ties between the Gaming Authority and the Tribe suffices to permit a finding that the RGB contract is the "business" of the Tribe.

The government's other attempts to distinguish Doran are also unavailing.  The government is right that the charge there was for § 666 embezzlement and not § 666 bribery.  The government is also right that the non-profit corporation created by the university was "neither a subsidiary nor the university's arm and instrumentality" (cleaned up).  But § 666 embezzlement must still

meet the jurisdictional element of § 666,[7] and, for the reasons we have discussed above, we are unpersuaded by the government's "arm" of the Tribe contention.

### D.

For all these reasons, we conclude that the § 666 convictions must be reversed.[8]

### III.

We move on to the government's cross-appeal, in which the government argues that the District Court erred in granting Cromwell's motion for judgment of acquittal on his Hobbs Act convictions. Once again, our review is de novo, <u>see</u>

---

[7] The concurrence in <u>Doran</u> does disagree with part of the reasoning in the majority's opinion, stating that the "relevant organization here is [FSU], the organization that employed Doran, not the [SIF], the student organization he advised that was the victim of his embezzlement." 854 F.3d at 1316 (Jill Pryor, J., concurring in the judgment). As such, the concurrence concludes, "the government needed to prove beyond a reasonable doubt that FSU -- not the SIF -- received over $10,000 in qualifying federal benefits during the relevant period." <u>Id.</u> However, the concurrence relies for this conclusion on text within § 666 that is specific to embezzlement -- specifically, that the embezzlement must have been of property that "is owned by, <u>or is under the care, custody, or control</u> of such organization, government, or agency" -- that does not apply to the federal-program bribery subsections. 18 U.S.C. § 666(a)(1)(A)(ii) (emphasis added); <u>see</u> <u>Doran</u>, 854 F.3d at 1320-21 (Pryor, J., concurring in the judgment).

[8] Because we conclude that DeQuattro's and Cromwell's federal-program bribery convictions must be reversed, we also need not address the government's cross-appeal of DeQuattro's and Cromwell's sentences on these convictions. <u>See</u> <u>United States</u> v. <u>Arrieta</u>, 224 F.3d 1076, 1083 n.4 (9th Cir. 2000) ("Because we are reversing the conviction[s], we need not reach the remaining sentencing issues raised by the parties.").

Millán-Machuca, 991 F.3d at 17, and "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Woodward, 149 F.3d at 56 (quoting Jackson, 443 U.S. at 319) (emphasis in original).

### A.

Cromwell's sole conviction for conspiracy to commit Hobbs Act extortion is set forth in Count Six. That Count charged him with having committed that offense "by obtaining property not due to [him], from [RGB], with the consent of DEQUATTRO . . . under color of official right." His three convictions for substantive Hobbs Act extortion are set forth in Counts Seven, Eight, and Ten. Those counts charged him with committing those offenses "by obtaining property not due to [him], from [RGB], with the consent of DEQUATTRO . . . under color of official right," and are predicated, respectively, on a "$10,000 payment on or about 11/13/15," a "Bowflex Revolution home gym valued at $1,700 on or about 8/5/16," and a "$1,849.37 payment on or about 5/18/17 for a stay at the Seaport Boston Hotel."

Although the jury found Cromwell guilty on all these counts, the District Court granted his motion for judgment of acquittal as to each count on grounds of tribal sovereign immunity, owing to his role as Chairman of the Council. The District Court

explained that the Hobbs Act does not apply to tribal officials absent a clear statement in the statute abrogating tribal sovereign immunity.

As the government notes, however, we and other circuits have long "recognized the United States as a superior sovereign from whose suits the tribes enjoy no sovereign immunity." In re Grand Jury Proceedings, 744 F.3d 211, 219 (1st Cir. 2014) (collecting cases). Thus, the government is plainly right that the District Court erred in granting Cromwell's motion for judgment of acquittal as to these counts, because there is no tribal immunity here that Congress needed to abrogate clearly.

In fact, Cromwell does not contend otherwise. He argues only that we may affirm the District Court's granting of that motion on either of two alternative bases.[9] See United States v. Arias-Santana, 964 F.2d 1262, 1264 (1st Cir. 1992) (noting that we "may affirm a district court decision on any ground supported by the record"). We address each of those arguments in turn.

**B.**

We begin with Cromwell's argument that we must affirm the District Court's granting of his motion for judgment of

---

[9] We do not understand Cromwell to have incorporated into his arguments defending the judgment of acquittal on the Hobbs Act charges either of the arguments that DeQuattro advanced as to the appeal of the § 666 convictions regarding the exclusion of a defense expert witness or the preclusion of the jury from reaching a verdict prior to receiving written instructions.

acquittal as to the Hobbs Act counts because, "in the absence of clear evidence of legislative intent to designate Native American leaders like Cromwell 'public officials' for purposes of the 'under color of official right' prong of Hobbs Act extortion, the rule of lenity precludes conviction of Mr. Cromwell on that distinct theory of liability" (cleaned up).  We disagree.

The rule of lenity only "properly comes into play when, at the end of a thorough inquiry, the meaning of a criminal statute remains obscure."  United States v. O'Neil, 11 F.3d 292, 301 n.10 (1st Cir. 1993).  In other words, "the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended."  Ladner v. United States, 358 U.S. 169, 178 (1958).

The Hobbs Act broadly applies, however, to "[w]hoever in any way or degree obstructs, delays, or affects commerce . . . by . . . extortion . . . under color of official right."  18 U.S.C. § 1951 (emphasis added).  And the Supreme Court has construed extortion "under color of official right," id. § 1951(b)(2), to be an "offense committed by a public official," Evans v. United States, 504 U.S. 255, 260, 261-64 (1992) (emphasis added).  It therefore follows that the Hobbs Act prohibition at issue applies to any public official.

That being so, the only question that we must resolve is whether there is a lenity-triggering ambiguity as to whether Cromwell -- having been elected by tribal members to be Chairman of the Council and therefore having been an official of that Tribe's government -- qualifies as a "public official" under the Hobbs Act.  Id.  We see no basis for concluding that there is.

Cromwell plainly holds a position within the Tribe's government.  Thus, unless there is some reason to doubt that an Indian tribal government is the kind of government whose officials the Hobbs Act covers, there is no basis for doubting that he is a "public official," id., and so is covered by that statute, see United States v. Percoco, 317 F. Supp. 3d 822, 832 (S.D.N.Y. 2018) ("[O]nly public officials -- that is, persons who hold official positions within the government -- are capable of committing the substantive offense of extortion under color of official right . . . ."); see also United States v. Alexander, 287 F.3d 811, 820 (9th Cir. 2002) (noting, in a different context, that "[t]he word 'official' refers to a person 'holding an office or serving in a public position'"); Durflinger v. Artiles, 727 F.2d 888, 909 (10th Cir. 1984) (noting that Black's Law Dictionary has defined "public official" as "the holder of a public office . . . [whose] position requires the exercise of some portion of the sovereign power, whether great or small" (citing Black's Law Dictionary (5th ed. 1979))).

As an initial matter, we see no ambiguity as to whether an Indian tribal government is a government.  See Fletcher v. United States, 116 F.3d 1315, 1326-27 (10th Cir. 1997) ("Indian tribes are separate sovereigns with the power to regulate their internal and social relations, including their form of government and tribal membership." (citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 62-63 (1978); and United States v. Wheeler, 435 U.S. 313, 322-23, 322 n.18 (1978))).  And, while it is true that the Hobbs Act does not expressly refer to Indian tribal governments or to the officials serving in them, the Hobbs Act also does not refer to any other type of government or government official.  See 18 U.S.C. § 1951.  Yet there is no reason to doubt that, in broadly referring to "[w]hoever" is acting "under color of official right," the Hobbs Act applies to state and local governments and their officials generally.  Id. § 1951(a), (b)(2) (emphasis added); see United States v. Boggi, 74 F.3d 470, 475 (3d Cir. 1996) ("[The Hobbs Act] applies to extortionate conduct by, among others, officials and employees of state and local governments." (quoting U.S.S.G. § 2C1.1 cmt. background)).  Indeed, as we have noted, the Supreme Court has construed that broad language to describe an encompassing class of persons that is comprised of "public officials" generally.  Evans, 504 U.S. at 260, 264.

This context also is not one in which there is special reason to think that Congress would have made express reference to

officials in Indian tribal governments if it had intended to bring them within the ambit of a statute otherwise encompassing government officials generally. As we explained above, officials in Indian tribal governments enjoy no tribal immunity from criminal prosecution by the United States itself. See Grand Jury Proceedings, 744 F.3d at 219-20. Furthermore, as the government points out, states themselves enjoy sovereign immunity, but not even Cromwell suggests that the Hobbs Act has no application to state officials just because it fails expressly to mention them or their governments.

In any event, the language that Congress chose to use to identify those government officials subject to the Hobbs Act "exudes comprehensiveness." Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin, 599 U.S. 382, 388 (2023). And that is because the measure refers to "[w]hoever" is engaged in the prohibited conduct while acting under "color of official right." 18 U.S.C. § 1951(a), (b)(2) (emphasis added). Language of a similarly sweeping sort -- and that also makes no express mention of Indian tribal governments -- recently has been deemed broad enough to "clearly" and "unequivocally" encompass those governments along with all others. Coughlin, 599 U.S. at 399. We thus do not see how here there is the kind of reason to doubt whether this statute encompasses such governments that would trigger the rule of lenity. United States v. Musso, 914 F.3d 26,

32 n.3 (1st Cir. 2019) (quoting Abramski v. United States, 573
U.S. 169, 188 n.10 (2014)).

## C.

Cromwell also argues in the alternative that we "may and
must affirm the judgments of acquittal below on the additional
basis of insufficient evidence to establish the quid-pro-quo
element of Hobbs Act extortion 'under color of official right'"
(cleaned up).  More specifically, Cromwell contends that "in order
to convict [him] on any [of] the Hobbs Act counts, the government
was required to prove his intent to effect a quid pro quo in
exchange for [his] performance of, or agreement to perform,
specific official acts to 'protect' RGB's casino contract from
termination."  He contends that none of the evidence in the record
suffices, however, to permit a rational juror to find beyond a
reasonable doubt that Cromwell had the required intent.  We are
again unpersuaded.

A "quid pro quo" is the giving of "something of
value" -- the quid -- in exchange "for influence over some official
conduct of the recipient" -- the quo.  United States v. Gracie,
731 F.3d 1, 3 (1st Cir. 2013).  As we have detailed previously:

> [T]he requirement of a quid pro quo means
> only[] "that without pretense of any
> entitlement to the payment, a public official
> violates § 1951 if he intends the payor to
> believe that absent payment the official is
> likely to abuse his office and his trust to
> the detriment and injury of the prospective

payor or to give the prospective payor less
favorable treatment if the quid pro quo is not
satisfied."

United States v. Correia, 55 F.4th 12, 35 (1st Cir. 2022) (quoting

Evans, 504 U.S. at 274 (Kennedy, J., concurring)).

Cromwell argues that none of the evidence is sufficient

to "prove his intent to effect a quid pro quo exchange for [his]

performance of, or agreement to perform, specific official acts to

'protect' RGB's casino contract from termination." But "tak[ing]

the facts and all reasonable inferences therefrom in the light

most favorable to the jury verdict," United States v. Sasso, 695

F.3d 25, 27 (1st Cir. 2012), and recognizing that "bribes are

seldom accompanied by written contracts, receipts or public

declarations of intentions," United States v. McDonough, 727 F.3d

143, 153 (1st Cir. 2013), we disagree.  See also Evans, 504 U.S.

at 274 (Kennedy, J., concurring) (stating that an official and

bribe-payer "need not state the quid pro quo in express terms, for

otherwise the law's effect could be frustrated by knowing winks

and nods"); United States v. Blagojevich, 794 F.3d 729, 738 (7th

Cir. 2015) ("Few politicians say, on or off the record, 'I will

exchange official act X for payment Y.'").

The government argues that the "quids in this case were

RGB's payments to Cromwell" (i.e., multiple monetary checks

ranging from $4,000 - $10,000, the Bowflex, and the Seaport Boston

Hotel stay), and "the quo in each instance was Cromwell's

protection of the RGB [c]ontract." That is, the government contends, Cromwell intended for DeQuattro to believe that he had to provide, through RGB, monetary checks and other things of value to Cromwell so that Cromwell would ensure that the RGB contract survived and that the no-cause termination provision of the contract would not be utilized to end the contract.

Cromwell does not dispute that RGB made the payments and the contract survived; that the Bowflex and Seaport Boston Hotel stay were for his personal use; or that the evidence sufficiently showed he used all the checks -- except for part of the check paid on January 12, 2017, for $4,000 -- solely on personal expenses. He contends only that the evidence is not sufficient to show that he intended DeQuattro to believe the payments were in exchange for his protection of the RGB contract (i.e., that the quid was for the quo). We disagree.

The record shows that Cromwell requested multiple specific things of value from RGB and DeQuattro and acted like he was entitled to them (e.g., giving DeQuattro instructions on how to get him the cash and calling him for updates when one of the checks was delayed). These facts undermine Cromwell's contention that the evidence is not sufficient to show he intended DeQuattro to understand that he was being asked to enter a quid-pro-quo arrangement.

The government correctly points out that "though people may solicit gifts or contributions, they generally do not demand them in specific amounts, and $50,000 over sixteen months is not a typical token of goodwill."  See United States v. Biaggi, 853 F.2d 89, 99-100 (2d Cir. 1988) (stating that the jury could infer from the size of the "gifts" worth "several thousands of dollars . . . each year" that they "were not intended simply as kindness-of-the-heart gifts" and that the official "was not requesting [them] without offering something more than his friendship in return").  Indeed, Cromwell's complaint to DeQuattro that the Bowflex was used rather than new further reinforces the conclusion that the checks and other things of value given were not -- as Cromwell contends -- gifts since, as the government notes, "adults generally do not complain to gift-givers about the quality of their voluntary gifts."

We recognize that Cromwell sometimes did offer noncriminal explanations to DeQuattro for the checks -- including that they were to be used as campaign contributions.  But the fact that Cromwell used most of the checks for personal expenses rather than for reasons that he gave DeQuattro could lead a reasonable juror to find that Cromwell's explanations were pretextual and intended to create plausible deniability should the payments be discovered.  Furthermore, because of the small size of the Tribe and the fact that most members already know each other, campaigning

for a Council seat typically costs from a few hundred dollars to a couple thousand dollars for an elaborate campaign, making it even more unlikely that Cromwell needed multiple $10,000 payments for a tribal election campaign. Thus, this evidence cuts against Cromwell's contention that he intended to request ordinary gifts, rather than quos.

Furthermore, the evidence in the record that Cromwell and RGB, both together and independently, took steps to conceal the monetary payments cuts against Cromwell's argument that he did not intend DeQuattro to believe that there was an impermissible quid pro quo. The evidence in the record shows that DeQuattro and Cromwell agreed to funnel the money through personal checks and shell companies; Cromwell had his close friend withdraw the funds for him in multiple treasurer's checks (mostly structured to be less than $10,000 each); and RGB reimbursed DeQuattro through "bonuses" and one-time salary increases that did not match the amounts DeQuattro had given Cromwell. In short, "the extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent." United States v. McNair, 605 F.3d 1152, 1197 (11th Cir. 2010). Indeed, that such steps were taken to conceal the monetary payments further undermines Cromwell's explanation that the payments were "borne of friendship between Cromwell and DeQuattro and/or the desire to promote RGB's interest in cultivat[ing] future business opportunities." And Cromwell

likewise provides no explanation as to why such steps to conceal the payments would be necessary if they were indeed "borne of friendship" or being paid "to promote RGB's interest in cultivat[ing] future business opportunities."

"[T]ak[ing] the facts and all reasonable inferences therefrom in the light most favorable to the jury verdict," Sasso, 695 F.3d at 27, we also disagree with Cromwell that none of the evidence proves "his intent to effect a quid pro quo in exchange for" his protection of the casino contract from termination. The evidence shows that Cromwell had influence over the fate of the RGB contract, and the contract not only provided a large portion of RGB's revenue but also had the potential to last for years. Moreover, the record shows that RGB had no guarantee of its continuation, regardless of its performance on the casino project, due to the no-cause termination provision of the contract. Indeed, the Gaming Authority board had used a similar provision to push out RGB's predecessor in the casino project, and Cromwell was the Gaming Authority board member who had "pushed" to bring in RGB to replace the predecessor that was pushed out, suggesting that he could try to persuade the Gaming Authority board to similarly "push out" RGB.

Also undercutting Cromwell's argument that he did not intend for the benefits to be given as part of a quid-pro-quo agreement to protect the RGB contract is the way Cromwell's

requests paralleled the life of the RGB contract.  Cf. Woodward,
149 F.3d at 53 (deeming "noteworthy" the "pattern formed by the[]
amounts" of the payments over time, which increased when the
official became chair of the relevant committee and ceased when he
resigned from office).  Even though DeQuattro and Cromwell were
"friends" before the contract, and RGB had previously worked with
the Tribe on a different project, Cromwell began making these
requests only after RGB started invoicing on the more valuable
casino contract.  While the project was proceeding apace, Cromwell
requested $10,000 every few months.  Then, a lawsuit was filed by
certain Taunton residents, and, after an initial adverse ruling,
the casino project slowed down.  Cromwell subsequently scaled back
his requests, leading to the requests for a Bowflex, a check worth
$4,000, and the Seaport Boston Hotel stay.  Only when it became
clear the adverse ruling would stand and the contract was no longer
valuable did the requests from Cromwell cease entirely.  So, taken
"in the light most flattering to the prosecution, together with
all reasonable inferences favorable" to the verdict, the evidence
was such that a rational jury could have inferred Cromwell's
"intent to effect a quid pro quo" for his Hobbs Act convictions.
United States v. Olbres, 61 F.3d 967, 970, 974 (1st Cir. 1995).

**IV.**

DeQuattro's and Cromwell's convictions for federal-
program bribery in violation of 18 U.S.C. § 666 are **reversed**.  The

- 48 -

District Court's grant of Cromwell's motion for judgment of acquittal on his Hobbs Act convictions is **reversed**, and the case is **remanded** for further proceedings consistent with this opinion.